# EXHIBIT "A"

```
               UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

----------------------x
FEDERAL INSURANCE       : CIVIL ACTION
COMPANY a/s/o           :
EZIBA.COM./AVACET,      : NO. 04-339
INC., EZIBA SECURITIES  :
CORP.,                  :
      Plaintiff(s),     :
      v.                :
LIGHTHOUSE              :
CONSTRUCTION, INC.,     :
BECKER MORGAN GROUP,    :
INC., and O'DONNELL,    :
NACCARATO & MACINTOSH,  :
INC.,                   :
      Defendant(s).     :
----------------------x
MILLERS CAPITAL         : CIVIL ACTION
INSURANCE COMPANY       :
a/s/o DEL-HOMES         : NO. 04-1322-JJF
CATALOG GROUP, LLC,     :
      Plaintiff(s),     :
      v.                :
LIGHTHOUSE              :
CONSTRUCTION, INC.,     :
BECKER MORGAN GROUP,    :
INC., and O'DONNELL,    :
NACCARATO & MACINTOSH,  :
INC.,                   :
      Defendant(s)      :
and                     :
LIGHTHOUSE              :
CONSTRUCTION, INC.,     :
      Defendant and     :
      Third-Party       :
      Plaintiff,        :
      v.                :
EAST COAST ERECTORS,    :
INC.,                   :
      Third-Party       :
      Defendant.        :
----------------------x
```

A-1

Page 2

1  Oral deposition of MICHAEL A.
2  WILLIAMS, held at the law offices of WETZEL &
3  ASSOCIATES, P.A., The Carriage House, Suite
4  201, 1100 North Grant Avenue, Wilmington,
5  Delaware, 19805, on Tuesday, June 14, 2005,
6  beginning at 9:25 a.m., on the above date,
7  before Debra J. Weaver, a Federally Approved
8  RPR, CRR, CSR of NJ (No. XI 01614) and Delaware
9  (No. 138-RPR, Expiration 1/31/08), and a Notary
10 Public of New Jersey, Pennsylvania and
11 Delaware.

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

A-2

ESQUIRE DEPOSITION SERVICES

798293c5-1c9a-436a-8706-ffc3971e9314

1    A.    No, I don't.
2    Q.    Did you review any documents in
3    preparation for today's deposition?
4    A.    Yes, I did.
5    Q.    Do you recall what you reviewed?
6    A.    I reviewed my file of the '95 and
7    the '99 building. I reviewed some documents
8    that my attorney had, various documents.
9    Q.    Do you recall what those
10   documents were?
11   A.    Specifically, no. In general,
12   the interrogatories. There were some drawings
13   that were numbered. I reviewed some
14   Varco-Pruden documents.
15   Q.    And earlier you referred to the
16   1995 and 1999 buildings. And that's how we've
17   been referring to them in this litigation, but
18   I just want to make sure there's a clear
19   understanding between the two of us, because
20   that's how I will refer to the two buildings at
21   issue in this case. Do you understand that the
22   1995 building was a Varco-Pruden building
23   installed at the Enterprise Business Park in or
24   about the year 1995?

1   A.   Yes.
2   Q.   And then the 1999 building, do
3   you understand, was installed adjacent to the
4   1995 building in or about 1999?
5   A.   Yes.
6   Q.   And East Coast played some role
7   in the erection of each of those buildings; is
8   that correct?
9   A.   Yes.
10  Q.   Okay. Can you please tell me who
11  you're currently employed by?
12  A.   East Coast Erectors,
13  Incorporated.
14  Q.   And how long have you been with
15  East Coast Erectors, Incorporated?
16  A.   It will be 20 years this October.
17  Q.   What is your position with the
18  company?
19  A.   I'm the president.
20  Q.   Do you hold any other titles?
21  A.   No.
22  Q.   And do you have an ownership
23  interest in the company?
24  A.   Yes.

