# EXHIBIT "N"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
--------------------x
FEDERAL INSURANCE    : CIVIL ACTION
COMPANY a/s/o        :
EZIBA.COM./AVACET,   : NO. 04-339
INC., EZIBA          :
SECURITIES CORP.,    :
       Plaintiff(s), :
          v.         :
LIGHTHOUSE           :
CONSTRUCTION, INC.,  :
BECKER MORGAN GROUP, :
INC., and O'DONNELL, :
NACCARATO &          :
MACINTOSH, INC.,     :
       Defendant(s). :
--------------------x
MILLERS CAPITAL      : CIVIL ACTION
INSURANCE COMPANY    :
a/s/o DEL-HOMES      : NO. 04-1322-JJF
CATALOG GROUP, LLC,  :
       Plaintiff(s), :
          v.         :
LIGHTHOUSE           :
CONSTRUCTION, INC.,  :
BECKER MORGAN GROUP, :
INC., and O'DONNELL, :
NACCARATO &          :
MACINTOSH, INC.,     :
       Defendant(s)  :
and                  :
LIGHTHOUSE           :
CONSTRUCTION, INC.,  :
       Defendant and :
       Third-Party   :
       Plaintiff,    :
          v.         :
EAST COAST ERECTORS, :
INC.,                :
       Third-Party   :
       Defendant.    :
--------------------x
```

3e12cc05-6437-4a00-90df-01e9644bb72a

1     Oral deposition of CHARLES N.

2 TIMBIE, P.E., held at the law offices of

3 CHRISSINGER & BAUMBERGER, 3 Mill Road, Suite

4 301, Wilmington, DE 19806, on Thursday, August

5 4, 2005, beginning at 9:10 a.m., on the above

6 date, before Debra J. Weaver, a Federally

7 Approved RPR, CRR, CSR of NJ (No. XI 01614) and

8 Delaware (No. 138-RPR, Expiration 1/31/08), and

9 a Notary Public of New Jersey, Pennsylvania and

10 Delaware.

11

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES
              1880 John F. Kennedy Boulevard
23                   15th Floor
              Philadelphia, Pennsylvania 19103
24                 (215) 988-9191

                                        A-82

3e12cc05-6437-4a00-90df-01e9644bb72a

Page 48

1    A.    No.  I'm going to rely on Mr. Davis

2    for that.  However, obviously, being in the business

3    for 30 years, I understand the various parties and

4    their interrelationship.  So if asked the right

5    question, I may respond in my opinion.

6        Q.    Well, how, hell, how am I supposed to

7    figure out that question?  I'm here trying to figure

8    out what I should expect of you, Mr. Timbie, is what

9    I'm trying to figure out.  And as far as opinions

10   that you intend to offer, if you're not surprised by

11   the right question, it's just on the structural

12   engineering aspects and not the construction

13   aspects; is that correct?

14       A.    That's correct.  That's what I was

15   hired to do.

16       Q.    All right.  As far as it relates to

17   the 1999 construction, do you intend to offer any

18   opinion that East Coast Erectors did anything wrong?

19       A.    Yes, as it relates to the design.

20       Q.    Okay.  Why would that not be in your

21   report?  Let me rephrase the question.

22            Have you identified in your report

23   anything concerning the performance of construction

24   services in 1999 that East Coast Erectors did wrong?

25       A.    Well, could I answer it this way?

A-83

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 49

1        Q.      Well, you can answer it, first,

2   whether you did state anything like that in your

3   report or whether you did not.  You can look at it.

4   It's in front of you.

5        A.      I think, Mr. Hill, if not

6   specifically stated in a sentence, it's implied, in

7   that East Coast Erectors provided O'Donnell

8   Naccarato & MacIntosh a set of drawings that were

9   labeled as-built.  East Coast erected the '96

10  building -- '95 building, and in the process of that

11  erection, these flange braces were eliminated.  And

12  on the transmittal of those drawings, which is an

13  exhibit in the report here, it says those drawings

14  were as-built.  East Coast knew that that was not

15  true.  Six flange braces were clustered at each

16  column.  They installed four.  So the drawings did

17  not show what was as-built.

18       Q.      Anything else?

19       A.      Nothing that I can think of offhand.

20       Q.      Okay.  I just want to make sure, as

21  far as 1999, that we've covered any criticism that

22  you might possibly have of East Coast Erectors, and

23  you've identified one, right?

24       A.      Yes.

25       Q.      Now, as far as whether -- as far as

A-84

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 50

1   the omission of the flange braces at the interior

2   columns, you understand and agree that that was --

3   that was done in 1995?

4           A.      That's correct.

5           Q.      For whatever reason, it occurred in

6   1995, right?

7           A.      Yes, it did.

8           Q.      Okay.  Now, let's talk about the one

9   thing that you have identified, that is the

10  transmittal of a set of Varco-Pruden drawings to

11  O'Donnell Naccarato MacIntosh with the designation

12  as-built on, I believe, the fax or transmittal cover

13  sheet.  Is that what you're referring to?

14          A.      Yes.

15          Q.      Now, you, as a structural engineer,

16  can look at the erection drawings of the

17  Varco-Pruden building and tell that those aren't

18  as-built drawings in the customary sense, can't you?

19          A.      Those were erection drawings that

20  came as a -- with a transmittal saying that that

21  was -- that set of drawings represented what was

22  built in '95.

23          Q.      Right.  But if I -- if I hand you a

24  pig and tell you it's a rabbit, you know it's a

25  rabbit, don't you?

