Exhibit "E"

# C. N. Timbie Engineers, Inc.

P.O. Box 158
47 South Lansdowne Avenue
Lansdowne, PA 19050-0158
Tel: (610) 626-0600
Fax: (610) 622-4296
ChasTimbie@aol.com

July 8, 2005

Mr. Ron L. Pingitore, Esquire
White and Williams LLP
1800 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7395

Re:  Del-Homes Catalog Group, LLC
     97 Enterprise Place, Dover, Kent County, DE
     DOL 2/17/03
     CNT File 03016

Dear Mr. Pingitore:

On Thursday, February 20, 2003 and on subsequent occasions I
examined the collapsed building at the above referenced
location at the request of Bill Schmidt of your office on
behalf of the property insurer, Miller's Mutual, to
determine the cause of damage.  I have also reviewed
architectural and structural drawings for the building and
for an adjacent addition and have read the transcripts of
the depositions of Robert MacIntosh, Joseph Anastasi, Robert
MacLeish, Michael Williams, Earnest Olds and Gregory Moore,
with exhibits.  I have reviewed erection drawings prepared
by Varco Pruden and drawings by A. F. Manns, architect for
the 1995 building as well as drawings for the 1999 addition
by Becker Morgan Moore Olds & Richter, architects and
O'Donnell Naccarato & MacIntosh, engineers.  I have examined
photographs taken by Thomas Destafney and reviewed the file
from SMI Joists.  I have referred to engineering manuals
such as BOCA 96, ANSI A7 95 and the AISC steel construction
manual.  This report outlines my findings to date.

**MMG1370**

B33

July 8, 2005
Mr. Ron L. Pingitore
Page 2

1.    **Description of the Building**

The building was constructed in the West Dover
Industrial Area in 1995 for Catalog Resources
Group/Clientlogic, a mail order catalog company. The
front of the building is a two story 48,000 square foot
office. The remainder of the building is a 76,000
square foot warehouse used for product storage. The
building was a pre-engineered metal building designed
by Varco Pruden. Pre-engineered buildings are
purchased with the understanding that the structural
design, fabrication and delivery of the steel building
to the site is part of the purchase contract. The
architect for the building was A. F. Manns Associates
of Wilmington, DE. The pre-engineered metal building
was provided by J.W. Walker & Sons who subcontracted
the erection to East Coast Erectors.

The roof was constructed with steel roof joists
designed by SMI Joists with a 1-1/2 inch corrugated
metal deck, 2 inch loose laid foam insulation boards,
an EPDM rubber membrane and stone ballast. The joists
were bearing on tapered steel rafters supported by
exterior tapered columns and interior three-plate
columns. The upper office floor was constructed with
steel floor joists, corrugated steel form and a 3 inch
concrete slab.

The roof of the building sloped at a pitch of 1/4" per
foot toward the east. The intent of the owner was to
connect this building to an existing building located
just west of the new building by constructing a future
linking building between the two. As Catalogue
Resources grew, Del-Homes was asked to construct a
larger addition to the building on the east side of the
existing structure rather than on the west side.

**MMG1371**

B34

July 8, 2005
Mr. Ron L. Pingitore
Page 3

2.    **Addition to the Building in 1999**

The addition to the Catalog Resources building was
larger and taller than the original building.  It was
constructed by Lighthouse Construction.  Lighthouse
engaged East Coast Erectors to provide the design,
materials and erection of the structure.  The building
was designed by Becker Morgan Moore Olds and Richter,
architects, and O'Donnell Naccarato & Macintosh,
Wilmington, DE, structural engineers.  This building
was constructed with conventional framing of open web
steel roof joists and hot rolled continuous steel
girders.  It survived the snow storm with minimal
damage.

The new addition was constructed along the low side of
the roof slope of the 1995 building and was taller than
that building effecting the older building in two
respects, each of which had to be addressed by the
designers of the adjacent new addition.

Firstly, the roof of the new building was higher than
the older building resulting in a 200 foot long offset
wall between the two buildings varying in height from 3
feet at the north end to 5 feet at the south end.  This
created a configuration where snow could scour from the
higher roof and be deposited as a snow drift on the
lower roof.  Roof drifting can be accommodated by
building a lower drift bay in the new building to place
the drift in the new structure where the designer has
control of the new roof construction.  Alternatively,
the edge of the new roof could slope in the profile of
a drift lessening the snow loading on the existing
roof.  The third more common option is to analyze the
existing lower building and strengthen all structural
components where necessary to comply with the current
code.

Secondly, the roof of the 1995 building slopes toward
the new building.  Internal roof drains were required
to evacuate the roof rain water which was directed

**MMG1372**

B35

July 8, 2005
Mr. Ron L. Pingitore
Page 4

toward the higher building.  Roof drains were installed
along the roof offset to collect the water into a 10
inch diameter PVC drain pipe which was suspended from
the first joist from the offset wall and from trapeze
at the drains, discharging the water into a storm drain
at the rear (north end) of the building [Photo 134-
141].  The drains were located about 2 feet from the
east edge of the roof placing them under the deepest
part of the code predicted snow drift.