A-4

```
 1   responsibilities --
 2        A.    No.
 3        Q.    -- in Mr. Hendrickson's absence?
 4        A.    I don't recall one.
 5        Q.    Would Tom Williams then oversee
 6   Mr. Hendrickson on the 1999 building project?
 7        A.    Yes.
 8        Q.    And going back to the 1995
 9   building project again, Tom Williams would have
10   oversaw the field foreman for that job as well?
11        A.    That's correct.
12        Q.    And do you have a recollection of
13   who the field foreman was for the 1995 project?
14        A.    To the best of my recollection,
15   it was the same people.
16        Q.    And can you describe for me, in a
17   broad sense, the services that East Coast
18   offers currently to its customers.
19        A.    We are titled structural and
20   miscellaneous steel fabricators and erectors.
21        Q.    And does that title cover all of
22   the services that East Coast offers?
23        A.    Yes.
24        Q.    If you had to break it down on a
```

1  percentage basis between structural -- strike
2  that.
3              If you had to break it down
4  between erector and fabricate, could you give
5  me a percentage between those two categories?
6        A.    Yes.  The fabrication portion is
7  approximately 80 -- 75 to 80 percent, erection
8  being 20 to 25 percent.
9        Q.    And that's current day?
10       A.    Yes.
11       Q.    Has that been pretty much the
12 ratio during your 20 years' existence?
13       A.    Yes.
14       Q.    Are there other instances where
15 you both fabricate and erect?
16       A.    Yes.
17       Q.    Is that a frequency or -- with
18 any degree of frequency or is that just here
19 and there?
20       A.    That's pretty typical of our
21 business.
22       Q.    Okay.  In those instances where
23 East Coast is erecting a building, is it
24 primarily pre-engineered buildings or some

1  specific point in time that there was a
2  realization of the need to remove downspouts
3  and install interior drains?
4         A.    I think it was generally
5  understood.
6         Q.    Do you know who was responsible
7  for that work?
8         A.    I do not.
9         Q.    Do you know if O'Donnell
10 Naccarato was made aware of the need to remove
11 downspouts and add interior drains in the
12 context of providing engineering services to
13 East Coast?
14        A.    I do not.
15        Q.    I just want to go over a few
16 documents.
17              (Whereupon, Deposition Exhibit
18        No. Williams-118, Scope of Work, Bates
19        ECE 0575-0576, was marked for
20        identification.)
21 BY MR. PINGITORE:
22        Q.    Let me show you a two-page
23 document marked as 118.  It's previously Bates
24 stamped as ECE 0575 and 0576.  Could you take a

1  moment to review that document, and when you
2  get a chance, please identify it for the
3  record.
4         A.    This looks like the scope of work
5  submitted to me by Lighthouse Construction for
6  purposes of bidding the project.
7         Q.    And this would then be the scope
8  of work that you provided to O'Donnell
9  Naccarato in order to provide engineering
10 services?
11        A.    That's correct.
12        Q.    On the second page of the
13 document, there are some dates handwritten in.
14 Do you see that?
15        A.    Yes.
16        Q.    Is that your handwriting?
17        A.    Yes.
18        Q.    And can you tell me the
19 significance of those dates, please?
20        A.    If I recall, they're nothing but
21 milestone dates.
22        Q.    Just a general schedule as to
23 when you would hope to complete the work?
24        A.    Yes.

A-8

1    Q.    Within the dates shown on the
2 second page, when would the modifications to
3 the 1995 building occur?
4    A.    I believe they were done sometime
5 prior to June 4th.
6    Q.    And what causes you to single out
7 that date?
8    A.    From reviewing our time sheets.
9    Q.    Were you able to narrow it down
10 any further?
11    A.    Can I correct that?  Did I say
12 July 4th?
13    Q.    No.  June 4th?
14    A.    It is June 4th.
15    Q.    So the modifications to the 1995
16 building were completed prior to June 4, 1995,
17 correct?
18    A.    Yes.
19    Q.    And do you know the date after
20 which they were completed, like a window?
21          MR. HILL:  I'm sorry.  I object
22       to the form of the question.
23          MR. PINGITORE:  That wasn't a
24       great question.