*A-85*

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 53

1    information.  I agree with you, if they didn't get

2    enough information, they should conduct their own

3    survey, but these drawings were given as the

4    conditions that are out there, and that's what they

5    worked from.  They apparently were comfortable

6    working from those drawings.

7         Q.    But, as I hear you testify today, the

8    most you can say to criticize East Coast Erectors is

9    they transmitted that set of Varco-Pruden drawings

10   with a cover sheet that said as-built?  That's the

11   worst you have on East Coast; is that right?

12        A.    Yes.

13              MR. VEITH:  Object to the form.

14              THE WITNESS:  As I sit here, yes.

15   BY MR. HILL:

16        Q.    How are you doing break-wise?

17        A.    Would that be me in particular?

18        Q.    You in particular.

19        A.    I'm fine.

20        Q.    I'm not going to be fine for long

21   here.  I'm going to have to take a break.  Just give

22   me a second.

23              MR. HILL:  Mr. Veith, do you want to

24   share with me what you think is wrong with my

25   question?

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 54

1          MR. VEITH:  I think it oversimplified

2     what he testified to.

3          THE WITNESS:  Can I get back to that

4     question?

5     BY MR. HILL:

6          Q.     Sure.

7          A.     If it's still open.

8          Q.     We'll reopen it for you.

9          A.     I believe O'Donnell Naccarato were

10    supposed to inspect the '99 building, and then that

11    would certainly be another opportunity to catch any

12    errors or omissions in the original building.  And I

13    think East Coast should have required that they go

14    out there, and they didn't.

15         Q.     Is that it?

16         A.     That would be it.

17         Q.     Okay.  So the fact that East Coast

18    transmitted that set of drawings with a sheet and

19    the fact that they didn't compel O'Donnell Naccarato

20    MacIntosh's piece to go out and look at the site,

21    that that's the worst criticisms you have of East

22    Coast; is that right?

23         A.     That's as I sit here now, yes.

24         Q.     Okay.  If anything else comes up, are

25    you going to tell me about it?

A-87

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

1        A.        You betcha.

2                  Do you mind if I go back to that

3    question again, Mr. Hill?

4        Q.        No, no.

5        A.        East Coast was the steel erector for

6    the '99 building, and a part of their work scope was

7    to go into the '95 building and add whatever bracing

8    O'Donnell Naccarato & MacIntosh comes up with.  The

9    document they came up with was a doodle on a piece

10   of draft paper, and it was given to East Coast

11   Erectors.  It didn't say what bays to reinforce or

12   how many bays or exactly where to put the Z.  I

13   think there's enough -- and there's no seal on it.

14   It's not signed.  There's enough ambiguity in that

15   document to go back to O'Donnell, Naccarato &

16   MacIntosh and say, could you please clarify this,

17   tell me where this goes, how many bays, exactly

18   where the Z goes.  It says to alter the X bracing to

19   accommodate the Z.  How do I do that?  Instead, they

20   took it on themselves to determine where these go

21   and how to install them.

22       Q.        You're saying if East Coast Erectors

23   got an ambiguous drawing, they should go back to the

24   designer, ONM, and ask what they mean?

25       A.        Yes.

A-88

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 56

1      Q.      Okay.  And do you have any evidence

2  that either East Coast Erectors didn't understand it

3  or that they failed to go back and ask, what does it

4  mean?

5      A.      No.  There was no other documents

6  generated, so, no.  To me it's an ambiguous

7  document.  It's a hard document to work from.

8      Q.      You're critical of the design, right?

9      A.      Yes, I'm critical of the design.  But

10  my criticism is sort of accepted by East Coast when

11  they went ahead and did the work based on this one

12  drawing.

13      Q.      Are you assuming that?

14      A.      Yes, I am.

15      Q.      Mr. Timbie, what I'm hearing is that

16  you would expect a contractor, if he doesn't

17  understand what a drawing means, to ask the

18  engineer?  That's what I'm hearing from this?  Is

19  that a good summary of it?

20      A.      Yes.

21      Q.      Okay.  And you don't know whether

22  that occurred or not, whether they asked or not?

23      A.      No.  But I know of no other documents

24  or sealed drawings that were produced.

25      Q.      Isn't it the engineer's

A-89

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 112

1    them.  But if you look at the Varco calculations and

2    find out what the vertical load is in those columns,

3    it's zero.  But in actual fact, I think you can

4    sense that it's not zero until those bolts shear

5    off.  Then it goes back to zero.

6         Q.    Okay.  Because, as the snow loads the

7    joists and the joists depress -- press on the --

8         A.    Needle beam.

9         Q.    -- on the needle, that imposes load

10   on the column?

11        A.    Exactly.

12        Q.    Okay.  And the bolts shear at the

13   column needle connection, and then the -- which --

14   and then the joist failed?  Is that your failure

15   mode?

16        A.    Yes.  The joist then will come down

17   and be a 50-foot long joist and act as a normal

18   roof.

19        Q.    Okay.

20        A.    And then as the joists get

21   overstressed, they start to sag, you get cat

22   narrowing, the building is starting to pull in, and

23   then as the joists failed, and the roof splits open,

24   then you have forces from the bracing cables and

25   from the adjacent joists and so on pulling on the

A-90

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 113

1    building, which has this inherent defect in it, the

2    missing column braces or flange braces at the

3    columns, and then it starts to radiate across the

4    building.