3.    **Survey of the 1995 Building in 1999**

The structural engineering consulting firm, O'Donnell,
Naccarato & MacIntosh, which designed the new addition
accepted the responsibility to review and strengthen
the original 1995 building.  The 1996 BOAC code states:

> **1614.2 Additions:** The *addition* to an existing
> structure shall not increase the force in any
> structural element of the existing element by more
> than 5 percent, unless the increased forces on the
> element are still in compliance with this code for
> new structures.  The addition shall not decrease
> the strength of any existing structural element of
> the existing structure to less than that required
> by this code for new structures.

When designing structural modifications to a commercial
building of this size it is good engineering practice
to survey the structure before performing the analysis.
It is not unusual for structural modifications and
structural damage to occur which should be surveyed.
Build owners and tenants may install equipment over the
years making the structures heavier as time passes.

O'Donnell, Naccarato & MacIntosh obtained Varco
erection drawings and calculations from East Coast to
work from in performing the structural analysis.  No

**MMG1373**

B36

July 8, 2005
Mr. Ron L. Pingitore
Page 5

one from O'Donnell, Naccarato & MacIntosh actually went
to the building to survey.  They relied on the drawings
and a verification that the drawings were "as built"
from the steel erector, East Coast.  Had a qualified
structural engineer inspected the building, Varco
drawings in hand, they would have or should have
discovered the following:

1.   The continuous tapered roof rafters are more
     4 feet deep with flanges only 6 inches wide
     and 3/8 inch thick over the interior columns.
     These slender beams require bracing at the
     columns to prevent roll of the rafter.  Under
     load a hinge forms at the top of the column
     causing the column to drift laterally
     allowing the rafter to roll and collapse.
     Properly located stiffeners with a moment
     connection between the column and beam could
     be used in some instances.  In this building,
     the bearing stiffeners did not align with the
     column flanges or column web below the beam
     flange rendering the beam to column
     connection as a normal pinned connection.
     The column to beam connection was a hinge
     requiring lateral bracing.  The bottom flange
     of a continuous rafter is in compression over
     the columns.  Compression flanges attempt to
     shed loading by buckling laterally.  The
     column offers no resistance to this lateral
     buckling and would drift laterally with the
     beam flange.  To prevent roll of the rafter
     and to decrease the unbraced length of the
     compression flange, lateral flange braces are
     required at the columns.  The Varco drawings
     show a cluster of 6 bottom flange braces at
     each interior column.  They were to be
     located on each side of the rafter at each
     interior column and on each side of the
     rafter 5 feet from the column.  The two
     braces at the column, the most critical, were
     not installed.  Omission of the braces at the
     columns made the rafter vulnerable to
     compression flange buckling and roll of the
     rafters over the columns.  There was no

MMG1374

B37

July 8, 2005
Mr. Ron L. Pingitore
Page 6

ceiling in the building and this defect would
be evident, especially when comparing the
existing structure with the Varco drawings.

2. The roofing on the building was a ballasted
EPDM membrane over loose laid insulation on
metal decking.  The ballast provides 10
pounds per square foot of weight to hold the
membrane in place resisting wind uplift.
This additional weight was not considered in
the O'Donnell, Naccarato & MacIntosh review
of the building because they had no knowledge
of its existence in 1999.  There is a roof
hatch leading to the roof and the type of
roof system on the building would easily have
been determine during a field survey.

3. The roof framing drawing do not indicate a
joist size.  A field survey would have been
helpful.  Every joist on the roof has a metal
tag with the manufacturer's name (SMI Joists
Co. Inc.), the project number (D51998-2), and
the joist mark (eg K8).  The actual size
could be obtained from the joist manufacture
with this information.

4. **Review of the Existing Roof Joists**

The roof was framed with open web steel joists
placed generally on 5 foot centers spanning 50
feet between rafters.  Steel joist sizes are
designated with three terms such as 30K10.  The
first term, 30, indicates the depth of the joist,
30 inches.  The second, K, indicate which joists
specification applies to this joist for
determining such aspects as bearing details,
materials used and bridging requirements.  The
last term refers to the structural performance of
the top and bottom chords.  The Steel Joist
Institute publishes standard joist tables

**MMG1375**

B38

July 8, 2005
Mr. Ron L. Pingitore
Page 7

indicating the strength of standard joist size
designations.

My own review indicated that the joists used in
the 1995 building had a strength between a 30K8
and 30K9 joist designation.  In reviewing the roof
it would be appropriate to use the lower rated
30K8 or to obtain the size from the manufacturer.