A-9

1              MR. HILL:  Can you rephrase that?
2     BY MR. PINGITORE:
3         Q.    Can you provide me with just a
4     general window as to when the modifications to
5     the 1995 building were completed?
6         A.    It would only be an estimate, but
7     I would have to say within probably two weeks
8     prior to June 4th.
9         Q.    If we go back to page one, the
10    scope of work, under work to be included, 2-C
11    reads, "Existing pre-engineered metal building
12    will require additional support for snow
13    loading, caused by addition.  Include this
14    work."  Is that the portion of the scope of
15    work that caused you to ask O'Donnell Naccarato
16    to evaluate the 1995 building?
17        A.    It could be.  This doesn't
18    specifically tell me that I'm responsible for
19    engineering in that sentence, but it could be
20    the sentence that caused me to ask them to
21    include this work.
22        Q.    Are you aware of any other
23    documents that asked East Coast to include an
24    evaluation of the 1995 building as part of its

A-10

MICHAEL A. WILLIAMS

Page 70

1  services?
2  A. No.
3  Q. I'm just going to show you
4  another two-page document. It's previously
5  Bates stamped ECE 0573 and ECE 0574. Take a
6  minute to review the document, and when you're
7  prepared, please identify it for the record.
8  And then we'll have this document marked as
9  Exhibit 119.
10            (Whereupon, Deposition Exhibit
11       No. Williams-119, Proposal from ONM to
12       East Coast dated 2/18/99, Bates ECE
13       0573-0574, was marked for
14       identification.)
15  BY MR. PINGITORE:
16  Q. Do you recognize this document?
17  A. Yes.
18  Q. Can you identify it for us,
19  please?
20  A. It appears to be the proposal
21  from O'Donnell Naccarato MacIntosh to East
22  Coast Erectors for the engineering services for
23  the 1999 building.
24  Q. And it's dated February 18, 1999,

A-11

ESQUIRE DEPOSITION SERVICES

798293c5-1c9a-436a-8706-ffc3971e9314

1   with a received stamp of February 25, 1999,
2   correct?
3           A.      Yes.
4           Q.      Is that East Coast's received
5   stamp?
6           A.      Yes.
7           Q.      And the proposal is directed to
8   you personally, correct?
9           A.      Yes.
10          Q.      Do you recall if this proposal
11  was accepted by East Coast?
12          A.      Yes, it was.
13          Q.      And did O'Donnell Naccarato
14  ultimately provide the engineering services
15  shown for the fee of $20,000?
16                  MR. HILL:  I'm going to object to
17          the form of the question.  Are you
18          asking him if they did the services or
19          they paid 20,000?
20                  MR. PINGITORE:  It's both.  So
21          I'll back up a step.
22  BY MR. PINGITORE:
23          Q.      Did East Coast agree to this
24  proposal?

A-12

1  A. Yes.
2  Q. And did O'Donnell Naccarato
3  ultimately provide the consulting structural
4  engineer services set forth in this proposal?
5  A. For the most part, yes.
6  Q. Do you know what services were
7  not performed?
8  A. I can't comment on their site
9  visits.
10  Q. Other than the site visits, which
11  are item 5, did O'Donnell Naccarato provide the
12  services set forth in this proposal?
13  A. Yes.
14  Q. And did East Coast agree to pay
15  O'Donnell Naccarato $20,000 for the services
16  set forth in this proposal?
17  A. Yes.
18  Q. Do you know if, in fact, East
19  Coast paid O'Donnell Naccarato the $20,000?
20  A. Yes, we did.
21  Q. Do the services set forth in
22  Exhibit 119 include an evaluation of the 1995
23  building?
24  A. Yes.

1  Q. So that the evaluation of the
2  1995 building was accounted for in the $20,000
3  fee; is that correct?
4  A. That's correct.
5  Q. I take it from an earlier answer
6  that you do not know if O'Donnell Naccarato
7  actually made two visits to the site during
8  construction, correct?
9  A. That's correct.
10 Q. Who with East Coast was
11 responsible for ensuring O'Donnell Naccarato's
12 compliance with the terms of this proposal?
13 A. That would be me.
14 Q. And what efforts did you
15 undertake to ensure that O'Donnell Naccarato
16 complied with its scope of services as provided
17 by the proposal?
18 A. The visits may not have been
19 required, so I don't refer to them as
20 compliance.
21 Q. Why wouldn't they be required?
22 A. There's no code or -- that I know
23 of that requires an engineer to visit a site on
24 any project.