5           Q.     So what you just described to me is

6    your opinion of the failure mode?

7           A.     Yes.

8                  Now, part of the opinion also is it

9    happened at the 5-foot -- 5-foot high portion of the

10   offset.

11          Q.     It began between frame lines 7 and 9?

12          A.     Yeah.  And I think the photographs

13   show that.  That's where the roof was ripped open,

14   and that's where the roof actually pulled away from

15   the wall and came down.  Everywhere else, it's

16   pretty well sealed up.

17          Q.     Let me ask you this question about

18   the roof.  When it goes into failure, you described

19   to the point of where the bar joists failed, and at

20   the point the bar joists failed and they're no

21   longer supporting load, are they?

22          A.     You're talking about bar joists?

23          Q.     The bar joists.

24          A.     Once they failed, right, they can't

25   support much load, or what they were designed for.

CHARLES N. TIMBIE, P.E.

Page 114

1      Q.      Okay.  And then your other members,

2  rafters, adjacent bar joists, are supporting load

3  from a greater area; is that right?

4      A.      That's true.  And not only that, but

5  as they deflect, the rafters are being pulled.

6  Okay?

7      Q.      So they're --

8      A.      They're trying to go roll.  They're

9  trying to roll.

10      Q.      The then-surviving members are not

11  only exposed to greater portions of the existing

12  load, but they're also being pulled by the failed

13  members?

14      A.      Right.

15      Q.      Okay.  So then you have a

16  progression, member to member, until the whole

17  building fails?

18      A.      Exactly.  Progressively.

19      Q.      And then once the bar joists failed,

20  then the rafters are submitted to the same existing

21  loads, just more share of it, and they're also being

22  pulled, so the rafters failed, too?

23      A.      They failed very much because of the

24  defect.  They're not braced properly against roll.

25      Q.      Well, we'll talk about that.

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

Page 115

1          A.      Okay.

2          Q.      But you do have what we'd call here,

3     once you have joist failure in the drift area, you

4     have a progressive failure of the entire building?

5          A.      Yes.  It's one of the unfortunate

6     properties of pre-engineered buildings with

7     continuity.

8          Q.      Okay.  You're saying that if it were

9     a simple span conventional building, you would

10    have -- without continuity from column to column,

11    then you'd have a break in this progression where

12    the collapse would end?

13         A.      Right.  And we would basically have

14    failure under the drift, or a bay, one bay,

15    something like that.

16         Q.      Okay.  So in your judgment, had this

17    been a conventional structure, the collapse would

18    have been isolated from the east sidewall to the

19    first interior column line?

20                 MR. VEITH:  Object to the form.

21    BY MR. HILL:

22         Q.      Is that your opinion?

23         A.      Pretty much within there.  Even if

24    this were a properly erected building, it may still

25    have done that.

A-93

CHARLES N. TIMBIE, P.E.

Page 116

1      Q.      What is this document marked MMG
2  1595?
3      A.      Okay.  What this document shows is an
4  evaluation I made as to what the Varco building was
5  actually designed for.  It's not from a
6  certification or letter or order form, but it's from
7  the calculations.  One way that you could figure out
8  how much --
9      Q.      Let me interrupt you for a moment.
10 Is this something you prepared before you had the
11 Varco-Pruden documents?
12     A.      No.
13     Q.      Okay.
14     A.      No.
15     Q.      All right.  Just tell me -- I mean, I
16 actually don't want to spend time on things that
17 aren't too important, and I'm trying to figure out
18 how important this is.  Is this --
19     A.      Well, the bottom line you want?
20     Q.      Yeah.
21     A.      Okay.  What I did is I added up the
22 total load on a rafter divided by the area that it's
23 carrying and that gives you the load per square
24 foot.  Okay?  The total load divided by the total
25 area is a load for one square foot.  And I did it

A-94

CHARLES N. TIMBIE, P.E.

Page 117

1    for the dead load, collateral load, live load and

2    snow load on line 9 and on line 3.  And basically

3    you're adding up all these S, Q, M, those are all

4    column lines, the load in each column, gives you a

5    total of 140.9, divide that by the area it supports,

6    and the dead load is 14.1.

7        Q.    Are you backing into those loads from

8    the reactions?

9        A.    Yes.  I just wanted to verify.  And

10   then 5 and then 30 and then the 17.9.

11       Q.    And so basically you're coming in at

12   the same place -- you're seeing -- you're

13   calculating, for example, at line 9 that they're

14   designing dead load at 14.1 pounds per square foot?

15       A.    Yes.  And the 5 came right in, the 30

16   came right on, and the 17.9 should be 17.5.  So that

17   came right in.  It's a verification of their

18   verification or certification.

19       Q.    Okay.  We'll pass on marking that as

20   an exhibit.

21            MR. PINGITORE:  If we're not going to

22   mark it, I just want to make sure it's in the

23   record.

24            MR. HILL:  I read the Bates number.

25   I appreciate that.  Just in case, it's MMG 1595.

A-95

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

Page 173

1    stress due to vertical gravity, no.  If you're

2    talking about lateral instability and buckling and

3    sort of this twisting effect, obviously, when that

4    happens, there's out-of-plain bending and the

5    flanges themselves will start to bend, and they

6    could exceed that about their local axis.