The joist manufacturer for this building does not
limit their joists to the discrete standard
designations.  They manufacture joists custom to
each roof project.  The joists on this project
were, in fact, of a strength between a 30K8 and
30K9 with a design total load of 228 pounds per
linear foot (plf) and design live load of 150 plf.
The design loads would therefore be 30 psf live
load and 15.6 psf dead load.  Joists over the
office area were designed for higher snow drift
loading behind the south wall parapet where a
ground snow load of 25 PSF was used.

5.   **Snow Drifting on the Low Roof**

When a high roof is built next to a lower roof
consideration should be given to a snow event
where snow is scoured off of the higher roof and
falls into an area of aerodynamic shade along the
leeward side of the offset in the roof.  The size
of the resulting drift depends on the geographical
location of the building, the surrounding
resistance to wind, the height of the roof offset
and the reach for scour on the higher roof.

**MMG1376**

B39

July 8, 2005
Mr. Ron L. Pingitore
Page 8

Analysis of the drift at the offset created by the
1999 building was performed using the 1996 BOCA
code.  The factors used were as follows:

$p_g$ = 20 psf      Ground snow load
$h_r$ = 5.0 ft      Roof offset
$W_b$ = 500 ft      Length of reach of upper roof
$I$ = 1.0          Importance of structure
$C_e$ = .7          Exposure to wind

The results is a design snow depth on the low roof
at the offset equal to the offset wall height with
a weight of 83 psf.  The design drift slopes down
to the uniform snow depth of .84 feet on the flat
roof portion of the roof about 16.6 feet from the
offset wall.  This drift represents the minimum
code design load.  Considering the factor of
safety one would expect collapse of a properly
designed roof at about 1.5 times the design load
or for 18 psf dead load, 10 psf stone ballast and
83 psf drift load the expected collapse load would
be about 167 psf at the high point of the drift.

6.    **Strengthening of the 1995 Building**

After their review of the existing building
O'Donnell, Naccarato & MacIntosh recommended
installation of a cold rolled 8 inch deep, 12 gage
zee purlins between the existing columns about one
foot from the existing eave purlin [shown red in
Photo 133].  This was apparently an arbitrary
decision as the one page calculation does not
reach a conclusion that this purlin is required.

The new steel was to be supported by steel angles
at each end.  This new purlin was intended to help
support the eave purlin.  The joists were thought
to be adequate with no additional support.  The
O'Donnell, Naccarato & MacIntosh sketch attached
as

**MMG1377**

B40

July 8, 2005
Mr. Ron L. Pingitore
Page 9

Exhibit 7 indicates the recommended stiffening of the roof for snow drifting.

The repair sketch was not signed or sealed. It was not included in the permit set of drawings and did not have the benefit of a review by the local code official or building inspector.

7.    **Roof Drainage Modifications**

Constructing the new building east of the 1995 building created a condition where the roof of the old building sloped toward the new building. The gutter system would have to be replaced by an interior drain system. New drains were installed about two feet off of the offset wall. The roof water from those drains was collected into a 10 inch diameter PVC drain pipe which was suspended below the roof. The main pipe was suspended from the first joist from the offset wall with clevice hangers [Photo 137]. The drain leaders were suspended from unistrut trapeze hangers which were attached to the first joist and to the bottom flange of the added zee purlins [Photo 138].

The added drains had two structural implications. Firstly, the weight of a filled 10 inch pipe is about 36 plf. This would reduce the capacity of the joist from which it is suspended by 36 plf. Secondly, the drains were buried in the deepest part of any snow drift deposited at the offset wall. Roof water flowing across the 200 foot roof could encounter a significant snow drift before reaching the drains. This could result in ponding at or under the drift. There is no evidence that either consequence was addressed in the 1999 repair recommendation.

**MMG1378**

B41

July 8, 2005
Mr. Ron L. Pingitore
Page 10

8.    **Cause of the Collapse**

On February 17, 2003, at about 6:35 am, the
building collapsed.  On that date snow was falling
with a northeasterly wind.  The wind scoured snow
off of the high roof reaching to the far northeast
corner, depositing snow as a drift onto the lower
roof according to meteorologist Dr. Lowell
Krawitz, our weather consultant.  The drift would
have been maximum height along the highest end of
the roof offset with a maximum weight of the snow
estimated to be 67.7 psf.  The drift would extend
approximately 17 feet from the offset wall.

Using the BOCA defined drift design the minimum
design load for a drift at that location is 83 psf
extending 16.6 feet from the offset wall to meet
the uniform accumulation of snow on the roof.
That uniform design snow depth is .84 feet, about
10 inches deep weighing 14 psf.  Under the weight
of this drift the total dead load and snow load at
the first joist line would be 397 plf.  The total
load on the second joist line would be 353 plf.
This loading exceeds the allowable loading on the
as-built joist (228 plf) as well as the higher
rated 30K9 (245 plf) and 30K10 (291 plf).  It is
evident that the roof joists were severely
overloaded under the weight of this drift.