MICHAEL A. WILLIAMS

Page 74

1  Q. All right. Just focusing on the
2  scope of services, O'Donnell Naccarato agreed
3  to visit the site two times during
4  construction, correct?
5  A. Yes.
6  Q. And you just do not know if they
7  in fact visited the site at all, correct?
8  A. That's correct.
9  Q. Do you know if East Coast ever
10 countersigned this proposal where provided for
11 on page two?
12 A. I do not know.
13 Q. I show you another document I'll
14 mark as Exhibit 120, previously Bates stamped
15 ECE 0532 through ECE 0534. Take a minute to
16 familiarize yourself with the document. Let me
17 know when you're ready to proceed.
18       (Whereupon, Deposition Exhibit
19    No. Williams-120, Proposal dated
20    2/23/99, Bates ECE 0532-0534, was
21    marked for identification.)
22 BY MR. PINGITORE:
23 Q. Are you ready?
24 A. Yes. This appears to be our

A-15

798293c5-1c9a-436a-8706-ffc3971e9314

1  proposal submitted to Lighthouse Construction
2  for the work on the '99 building.
3      Q.    And this proposal is dated
4  February 23, 1999, correct?
5      A.    Yes.
6      Q.    And it's signed by you on page
7  three?
8      A.    Yes.
9      Q.    Focusing on the first paragraph,
10 if I understand that sentence correctly, your
11 proposal relied on a drawing marked A2.1 and
12 specifications dated February 8, 1999, correct?
13     A.    Yes.
14     Q.    And were the specifications dated
15 February 8, 1999, the same specifications that
16 we've previously marked as Exhibit 118?
17     A.    Yes.
18     Q.    And at the point you provided
19 this proposal that we've marked as Exhibit 120,
20 did you already have the benefit of O'Donnell
21 Naccarato's engineering fee?
22     A.    Yes.
23     Q.    And would that proposal include
24 O'Donnell Naccarato's engineering fee?

A-16

1           the form of that question.
2  BY MR. PINGITORE:
3           Q.    You can answer it.
4           A.    Am I aware of any deviation from
5  the erection drawing is your question?
6           Q.    Right.
7           A.    Yes.
8           Q.    What are you aware of?
9           A.    There were braces at the column
10 omitted, which are shown on the erection
11 drawings.
12          Q.    What braces are they?
13          A.    Flange braces.
14          Q.    The lower flange braces?
15          A.    Yes.
16          Q.    And how did that come to be known
17 by you?
18          A.    My recollection was the quantity
19 shipped was not consistent with the quantity
20 shown on the erection drawings, and I was
21 informed of that by my field people, which I
22 relayed to Mr. MacLeish and was told that those
23 braces were not necessary due to a stiffener
24 added to the girder beam at every interior

1  column.

2  Q.    And when was this conversation?

3  A.    This would have been probably
4  early in the erection of the '95 building.

5  Q.    And did you have an understanding
6  as to why the stiffener would, at least
7  according to Mr. MacLeish, take the place of a
8  brace?

9  A.    Yes.

10 Q.    Can you explain that to me?

11 A.    The braces are generally used to
12 keep the bottom flange of the girder beams from
13 rotating, and in this case, where they attached
14 to the columns, rotation can't occur there
15 because it's attached to the column.  And then
16 the stiffener was added, I think, to prevent
17 any buckling as well.

18 Q.    And that information that Mr.
19 MacLeish provided you, was it your
20 understanding that he in turn received the
21 information from Varco-Pruden?

22 A.    It was my understanding he
23 received it verbally.

24 Q.    From Varco-Pruden?

A-18

1        A.      Yes.
2        Q.      Did you relay any part of that
3   conversation to O'Donnell Naccarato as part of
4   their involvement in the 1999 project and
5   evaluation of the 1995 building?
6        A.      I don't recall.
7        Q.      Just for clarification, you don't
8   recall relaying that information or you didn't
9   relay that information?
10       A.      I don't recall relaying that
11  information.
12       Q.      Is there a reason you wouldn't
13  have relayed that information?
14       A.      Not that I can think of.
15       Q.      And if that information was
16  relayed, it would have been either to Mr.
17  Anastasi or Mr. MacIntosh; is that correct?
18              MR. HILL:  Object to the form of
19          the question.
20              THE WITNESS:  It probably would
21          have been relayed to one of those two,
22          yes.
23  BY MR. PINGITORE:
24       Q.      Other than the flange braces, are

A-19