7          Q.      That being 40 ksi?

8          A.      Yes.

9          Q.      That being the allowable stress plus

10   a factor of 1.5?

11         A.      Right.  That could be.

12         Q.      You understand what I mean, don't

13   you?

14         A.      Yes, I think I do.

15         Q.      Well, what I mean is, in other words,

16   when these joists start to fail and you start

17   imposing all these forces on the rafter at the

18   eastern end of it, it's going to affect the western

19   end of that rafter at the first interior column, and

20   the stresses can exceed the safety factor, can't

21   they?

22         A.      They can, because of out-of-plain

23   bending and buckling.

24         Q.      Now, can you testify and say whether

25   or not that rafter is going to fail at the first

A-96

CHARLES N. TIMBIE, P.E.

Page 174

1    interior column when all this is going on even if

2    the flange brace was there?  Do you know?

3          A.        I believe it would have.  I believe

4    it would have survived.

5          Q.        All right.  I asked you if it would

6    fail.  You're saying you think it would have

7    survived?

8          A.        Yes, I think it would have survived.

9          Q.        With nothing else changed but just

10   the frame bracing?

11         A.        You would have the foot frame brace

12   there which braced every 10 feet -- or every 5 feet

13   instead of every 10, and it could hold that rafter

14   vertical and hold it in plain.  It wouldn't be out

15   of plain the way we were just describing.

16         Q.        How many frame braces are there

17   between your node 1 and your node 8, in other words,

18   the second interior column?

19         A.        On the rafter?

20         Q.        Yes, on the rafter.

21         A.        There's three on each side.  Which

22   node are you talking about?

23         Q.        I'm talking about between the

24   sidewall and the second interior column.

25         A.        Oh.  There are 12.

A-97

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 175

1       Q.      There are 12?

2       A.      Right.

3       Q.      And between those locations, at the

4    first interior column, there is one frame brace

5    missing?

6       A.      At the column.

7       Q.      Yes, one pair?

8       A.      One pair, that's true.

9       Q.      Okay.  And you're saying that that

10   one pair of frame braces could have stopped the

11   entire remainder of the collapse?

12      A.      I believe.  I believe so.  You may

13   have some damage to the rafter before you get there,

14   but this is the most unstable portion of the entire

15   building right there.  And when things start moving

16   around back at the tapered column, if you don't have

17   a brace at the column, the column is trying to push

18   out, the flange is trying to push out, and it's

19   trying to roll over, and at the same time the roof

20   is bouncing around.

21      Q.      Okay.  So --

22              MR. PINGITORE:  Bob, is this a good

23   place for five minutes?

24              MR. HILL:  Yes.

25              (Recess taken from 2:56 p.m. to

A-98

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

Case 1:04-cv-00339-JJF    Document 133-7    Filed 08/17/2005    Page 20 of 43
CHARLES N. TIMBIE, P.E.

Page 203

1    and it doesn't seem to be included in any of the

2    other loads.

3         Q.    Okay.  Do you believe that the party

4    that decided to put the ballast on the roof then

5    violated any code or industry practice?

6         A.    No.  You can put a ballasted roof on;

7    it just have to be designed for that.  Designed or

8    strengthened.

9         Q.    You mentioned something about the

10   missing flange bracing being an inherent defect in

11   the building.  What did you mean by that?

12        A.    An inherent -- did I say that?

13        Q.    A few hours ago probably.

14        A.    Okay.  It was a defect in the

15   building.

16        Q.    Simply because it wasn't there?

17        A.    Exactly.  It wasn't installed in

18   1995, and it compromised the strength of the

19   building.  So it's a defect.

20        Q.    Okay.  And that flange bracing, you

21   believe, would have prevented the collapse --

22        A.    Yes.

23        Q.    -- had it been there?

24        A.    Yes.

25        Q.    Even if it was designed with all the

CHARLES N. TIMBIE, P.E.

Page 204

1    same steel and whatever else, rafters and joists

2    that were in the building, just putting in the

3    flange braces would have prevented this collapse?

4         A.      Well, of the mainframes, if that's

5    what you're talking about.  You'd still have a

6    collapse under the drifts, under the snow drifts.

7    But it may not have spread across the entire

8    building.

9         Q.      Okay.  Well, can you say one way or

10   the other where it would have forced that collapse

11   by the drift starting, whether that would have

12   impacted the rest of the building or not?

13        A.      In my opinion, if the braces were

14   there, it would be a local collapse, not a general

15   collapse.

16        Q.      Okay.  You talked about the

17   stiffeners and you said you didn't believe that they

18   made any difference?

19        A.      Pardon me?

20        Q.      You talked about the stiffeners, and

21   you said you --

22        A.      Oh, the stiffeners.

23        Q.      -- you didn't believe they made a

24   difference one way or the other?  They didn't do

25   anything essentially?