The weakest component of this area of roof framing
is the connection of the wind strut to the wind
column [e.g. Photo 48, 98].  This strut was welded
to the center of four joists and bolted to the
wind column using four 1/2 inch diameter bolts.
The wind struts and wind columns were not designed
for gravity loads as is evident from the Varco
calculations.  With the snow accumulating on the
roof this connection would have failed in shear.
Photos 29 and 34 indicate how little resistence
the connection gave to gravity loads as the roof

July 8, 2005
Mr. Ron L. Pingitore
Page 11

has collapsed but the wind columns remain standing. Photos 53 and 54 show no distortion of the connection plate at the end of a wind strut along the offset wall.

With the failure of the wind strut connection the joists lose any support at mid span that the wind strut may have provided. As snow accumulated the joists at the five foot roof offset were overloaded and deflected at mid-span similar to that shown in Photo 110. The most traumatically disturbed area of the roof was at the five foot offset where the roof was torn open [Photo 48 to 57]. The added zee purlin provided little support of the roof. The wall was unintentionally providing support to the edge of the roof, not the added purlin.

With the roof failure along the offset, collapse worked progressively across the building, weakened by missing compression flange bracing, as lateral movements and stresses radiated from the first collapse by structural members and bracing rods which were laced through the roof structure. The office roof survived as it was unintentionally supported by the demising wall between the warehouse and office. The roof joists along the south parapet had been designed for a higher drift load and these joists survived the storm. Additionally, the interior columns in the office area were laterally braced by the mezzanine floor providing resistance to lateral buckling and roll of the rafter.

9.  **Conclusions**

The building collapsed under the burden of drifting snow along the roof offset. When the 1999 building was designed O'Donnell, Naccarato & MacIntosh was charged with and accepted the

July 8, 2005
Mr. Ron L. Pingitore
Page 12

responsibility to review the existing building and provide the design for drifting snow on that building resulting in the construction of the new building.  The investigation and repair recommendation was deficient in the following ways:

1.  Investigating the strength of an existing commercial building of this size should have started with a field survey.  There were no ceiling or wall coverings in the portion of the warehouse along the offset.  A walk-through inspection of the building would have revealed:

   a.  The roof was an EPDM loose laid system with 10 pound per square foot ballast. The implications of ballast on the roof alone would have been a red flag according to Mr. Anastasi, the design engineer from O'Donnell, Naccarato & MacIntosh.  The 10 pound ballast reduced the available joist capacity for snow loads considerably.  The roof hatch makes the discovery of ballast quite easy.

   b.  The drawings received from East Coast indicate a cluster of six flange braces at each column.  The two located directly over the columns were missing and the stiffeners were not aligned for column continuity.  This defect was easily discoverable.

   c.  The first joist is spaced at 4'-9".  The remainder of the roof has a joist spacing of 5'-0", not 4'-9" as indicated on the drift calculations.

2.  The O'Donnell, Naccarato & MacIntosh proposal included two site visits to the new building. Had these visits been executed with an examination of the work in the existing building, the

**MMG1381**

B44

July 8, 2005
Mr. Ron L. Pingitore
Page 13

inadequacy of the repair would have been realized.

3.  Rather than survey the building the engineers relied on the erection contractor to verify the information on the Varco drawings, not someone from their office familiar with the engineering issues related to the snow drift analysis.

4.  The snow drift calculation for the 1995 building was flawed in that low side of the roof was used for the drift height.  Using the offset height of 5 feet rather than 3 feet results in a considerably heavier and wider drift.  Also, the use of a scour reach of 200 rather than 500 and considering this a parapet configuration indicates an unfamiliarity with the intent of the code on the part of the designer.

5.  The recommended repair stopped at the end of the roof offset even though it is logical that the drift would continue into the next bay.  The repair should have extended for another bay to support the extended drift.

6.  The roof rafters were not part of the O'Donnell, Naccarato & MacIntosh roof strength analysis.  By including the rafters the bracing defect would have been discovered.

7.  It is normal practice for a licenced engineer to review the work of an unlicenced employee, including at least the design criteria used in the calculation.  O'Donnell, Naccarato & MacIntosh's own calculation sheets have initial space for "calculated by" and "checked by" at the top.

8.  A structural review and repair recommendation for a commercial building of this size should have been signed and sealed as a part of a permit set for the review by the local

MMG1382

B46

July 8, 2005
Mr. Ron L. Pingitore
Page 14

building official.  Requesting the back-up
calculation may have resulted in the
discovery of the deficiency of the repair.

9.   Consideration of the flow of water toward the
     snow drifting area and the weight of the
     water filled drain pipe was not considered.