A-100

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

# EXHIBIT "N"

```
            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF DELAWARE

    ---------------------x
    FEDERAL INSURANCE    : CIVIL ACTION
    COMPANY a/s/o        :
    EZIBA.COM./AVACET,   : NO. 04-339
    INC., EZIBA          :
    SECURITIES CORP.,    :
          Plaintiff(s), :
              v.         :
    LIGHTHOUSE           :
    CONSTRUCTION, INC.,  :
    BECKER MORGAN GROUP, :
    INC., and O'DONNELL, :
    NACCARATO &          :
    MACINTOSH, INC.,     :
          Defendant(s). :
    ---------------------x
    MILLERS CAPITAL      : CIVIL ACTION
    INSURANCE COMPANY    :
    a/s/o DEL-HOMES      : NO. 04-1322-JJF
    CATALOG GROUP, LLC,  :
          Plaintiff(s), :
              v.         :
    LIGHTHOUSE           :
    CONSTRUCTION, INC.,  :
    BECKER MORGAN GROUP, :
    INC., and O'DONNELL, :
    NACCARATO &          :
    MACINTOSH, INC.,     :
          Defendant(s)   :
    and                  :
    LIGHTHOUSE           :
    CONSTRUCTION, INC.,  :
          Defendant and :
          Third-Party    :
          Plaintiff,     :
              v.         :
    EAST COAST ERECTORS, :
    INC.,                :
          Third-Party    :
          Defendant.     :
    ---------------------x
```

A-81

3e12cc05-6437-4a00-90df-01e9644bb72a

1         Oral deposition of CHARLES N.

2    TIMBIE, P.E., held at the law offices of

3    CHRISSINGER & BAUMBERGER, 3 Mill Road, Suite

4    301, Wilmington, DE 19806, on Thursday, August

5    4, 2005, beginning at 9:10 a.m., on the above

6    date, before Debra J. Weaver, a Federally

7    Approved RPR, CRR, CSR of NJ (No. XI 01614) and

8    Delaware (No. 138-RPR, Expiration 1/31/08), and

9    a Notary Public of New Jersey, Pennsylvania and

10   Delaware.

11

12

13

14

15

16

17

18

19

20

21

22           ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
23                  15th Floor
           Philadelphia, Pennsylvania 19103
24                (215) 988-9191

A-82

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 48

1       A.      No.  I'm going to rely on Mr. Davis

2   for that.  However, obviously, being in the business

3   for 30 years, I understand the various parties and

4   their interrelationship.  So if asked the right

5   question, I may respond in my opinion.

6       Q.      Well, how, hell, how am I supposed to

7   figure out that question?  I'm here trying to figure

8   out what I should expect of you, Mr. Timbie, is what

9   I'm trying to figure out.  And as far as opinions

10  that you intend to offer, if you're not surprised by

11  the right question, it's just on the structural

12  engineering aspects and not the construction

13  aspects; is that correct?

14      A.      That's correct.  That's what I was

15  hired to do.

16      Q.      All right.  As far as it relates to

17  the 1999 construction, do you intend to offer any

18  opinion that East Coast Erectors did anything wrong?

19      A.      Yes, as it relates to the design.

20      Q.      Okay.  Why would that not be in your

21  report?  Let me rephrase the question.

22              Have you identified in your report

23  anything concerning the performance of construction

24  services in 1999 that East Coast Erectors did wrong?

25      A.      Well, could I answer it this way?

A-83

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 49

1          Q.      Well, you can answer it, first,

2    whether you did state anything like that in your

3    report or whether you did not.  You can look at it.

4    It's in front of you.

5          A.      I think, Mr. Hill, if not

6    specifically stated in a sentence, it's implied, in

7    that East Coast Erectors provided O'Donnell

8    Naccarato & MacIntosh a set of drawings that were

9    labeled as-built.  East Coast erected the '96

10   building -- '95 building, and in the process of that

11   erection, these flange braces were eliminated.  And

12   on the transmittal of those drawings, which is an

13   exhibit in the report here, it says those drawings

14   were as-built.  East Coast knew that that was not

15   true.  Six flange braces were clustered at each

16   column.  They installed four.  So the drawings did

17   not show what was as-built.

18         Q.      Anything else?

19         A.      Nothing that I can think of offhand.

20         Q.      Okay.  I just want to make sure, as

21   far as 1999, that we've covered any criticism that

22   you might possibly have of East Coast Erectors, and

23   you've identified one, right?

24         A.      Yes.

25         Q.      Now, as far as whether -- as far as

A-84

CHARLES N. TIMBIE, P.E.

Page 50

1    the omission of the flange braces at the interior

2    columns, you understand and agree that that was --

3    that was done in 1995?

4            A.      That's correct.

5            Q.      For whatever reason, it occurred in

6    1995, right?

7            A.      Yes, it did.

8            Q.      Okay.  Now, let's talk about the one

9    thing that you have identified, that is the

10   transmittal of a set of Varco-Pruden drawings to

11   O'Donnell Naccarato MacIntosh with the designation

12   as-built on, I believe, the fax or transmittal cover

13   sheet.  Is that what you're referring to?

14           A.      Yes.

15           Q.      Now, you, as a structural engineer,

16   can look at the erection drawings of the

17   Varco-Pruden building and tell that those aren't

18   as-built drawings in the customary sense, can't you?

19           A.      Those were erection drawings that

20   came as a -- with a transmittal saying that that

21   was -- that set of drawings represented what was

22   built in '95.

23           Q.      Right.  But if I -- if I hand you a

24   pig and tell you it's a rabbit, you know it's a

25   rabbit, don't you?

A-85

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 53

1    information.  I agree with you, if they didn't get

2    enough information, they should conduct their own

3    survey, but these drawings were given as the

4    conditions that are out there, and that's what they

5    worked from.  They apparently were comfortable

6    working from those drawings.