10.  Rather than installing one line of light gage
     purlins, a more appropriate repair for the
     roof would be installing new joists or
     equivalent steel beams between the first
     three joists.  This would double the strength
     of the roof under the drift area and would
     cut the metal deck span in half.

A more thorough investigation and analysis and
providing the Code Official with the proposed
repair would have prevented collapse under the
drifted snow.  A series of errors and overlooked
aspects of the roof review cumulatively led to
inadequate roof support at the drift.  Defects in
the building allowed a local collapse to progress
across the roof.

9.   **Post Collapse Review of the Roof**

I have reviewed the post collapse calculations and
have the following comments.

1.   It would be most logical to use the worst
     condition when reviewing the roof even in a
     bay by bay analysis.  The worst case would be
     the 5 foot depth at the south end of the
     offset.

**MMG1383**

B47

July 8, 2005
Mr. Ron L. Pingitore
Page 15

    2.    Each of the O'Donnell, Naccarato & MacIntosh
        analyses indicate that the joists were
        overloaded in the drift area and repairs to
        the roof were required as indicated on
        Exhibit 6.

    3.    The rafters were not included in the
        O'Donnell, Naccarato & MacIntosh review.

These opinions were reached within a reasonable degree
of engineering certainty. Since discovery is
continuing, these opinions are preliminary. If you
have any questions or require additional information
please feel free to contact our office.

Very truly yours,

Charles N. Timbie, P.E.
Structural Engineer

Exhibits:

1.  1996 BOCA snow excerpt
2.  Varco S-26 of 39 and S-5 of 39
3.  Varco load certification
4.  ONM snow drift calculations
5.  Calculation comparison chart
6.  ONM roof repair sketch
7.  MBMA snow load table
8.  SMI Joist calculation sheet fo K8 and K16
9 .  SJI Load table
10. Photographs

**MMG1384**

B48

Exhibit "F"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MILLERS CAPITAL INSURANCE COMPANY a/s/o DEL-HOMES CATALOG GROUP, LLC, | C.A. No. 04-1322-JJF |
| Plaintiff, | |
| v. | |
| LIGHTHOUSE CONSTRUCTION, INC., BECKER MORGAN GROUP, INC., O'DONNELL, NACCARATO & MACINTOSH, INC., and EAST COAST ERECTORS, INC., | |
| Defendants. | **JURY TRIAL OF TWELVE DEMANDED** |
| and | |
| LIGHTHOUSE CONSTRUCTION, INC., | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| EAST COAST ERECTORS, INC., | |
| Defendant and Third-Party Defendant. | |

## FIRST AMENDED COMPLAINT

1. Plaintiff Millers Capital Insurance Company (hereinafter "Millers Capital") is a business incorporated under the laws of Pennsylvania with its primary place of business located at 805 North Front Street, P.O. Box 1246, Harrisburg, PA 17108-1246, and at all times hereinafter mentioned was authorized to do business in the State of Delaware as an insurance company.

B49

2. Plaintiff's insured, Del-Homes Catalog Group, LLC (hereinafter "Del-Homes") is the owner of a warehouse and distribution facility located at 97 Commerce Way, Dover, Delaware, and at all times herein was insured under plaintiff's policy #609497.

3. Defendant Lighthouse Construction, Inc. (hereinafter "Lighthouse Construction") is a business incorporated under the laws of Delaware with its primary place of business located at 1201 College Park Drive, Dover, Delaware, and at all times hereinafter mentioned was engaged in the business of, inter alia, general contracting and construction.

4. Defendant Becker Morgan Group, Inc. (hereinafter "Becker Morgan") is a business incorporated under the laws of Maryland, and is the successor to Becker Morgan Moore Olds & Richter, Inc., with a place of business located at 738 S. Governors Avenue, Dover, Delaware, and at all times hereinafter mentioned was engaged in the business of, inter alia, designing and engineering buildings.

5. Defendant O'Donnell, Naccarato & Macintosh, Inc. (hereinafter "O'Donnell, Naccarato & Macintosh") is a business incorporated under the laws of Delaware with its primary place of business located at 300 Delaware Avenue, Suite 820, Wilmington, Delaware, and at all times hereinafter mentioned was engaged in the business of, inter alia, designing and engineering buildings.

6. Defendant East Coast Erectors, Inc. (hereinafter "East Coast Erectors") is a business incorporated under the laws of Delaware with a registered agent located at 1332 King Street, Wilmington, Delaware, and at all times hereinafter mentioned was engaged in the business of, inter alia, designing, engineering, and constructing buildings.

B50

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. §1332. The matter in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a).

## FACTS

8. In or about September 1999, Del-Homes acquired a building that was designed, engineered, supplied and/or erected by Lighthouse Construction located at 97 Commerce Place (hereinafter the "1999 building").

9. Upon information and belief, East Coast Erectors provided design, engineering, and erection services to Lighthouse Construction in connection with the construction of the 1999 building.