7         Q.     But, as I hear you testify today, the

8    most you can say to criticize East Coast Erectors is

9    they transmitted that set of Varco-Pruden drawings

10   with a cover sheet that said as-built?  That's the

11   worst you have on East Coast; is that right?

12        A.     Yes.

13               MR. VEITH:  Object to the form.

14               THE WITNESS:  As I sit here, yes.

15   BY MR. HILL:

16        Q.     How are you doing break-wise?

17        A.     Would that be me in particular?

18        Q.     You in particular.

19        A.     I'm fine.

20        Q.     I'm not going to be fine for long

21   here.  I'm going to have to take a break.  Just give

22   me a second.

23               MR. HILL:  Mr. Veith, do you want to

24   share with me what you think is wrong with my

25   question?

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 54

1              MR. VEITH:  I think it oversimplified
2    what he testified to.
3              THE WITNESS:  Can I get back to that
4    question?
5    BY MR. HILL:
6         Q.    Sure.
7         A.    If it's still open.
8         Q.    We'll reopen it for you.
9         A.    I believe O'Donnell Naccarato were
10   supposed to inspect the '99 building, and then that
11   would certainly be another opportunity to catch any
12   errors or omissions in the original building.  And I
13   think East Coast should have required that they go
14   out there, and they didn't.
15        Q.    Is that it?
16        A.    That would be it.
17        Q.    Okay.  So the fact that East Coast
18   transmitted that set of drawings with a sheet and
19   the fact that they didn't compel O'Donnell Naccarato
20   MacIntosh's piece to go out and look at the site,
21   that that's the worst criticisms you have of East
22   Coast; is that right?
23        A.    That's as I sit here now, yes.
24        Q.    Okay.  If anything else comes up, are
25   you going to tell me about it?

A-87

CHARLES N. TIMBIE, P.E.

Page 55

1            A.      You betcha.

2                    Do you mind if I go back to that

3       question again, Mr. Hill?

4            Q.      No, no.

5            A.      East Coast was the steel erector for

6       the '99 building, and a part of their work scope was

7       to go into the '95 building and add whatever bracing

8       O'Donnell Naccarato & MacIntosh comes up with.  The

9       document they came up with was a doodle on a piece

10      of draft paper, and it was given to East Coast

11      Erectors.  It didn't say what bays to reinforce or

12      how many bays or exactly where to put the Z.  I

13      think there's enough -- and there's no seal on it.

14      It's not signed.  There's enough ambiguity in that

15      document to go back to O'Donnell, Naccarato &

16      MacIntosh and say, could you please clarify this,

17      tell me where this goes, how many bays, exactly

18      where the Z goes.  It says to alter the X bracing to

19      accommodate the Z.  How do I do that?  Instead, they

20      took it on themselves to determine where these go

21      and how to install them.

22           Q.      You're saying if East Coast Erectors

23      got an ambiguous drawing, they should go back to the

24      designer, ONM, and ask what they mean?

25           A.      Yes.

                                                    A-88

CHARLES N. TIMBIE, P.E.

Page 56

1        Q.       Okay.  And do you have any evidence
2    that either East Coast Erectors didn't understand it
3    or that they failed to go back and ask, what does it
4    mean?

5        A.       No.  There was no other documents
6    generated, so, no.  To me it's an ambiguous
7    document.  It's a hard document to work from.

8        Q.       You're critical of the design, right?

9        A.       Yes, I'm critical of the design.  But
10   my criticism is sort of accepted by East Coast when
11   they went ahead and did the work based on this one
12   drawing.

13       Q.       Are you assuming that?

14       A.       Yes, I am.

15       Q.       Mr. Timbie, what I'm hearing is that
16   you would expect a contractor, if he doesn't
17   understand what a drawing means, to ask the
18   engineer?  That's what I'm hearing from this?  Is
19   that a good summary of it?

20       A.       Yes.

21       Q.       Okay.  And you don't know whether
22   that occurred or not, whether they asked or not?

23       A.       No.  But I know of no other documents
24   or sealed drawings that were produced.

25       Q.       Isn't it the engineer's

A-89

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

## CHARLES N. TIMBIE, P.E.

Page 112

1    them.  But if you look at the Varco calculations and
2    find out what the vertical load is in those columns,
3    it's zero.  But in actual fact, I think you can
4    sense that it's not zero until those bolts shear
5    off.  Then it goes back to zero.
6              Q.      Okay.  Because, as the snow loads the
7    joists and the joists depress -- press on the --
8              A.      Needle beam.
9              Q.      -- on the needle, that imposes load
10   on the column?
11             A.      Exactly.
12             Q.      Okay.  And the bolts shear at the
13   column needle connection, and then the -- which --
14   and then the joist failed?  Is that your failure
15   mode?
16             A.      Yes.  The joist then will come down
17   and be a 50-foot long joist and act as a normal
18   roof.
19             Q.      Okay.
20             A.      And then as the joists get
21   overstressed, they start to sag, you get cat
22   narrowing, the building is starting to pull in, and
23   then as the joists failed, and the roof splits open,
24   then you have forces from the bracing cables and
25   from the adjacent joists and so on pulling on the

A-90

CHARLES N. TIMBIE, P.E.

Page 113

1    building, which has this inherent defect in it, the

2    missing column braces or flange braces at the

3    columns, and then it starts to radiate across the

4    building.

5         Q.    So what you just described to me is

6    your opinion of the failure mode?

7         A.    Yes.

8              Now, part of the opinion also is it

9    happened at the 5-foot -- 5-foot high portion of the

10   offset.