10. Upon information and belief, Becker Morgan and/or its predecessor Becker Morgan Moore Olds & Richter, Inc. provided design and engineering services to Lighthouse Construction in connection with the construction of the 1999 building.

11. Upon information and belief, O'Donnell, Naccarato & Macintosh also provided design and engineering services to Lighthouse Construction in connection with the construction of the 1999 building. The 1999 building was erected adjacent to a preexisting building, also acquired by Del-Homes in September 1999, that was erected in or about 1995 (hereinafter the "1995 building").

12. ANSI/ASCE 7-98, the American Society of Civil Engineers, Minimum Design Loads For Buildings and Other Structures, Section 7.12 Existing Roofs states, "Existing roofs shall be evaluated for increased snow loads caused by additions or alterations. Owners or agents for

B51

owners of an existing lower roof shall be advised of the potential for increased snow loads where a higher roof is constructed within 20 feet."

13. In the course of erecting the 1999 building, defendants failed to properly evaluate the 1995 building for the increased snow load caused by the construction of the 1999 building and the resulting height differential created where the buildings interfaced.

14. In the course of designing and constructing the 1999 building, defendants did not engineer or otherwise account for the additional snow load that would be imposed on the pre-existing 1995 building.

15. The 1999 building was designed and constructed without adequate bracing or other structural support being provided for the pre-existing 1995 building where they interfaced.

16. On or about February 17, 2003, a substantial portion of the roof of the 1995 building collapsed following a foreseeable snowfall which collapse directly resulted from the carelessness, negligence and negligent omissions of defendants, as hereinafter more fully set forth.

17. As a result of the collapse, Del-Homes sustained substantial damage to its 1995 building and incurred business income and extra expense losses.

18. Pursuant to the terms and conditions of its contract of insurance, plaintiff has made payments to Del-Homes in excess of $6,000,000.00 as a result of the foregoing.

19. As a result of the aforesaid payments, and pursuant to the contract of insurance and by operation of law, plaintiff is subrogated to the rights of its insured against all parties responsible for the occurrence of said damages including, but not limited to, any and all subsequent payments related to the loss suffered.

B52

## COUNT I – Negligence
## Plaintiff v All Defendants

20. Plaintiff incorporates by reference the allegations of paragraphs 1 through 19 hereof as though fully set forth at length herein.

21. The roof collapse referred to above and the consequent damages sustained by Del-Homes were caused by the negligence, carelessness and negligent omissions of defendants, their agents, servants and/or employees acting within the course and scope of their employment in:

    a.   failing to properly engineer or design for the increased snow loading imposed on the pre-existing 1995 building as a result of the construction of the 1999 building;

    b.   failing to warn of the need to engineer or design for the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

    c.   failing to design or engineer the 1999 building in a manner that did not compromise the structural integrity of the 1995 building;

    d.   failing to properly inspect the 1995 building for adequate structural stability against snow loads that could and did result from construction of the 1999 building immediately adjacent to the 1995 building;

    e.   failing to advise and warn of the necessity to review the design of the 1995 building for the additional loads that could be imposed by the construction of an adjacent higher building;

    f.   failing to advise and warn of the necessity to inspect the 1995 building for conformance with the design drawings of the 1995 building in anticipation of additional loading on the 1995 building from construction of the 1999 building;

    g.   failing to redesign and/or re-engineer the 1995 building to accommodate the additional load imposed by the construction of the 1999 building;

    h.   failing to warn of the inherent deficiencies with interfacing the 1999 and 1995 buildings;

    i.   failing to adequately warn of the inherent deficiencies with interfacing the 1999 and 1995 buildings without engineering or designing for the additional load imposed upon the 1995 building;

    j.   failing to install additional bracing and/or structural reinforcement to counter the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

B53

k.    failing to recognize or perceive the additional load imposed on the 1995 building by the construction of the 1999 building;

l.    failing to provide alternative design and/or engineering for the additional load imposed on the 1995 building as a result of the construction of the 1999 building;

m.   failing to address or counteract the additional wind drifted snow load conditions created by the 1999 building's height differential at the point where the buildings interfaced;

n.    failing to properly brace and/or support structural components and/or members of the buildings to support anticipated wind drifted snow load conditions;

o.    failing to perform standard calculations to identify and correct the inherent design defects with interfacing two buildings with significant height differentials;

p.    failing to select competent and skilled workers and subcontractors to design, engineer, supply and erect the buildings in accordance with industry standards and readily identifiable load conditions;

q.    failing to warn of the inherent defects, known defects, and work product deficiencies that compromised the structural integrity of the 1995 building;

r.    failing to perform the design, engineering, supply and construction of the 1999 building in a good and workmanlike manner;

s.    failing to comply with applicable codes and standards including but not limited to ANSI/ASCE 7-98, the American Society of Civil Engineers, Minimum Design Loads For Buildings and Other Structures, Section 7.12; and

t.    otherwise failing to use due care under the circumstances.