11        Q.    It began between frame lines 7 and 9?

12        A.    Yeah.  And I think the photographs

13   show that.  That's where the roof was ripped open,

14   and that's where the roof actually pulled away from

15   the wall and came down.  Everywhere else, it's

16   pretty well sealed up.

17        Q.    Let me ask you this question about

18   the roof.  When it goes into failure, you described

19   to the point of where the bar joists failed, and at

20   the point the bar joists failed and they're no

21   longer supporting load, are they?

22        A.    You're talking about bar joists?

23        Q.    The bar joists.

24        A.    Once they failed, right, they can't

25   support much load, or what they were designed for.

A-91

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

Case 1:04-cv-00339-JJF    Document 133-7    Filed 08/17/2005    Page 34 of 43
CHARLES N. TIMBIE, P.E.

Page 114

1          Q.        Okay.  And then your other members,
2     rafters, adjacent bar joists, are supporting load
3     from a greater area; is that right?
4          A.        That's true.  And not only that, but
5     as they deflect, the rafters are being pulled.
6     Okay?
7          Q.        So they're --
8          A.        They're trying to go roll.  They're
9     trying to roll.
10         Q.        The then-surviving members are not
11    only exposed to greater portions of the existing
12    load, but they're also being pulled by the failed
13    members?
14         A.        Right.
15         Q.        Okay.  So then you have a
16    progression, member to member, until the whole
17    building fails?
18         A.        Exactly.  Progressively.
19         Q.        And then once the bar joists failed,
20    then the rafters are submitted to the same existing
21    loads, just more share of it, and they're also being
22    pulled, so the rafters failed, too?
23         A.        They failed very much because of the
24    defect.  They're not braced properly against roll.
25         Q.        Well, we'll talk about that.

A-92

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 115

1          A.       Okay.

2          Q.       But you do have what we'd call here,

3    once you have joist failure in the drift area, you

4    have a progressive failure of the entire building?

5          A.       Yes.  It's one of the unfortunate

6    properties of pre-engineered buildings with

7    continuity.

8          Q.       Okay.  You're saying that if it were

9    a simple span conventional building, you would

10   have -- without continuity from column to column,

11   then you'd have a break in this progression where

12   the collapse would end?

13         A.       Right.  And we would basically have

14   failure under the drift, or a bay, one bay,

15   something like that.

16         Q.       Okay.  So in your judgment, had this

17   been a conventional structure, the collapse would

18   have been isolated from the east sidewall to the

19   first interior column line?

20              MR. VEITH:  Object to the form.

21   BY MR. HILL:

22         Q.       Is that your opinion?

23         A.       Pretty much within there.  Even if

24   this were a properly erected building, it may still

25   have done that.

A-93

Page 116

1    Q.    What is this document marked MMG

2    1595?

3    A.    Okay.  What this document shows is an

4    evaluation I made as to what the Varco building was

5    actually designed for.  It's not from a

6    certification or letter or order form, but it's from

7    the calculations.  One way that you could figure out

8    how much --

9    Q.    Let me interrupt you for a moment.

10   Is this something you prepared before you had the

11   Varco-Pruden documents?

12   A.    No.

13   Q.    Okay.

14   A.    No.

15   Q.    All right.  Just tell me -- I mean, I

16   actually don't want to spend time on things that

17   aren't too important, and I'm trying to figure out

18   how important this is.  Is this --

19   A.    Well, the bottom line you want?

20   Q.    Yeah.

21   A.    Okay.  What I did is I added up the

22   total load on a rafter divided by the area that it's

23   carrying and that gives you the load per square

24   foot.  Okay?  The total load divided by the total

25   area is a load for one square foot.  And I did it

A-94

Page 117

1    for the dead load, collateral load, live load and

2    snow load on line 9 and on line 3.  And basically

3    you're adding up all these S, Q, M, those are all

4    column lines, the load in each column, gives you a

5    total of 140.9, divide that by the area it supports,

6    and the dead load is 14.1.

7         Q.      Are you backing into those loads from

8    the reactions?

9         A.      Yes.  I just wanted to verify.  And

10   then 5 and then 30 and then the 17.9.

11        Q.      And so basically you're coming in at

12   the same place -- you're seeing -- you're

13   calculating, for example, at line 9 that they're

14   designing dead load at 14.1 pounds per square foot?

15        A.      Yes.  And the 5 came right in, the 30

16   came right on, and the 17.9 should be 17.5.  So that

17   came right in.  It's a verification of their

18   verification or certification.

19        Q.      Okay.  We'll pass on marking that as

20   an exhibit.

21             MR. PINGITORE:  If we're not going to

22   mark it, I just want to make sure it's in the

23   record.

24             MR. HILL:  I read the Bates number.

25   I appreciate that.  Just in case, it's MMG 1595.

CHARLES N. TIMBIE, P.E.

Page 173

1    stress due to vertical gravity, no.  If you're

2    talking about lateral instability and buckling and

3    sort of this twisting effect, obviously, when that

4    happens, there's out-of-plain bending and the

5    flanges themselves will start to bend, and they

6    could exceed that about their local axis.

7            Q.       That being 40 ksi?

8            A.       Yes.

9            Q.       That being the allowable stress plus

10    a factor of 1.5?

11            A.       Right.  That could be.

12            Q.       You understand what I mean, don't

13    you?