22.   As a direct and proximate result of the collapse, Del-Homes sustained substantial damage to its building and incurred business income and extra expense losses.

23.   As a result of the foregoing and pursuant to the terms and conditions of its contract of insurance, plaintiff has made payments to Del-Homes in excess of $6,000,000.00 for which defendants are liable to plaintiff.

**WHEREFORE**, plaintiff demands judgment in its favor and against defendants Lighthouse Construction, Inc., Becker Morgan Group, Inc., O'Donnell, Naccarato & Macintosh,

B54

Inc., and East Coast Erectors, Inc., in an amount in excess of $6,000,000.00 together with costs,

pre-judgment interest, attorney fees and such other relief as this court deems appropriate.

### COUNT II – Negligent Misrepresentation
### Plaintiff v O'Donnell, Naccarato & Macintosh

24.  Plaintiff incorporates by reference the allegations of paragraphs 1 through 23 hereof as

though fully set forth at length herein.

25.  Upon information and belief, O'Donnell, Naccarato & Macintosh was specifically

retained by Lighthouse Construction and/or East Coast Erectors to engineer the 1999 building.

26.  In the course of providing engineering services, O'Donnell, Naccarato & Macintosh

reviewed applicable building codes, designed the 1999 building, and prepared plans and

drawings for plan approval and/or building permit issuance by the local and/or state agencies

responsible for new construction in Dover, Delaware.

27.  As an engineer for the 1999 building design process, O'Donnell, Naccarato &

Macintosh failed to recommend or require necessary modifications and/or additions to the 1995

building to protect against collapse due to excessive snow loads and, as a result, supplied false,

inadequate, incomplete and incorrect information to others in their business relations, including

Lighthouse Construction and/or East Coast Erectors.

28.  As an engineer for the 1999 building design process, O'Donnell, Naccarato &

Macintosh failed to design the building in a manner that did not place the 1995 building at risk of

collapse due to snow loading.

29.  O'Donnell, Naccarato & Macintosh was, at all times relevant hereto, an engineering

firm and was in the business of supplying structural design information and plans/drawings used

B55

by others to construct buildings such as the 1999 building constructed by Lighthouse Construction.

30. As set forth in Count I and above, O'Donnell, Naccarato & Macintosh failed to exercise reasonable care or competence in obtaining or communicating the engineering information reasonably relied upon before, during and after construction.

31. O'Donnell, Naccarato & Macintosh was under a public duty to obtain and communicate engineering information that was the result of reasonable care or competence.

32. The engineering services provide by O'Donnell, Naccarato & Macintosh were intended to benefit a limited group of persons, including Plaintiff, as a subsequent owner of the buildings.

33. As a direct and proximate result of the collapse caused by the aforementioned negligent misrepresentations of O'Donnell, Naccarato & Macintosh, Del-Homes sustained substantial damage to its building and incurred business income and extra expense losses.

34. As a result of the foregoing and pursuant to the terms and conditions of its contract of insurance, plaintiff has made payments to Del-Homes in excess of $6,000,000.00 for which the defendant is liable to plaintiff.

**WHEREFORE**, plaintiff demands judgment in its favor and against defendant O'Donnell, Naccarato & Macintosh, Inc., in an amount in excess of $6,000,000.00 together with costs, pre-judgment interest, attorney fees and such other relief as this court deems appropriate.

B56

**WHITE AND WILLIAMS LLP**

BY: _____

Frank Noyes, Esquire
824 North Market Street, Suite 902
Wilmington, DE 19899
302-654-0424
Attorney for Plaintiff

Of Counsel:
Ron Pingitore, Esquire
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19135-7395
215-864-6324

DOCS_PH 1670111v1

B57

Exhibit "G"

1
2                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE
3        ----------------------x
    FEDERAL INSURANCE           : CIVIL ACTION
4   COMPANY a/s/o
    EZIBA.COM./AVACET,          : NO. 04-339
5   INC., EZIBA SECURITIES
    CORP.,                      :
6            Plaintiff(s),      :
                 v.             :
7   LIGHTHOUSE                  :
    CONSTRUCTION, INC.,         :          ORIGINAL
8   BECKER MORGAN GROUP,        :
    INC., and O'DONNELL,        :
9   NACCARATO & MACINTOSH,      :
    INC.,                       :
10           Defendant(s).      :
         ----------------------x
11  MILLERS CAPITAL             : CIVIL ACTION
    INSURANCE COMPANY           :
12  a/s/o DEL-HOMES             : NO. 04-1322-JJF
    CATALOG GROUP, LLC,         :
13           Plaintiff(s),      :
                 v.             :
14  LIGHTHOUSE                  :
    CONSTRUCTION, INC.,         :
15  BECKER MORGAN GROUP,        :
    INC., and O'DONNELL,        :
16  NACCARATO & MACINTOSH,      :
    INC.,                       :
17           Defendant(s)       :
    and                         :
18  LIGHTHOUSE                  :
    CONSTRUCTION, INC.,         :
19           Defendant and      :
             Third-Party        :
20           Plaintiff,         :
                 v.             :
21  EAST COAST ERECTORS,        :
    INC.,                       :
22           Third-Party        :
             Defendant.         :
23       ----------------------x
24