14            A.       Yes, I think I do.

15            Q.       Well, what I mean is, in other words,

16    when these joists start to fail and you start

17    imposing all these forces on the rafter at the

18    eastern end of it, it's going to affect the western

19    end of that rafter at the first interior column, and

20    the stresses can exceed the safety factor, can't

21    they?

22            A.       They can, because of out-of-plain

23    bending and buckling.

24            Q.       Now, can you testify and say whether

25    or not that rafter is going to fail at the first

A-96

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 174

1    interior column when all this is going on even if
2    the flange brace was there?  Do you know?
3            A.      I believe it would have.  I believe
4    it would have survived.
5            Q.      All right.  I asked you if it would
6    fail.  You're saying you think it would have
7    survived?
8            A.      Yes, I think it would have survived.
9            Q.      With nothing else changed but just
10   the frame bracing?
11           A.      You would have the foot frame brace
12   there which braced every 10 feet -- or every 5 feet
13   instead of every 10, and it could hold that rafter
14   vertical and hold it in plain.  It wouldn't be out
15   of plain the way we were just describing.
16           Q.      How many frame braces are there
17   between your node 1 and your node 8, in other words,
18   the second interior column?
19           A.      On the rafter?
20           Q.      Yes, on the rafter.
21           A.      There's three on each side.  Which
22   node are you talking about?
23           Q.      I'm talking about between the
24   sidewall and the second interior column.
25           A.      Oh.  There are 12.

A-97

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 175

1          Q.      There are 12?

2          A.      Right.

3          Q.      And between those locations, at the

4    first interior column, there is one frame brace

5    missing?

6          A.      At the column.

7          Q.      Yes, one pair?

8          A.      One pair, that's true.

9          Q.      Okay.  And you're saying that that

10   one pair of frame braces could have stopped the

11   entire remainder of the collapse?

12         A.      I believe.  I believe so.  You may

13   have some damage to the rafter before you get there,

14   but this is the most unstable portion of the entire

15   building right there.  And when things start moving

16   around back at the tapered column, if you don't have

17   a brace at the column, the column is trying to push

18   out, the flange is trying to push out, and it's

19   trying to roll over, and at the same time the roof

20   is bouncing around.

21         Q.      Okay.  So --

22                 MR. PINGITORE:  Bob, is this a good

23   place for five minutes?

24                 MR. HILL:  Yes.

25                 (Recess taken from 2:56 p.m. to

A-98

Esquire Deposition Services

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 203

1    and it doesn't seem to be included in any of the
2    other loads.
3         Q.    Okay.  Do you believe that the party
4    that decided to put the ballast on the roof then
5    violated any code or industry practice?
6         A.    No.  You can put a ballasted roof on;
7    it just have to be designed for that.  Designed or
8    strengthened.
9         Q.    You mentioned something about the
10   missing flange bracing being an inherent defect in
11   the building.  What did you mean by that?
12        A.    An inherent -- did I say that?
13        Q.    A few hours ago probably.
14        A.    Okay.  It was a defect in the
15   building.
16        Q.    Simply because it wasn't there?
17        A.    Exactly.  It wasn't installed in
18   1995, and it compromised the strength of the
19   building.  So it's a defect.
20        Q.    Okay.  And that flange bracing, you
21   believe, would have prevented the collapse --
22        A.    Yes.
23        Q.    -- had it been there?
24        A.    Yes.
25        Q.    Even if it was designed with all the

A-99

3e12cc05-6437-4a00-90df-01e9644bb72a

Page 204

1    same steel and whatever else, rafters and joists

2    that were in the building, just putting in the

3    flange braces would have prevented this collapse?

4         A.      Well, of the mainframes, if that's

5    what you're talking about.  You'd still have a

6    collapse under the drifts, under the snow drifts.

7    But it may not have spread across the entire

8    building.

9         Q.      Okay.  Well, can you say one way or

10   the other where it would have forced that collapse

11   by the drift starting, whether that would have

12   impacted the rest of the building or not?

13        A.      In my opinion, if the braces were

14   there, it would be a local collapse, not a general

15   collapse.

16        Q.      Okay.  You talked about the

17   stiffeners and you said you didn't believe that they

18   made any difference?

19        A.      Pardon me?

20        Q.      You talked about the stiffeners, and

21   you said you --

22        A.      Oh, the stiffeners.

23        Q.      -- you didn't believe they made a

24   difference one way or the other?  They didn't do

25   anything essentially?

A-100

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

1    A.    Well, they're doing things, but

2    they're not preventing the rafter from rolling.

3    That's what they're doing.

4    Q.    Is that your opinion as to what

5    started the collapse was a rafter rolling?

6    A.    It started actually with the failure

7    of the joists under the snow drift.  And since the

8    building was defective with these missing braces, it

9    spread.

10    Q.    Okay.  Mr. Hill asked you at one

11    point whether you thought Varco-Pruden had done

12    anything wrong, and you had a long pause before you

13    answered.  What were you considering as far as

14    whether or not you believed they had been in any way

15    responsible or had done anything wrong?

16    A.    I guess it's a question I really

17    hadn't thought about, and I wanted to take my time

18    and think about it.

19    Q.    Didn't you testify earlier, though,

20    that they needed to account for the ballast in their

21    design and to advise SMI of that as well.

22    A.    Well, if they knew.  I don't know

23    what the paper trail of that ballast is.

24    Q.    Have you been shown anything about

25    any of the plaintiff attorneys that would indicate

A-101