B58

1              Oral deposition of MICHAEL A.

2   WILLIAMS, held at the law offices of WETZEL &

3   ASSOCIATES, P.A., The Carriage House, Suite

4   201, 1100 North Grant Avenue, Wilmington,

5   Delaware, 19805, on Tuesday, June 14, 2005,

6   beginning at 9:25 a.m., on the above date,

7   before Debra J. Weaver, a Federally Approved

8   RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9   (No. 138-RPR, Expiration 1/31/08), and a Notary

10  Public of New Jersey, Pennsylvania and

11  Delaware.

12

13

14

15

16

17

18

19

20

21

22          ESQUIRE DEPOSITION SERVICES

        1880 John F. Kennedy Boulevard

23             15th Floor

        Philadelphia, Pennsylvania 19103

24          (215) 988-9191

Esquire Deposition Services

B59

MICHAEL A. WILLIAMS

1      Q.      In a general sense has anyone?

2      A.      Yes.

3      Q.      Who?

4      A.      Actually, not any specific
5  person, but just hearing testimony in some of
6  these depositions, I'm getting a feel of
7  they're focusing on the snow drift.

8      Q.      And has anyone shared with you an
9  opinion regarding the weight of the snow, ice
10  and/or water on the roof immediately prior to
11  the collapse?

12      A.      Immediately prior to the
13  collapse?

14      Q.      Right.

15      A.      No.

16      Q.      Sitting here today, are you aware
17  of any mistakes regarding the erection of the
18  1995 building?

19      A.      No.

20      Q.      Sitting here today, are you aware
21  of any deviations from the erection drawings
22  with respect to the actual condition of the
23  1995 building as of the time of the collapse?

24          MR. HILL:   I'm going to object to

B60

MICHAEL A. WILLIAMS

1              the form of that question.
2     BY MR. PINGITORE:
3              Q.     You can answer it.
4              A.     Am I aware of any deviation from
5     the erection drawing is your question?
6              Q.     Right.
7              A.     Yes.
8              Q.     What are you aware of?
9              A.     There were braces at the column
10    omitted, which are shown on the erection
11    drawings.
12             Q.     What braces are they?
13             A.     Flange braces.
14             Q.     The lower flange braces?
15             A.     Yes.
16             Q.     And how did that come to be known
17    by you?
18             A.     My recollection was the quantity
19    shipped was not consistent with the quantity
20    shown on the erection drawings, and I was
21    informed of that by my field people, which I
22    relayed to Mr. MacLeish and was told that those
23    braces were not necessary due to a stiffener
24    added to the girder beam at every interior

MICHAEL A. WILLIAMS

1   column.

2          Q.      And when was this conversation?

3          A.      This would have been probably

4   early in the erection of the '95 building.

5          Q.      And did you have an understanding

6   as to why the stiffener would, at least

7   according to Mr. MacLeish, take the place of a

8   brace?

9          A.      Yes.

10         Q.      Can you explain that to me?

11         A.      The braces are generally used to

12  keep the bottom flange of the girder beams from

13  rotating, and in this case, where they attached

14  to the columns, rotation can't occur there

15  because it's attached to the column.  And then

16  the stiffener was added, I think, to prevent

17  any buckling as well.

18         Q.      And that information that Mr.

19  MacLeish provided you, was it your

20  understanding that he in turn received the

21  information from Varco-Pruden?

22         A.      It was my understanding he

23  received it verbally.

24         Q.      From Varco-Pruden?

B62

1    A.    Yes.

2    Q.    Did you relay any part of that
3  conversation to O'Donnell Naccarato as part of
4  their involvement in the 1999 project and
5  evaluation of the 1995 building?

6    A.    I don't recall.

7    Q.    Just for clarification, you don't
8  recall relaying that information or you didn't
9  relay that information?

10    A.    I don't recall relaying that
11  information.

12    Q.    Is there a reason you wouldn't
13  have relayed that information?

14    A.    Not that I can think of.

15    Q.    And if that information was
16  relayed, it would have been either to Mr.
17  Anastasi or Mr. MacIntosh; is that correct?

18         MR. HILL:  Object to the form of
19         the question.

20         THE WITNESS:  It probably would
21         have been relayed to one of those two,
22         yes.

23  BY MR. PINGITORE:

24    Q.    Other than the flange braces, are