Exhibit "J"

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3  -----------------------x
    FEDERAL INSURANCE          : CIVIL ACTION
 4  COMPANY a/s/o              :
    EZIBA.COM./AVACET,         : NO. 04-339
 5  INC., EZIBA SECURITIES     :
    CORP.,                     :
 6         Plaintiff(s),       :
           v.                  :
 7  LIGHTHOUSE                 :
    CONSTRUCTION, INC.,        :     ORIGINAL
 8  BECKER MORGAN GROUP,       :
    INC., and O'DONNELL,       :
 9  NACCARATO & MACINTOSH,     :
    INC.,                      :
10         Defendant(s).       :
    -----------------------x
11  MILLERS CAPITAL            : CIVIL ACTION
    INSURANCE COMPANY          :
12  a/s/o DEL-HOMES            : NO. 04-1322-JJF
    CATALOG GROUP, LLC,        :
13         Plaintiff(s),       :
           v.                  :
14  LIGHTHOUSE                 :
    CONSTRUCTION, INC.,        :
15  BECKER MORGAN GROUP,       :
    INC., and O'DONNELL,       :
16  NACCARATO & MACINTOSH,     :
    INC.,                      :
17         Defendant(s)        :
    and                        :
18  LIGHTHOUSE                 :
    CONSTRUCTION, INC.,        :
19         Defendant and       :
           Third-Party         :
20         Plaintiff,          :
           v.                  :
21  EAST COAST ERECTORS,       :
    INC.,                      :
22         Third-Party         :
           Defendant.          :
23  -----------------------x
24
```

B76

```
 1              Oral deposition of MICHAEL A.
 2  WILLIAMS, held at the law offices of WETZEL &
 3  ASSOCIATES, P.A., The Carriage House, Suite
 4  201, 1100 North Grant Avenue, Wilmington,
 5  Delaware, 19805, on Tuesday, June 14, 2005,
 6  beginning at 9:25 a.m., on the above date,
 7  before Debra J. Weaver, a Federally Approved
 8  RPR, CRR, CSR of NJ (No. XI 01614) and Delaware
 9  (No. 138-RPR, Expiration 1/31/08), and a Notary
10  Public of New Jersey, Pennsylvania and
11  Delaware.
```

                    ESQUIRE DEPOSITION SERVICES
                    1880 John F. Kennedy Boulevard
                            15th Floor
                    Philadelphia, Pennsylvania 19103
                         (215) 988-9191

        Q.      Is there a reason they're not sealed?

        A.      It's not required.

        Q.      When is it required that drawings be sealed, if you know?

        A.      To my knowledge, it's not required by any government or building code.

        Q.      For shop drawings to be sealed?

        A.      For shop drawings to be sealed, correct.

        Q.      Are there other drawings to your understanding that must be sealed?

        A.      The structural drawings for the project must be sealed.

        Q.      By a registered engineer?

        A.      That's correct.

        Q.      Okay. Now, as of March 22, 1999, had O'Donnell Naccarato supplied its $20,000 worth of engineering services?

        A.      For the most part, yes.

        Q.      What services then were not yet complete?

        A.      I would have to say that by the end of March they probably had not completed

B78

1  for payment that we've marked as Exhibit 123,
2  that the reinforcement of the 1995 building was
3  completed between May 19, 1999, and June 4,
4  1999?
5          A.    Yes.
6          Q.    Okay.  Let me show you yet
7  another document, single-page document,
8  previously Bates stamped ECE 0649.  We'll mark
9  it as Exhibit 125.
10              (Whereupon, Deposition Exhibit
11         No. Williams-125, Sketch from ONM,
12         Bates ECE 0649, was marked for
13         identification.)
14 BY MR. PINGITORE:
15         Q.    Once you have a chance to
16 familiarize yourself with the document, please
17 identify it for the record.
18         A.    This is a sketch from O'Donnell
19 Naccarato MacIntosh showing the additional
20 purlin that was added to the 1995 building.
21         Q.    Then is the additional purlin
22 shown as 8Z105?
23         A.    Yes.
24         Q.    Do you know who specifically with

1  O'Donnell Naccarato created this drawing?
2       A.    Joe Anastasi.
3       Q.    And how do you know that Mr.
4  Anastasi created this drawing?
5       A.    I'm familiar with the document
6  and somewhat familiar with his handwriting.
7       Q.    Are you familiar with the
8  document in the context of the 1999 project
9  being undertaken?
10      A.    Yes.
11      Q.    And how was this document used by
12 East Coast, if at all?
13      A.    It was used to procure the
14 materials recommended and to install them.
15      Q.    Would this be considered a
16 construction document?
17      A.    I'm not sure how to answer that.
18      Q.    Well, to your understanding, was
19 this document intended to be used by East Coast
20 in order to construct the additional members to
21 reinforce the 1995 building?
22      A.    Yes.
23      Q.    And was this document then given
24 to East Coast's field personnel in order to

1  follow in the reinforcement of the 1995
2  building?
3        A.    Yes.
4        Q.    To your knowledge, were any other
5  documents created by O'Donnell Naccarato or
6  East Coast depicting the modifications to the
7  1995 building?
8        A.    I don't recall any.
9        Q.    And to your knowledge, was this
10 document ever sealed by a registered engineer?
11       A.    Not to my knowledge.
12       Q.    Did you ever request that
13 O'Donnell Naccarato seal this document?
14       A.    That I don't recall.
15       Q.    You don't recall ever asking
16 that?
17       A.    I don't recall asking that.
18       Q.    Are you aware of any sealed plan
19 or drawing showing alterations to the 1995
20 building?
21       A.    I'm not aware of any.
22       Q.    Do you know who was responsible
23 for securing a building permit for the work
24 shown on Exhibit 125?

         MR. HILL:  Object to the form of
   the question.
BY MR. PINGITORE:
   Q.      To your understanding, would the
work depicted on Exhibit 125 require the
issuance of a building permit?
   A.      That I couldn't answer.
   Q.      With respect to the 1995 project,
who to your understanding was responsible for
securing building permits?
   A.      Lighthouse Construction.
   Q.      And to your knowledge, did
Lighthouse Construction secure a building
permit for the 1999 project?
   A.      I don't have explicit knowledge,
but I assume that there was one issued.
   Q.      Was East Coast involved at all
with the securing of building permits for the
1999 project?
   A.      No.
   Q.      Did Lighthouse ever ask East
Coast for specific documents from O'Donnell
Naccarato in the course of securing building
permits for the 1999 project?

A. Yes.

Q. What documents did Lighthouse request of O'Donnell Naccarato through East Coast?

A. They requested the -- all the structural plans showing, you know, the '99 building, from foundation plan to roof framing plan to building sections.

Q. And did East Coast facilitate getting those plans from O'Donnell Naccarato to Lighthouse?

A. Yes.

Q. Was that you personally that was involved with that process?

A. I don't think it was me personally.

Q. Who would that have been?

A. It could have been a number of people in my office. I'm not sure specifically who.

Q. Would you consider the work depicted in Exhibit 125 to be structural in nature?

A. I guess that's a fair statement,

1  yes.
2       Q.    Was there ever a request by
3  Lighthouse through you to get a sealed document
4  showing the structural modifications depicted
5  in Exhibit 125?
6       A.    Not --
7            MR. HILL:   Object to the form of
8       the question.
9  BY MR. PINGITORE:
10      Q.    You can answer it.
11      A.    Not to my knowledge.
12      Q.    The structural modifications
13 shown on Exhibit 125, they were actually
14 performed by East Coast, correct?
15      A.    Yes.
16      Q.    And can you just walk me through
17 the modification that's depicted in Exhibit 125
18 in terms of how you would accomplish the work.
19      A.    We would have supplied the 8Z105
20 member that would span column to column as well
21 as the angle, 6 X 4 by 5/16, depicted under it.
22 Those angles were field welded to the existing
23 columns.  The new purlin was field welded to
    the new angle.  Then the purlin was screwed to

1  the low flutes of the roof deck. That's pretty
2  much the sequence of events.
3      Q.   And where the new purlin was
4  screwed to the roof deck, would there be any
5  preparation work required at the roof deck
6  level, or was all of the work completed on the
7  underside of the roof deck?
8      A.   All completed from underneath.
9      Q.   Would that screw then that
10 connects the top, I'll call it flange of the
11 purlin to the roof deck, penetrate the roof
12 deck itself?
13     A.   Yes.
14     Q.   And then the lower flange of the
15 purlin was welded, if I understand it
16 correctly?
17     A.   That's correct.
18     Q.   As of today, do you hold any
19 opinions regarding the cause of the collapse at
20 issue in this litigation?
21     A.   No.
22     Q.   Do you hold any opinions
23 regarding the weight of snow, ice or water on
24 the roof immediately prior to the collapse?

```
 1        A.    Do I hold an opinion to the
weight of the snow, is that what you asked me?
 3        Q.    Yeah.  I want to know if you hold
any opinions regarding the weight of the snow,
ice and/or water on the roof immediately prior
to the collapse.
          A.    Not an opinion, no.
          Q.    Do you hold -- do you have some
type of an understanding as to the weight?
          A.    More or less that it was
excessive.
          Q.    And how would you define
excessive?
          A.    I'm not sure.  It was pretty much
a one-in-100-year storm or something, and there
was very excessive snow on this roof.
          Q.    Can you express your belief
regarding the weight in terms of pounds per
square foot or pounds per lineal foot or any
other type of measurement?
          A.    No, I can't.
          Q.    Has anyone shared with you their
opinion regarding the cause of the collapse?
          A.    Not specifically.
```

Exhibit "K"

```
                 UNITED STATES DISTRICT COURT
 1                FOR THE DISTRICT OF DELAWARE
 2      ------------------------------x
 3      FEDERAL INSURANCE              :  CIVIL ACTION
        COMPANY a/s/o                  :
 4      EZIBA.COM./AVACET,             :
        INC., EZIBA                    :  NO. 04-339
 5      SECURITIES CORP.,              :
                Plaintiff(s),          :
 6              v.                     :
        LIGHTHOUSE                     :
 7      CONSTRUCTION, INC.,            :
        BECKER MORGAN GROUP,           :
 8      INC., and O'DONNELL,           :
        NACCARATO &                    :
 9      MACINTOSH, INC.,               :
                Defendant(s).          :
10      ------------------------------x
        MILLERS CAPITAL                :  CIVIL ACTION
11      INSURANCE COMPANY              :
        a/s/o DEL-HOMES                :  NO. 04-1322-JJF
12      CATALOG GROUP, LLC,            :
                Plaintiff(s),          :
13              v.                     :
        LIGHTHOUSE                     :
14      CONSTRUCTION, INC.,            :
        BECKER MORGAN GROUP,           :
15      INC., and O'DONNELL,           :
        NACCARATO &                    :
16      MACINTOSH, INC.,               :
                Defendant(s)           :
17      and                            :
        LIGHTHOUSE                     :
18      CONSTRUCTION, INC.,            :
                Defendant and          :
19              Third-Party            :
                Plaintiff,             :
20              v.                     :
        EAST COAST ERECTORS,           :
21      INC.,                          :
                Third-Party            :
22              Defendant.             :
        ------------------------------x
23
24
```

                                                                    B87

```
 1              Continued deposition of
 2   ROBERT MacINTOSH, held at the law offices
 3   of CHRISSINGER & BAUMBERGER, 3 Mill Road,
 4   Suite 301, Wilmington, DE 19806, on
 5   Monday, May 2, 2005, beginning at 9:45
 6   a.m., on the above date, before Debra J.
 7   Weaver, a Federally Approved RPR, CRR,
 8   CSR of NJ (No. XI 01614) and Delaware
 9   (No. 138-RPR, Expiration 1/31/08), and a
10   Notary Public of New Jersey, Pennsylvania
11   and Delaware.
12
13
14
15
16
17
18
19
20
21
22            ESQUIRE DEPOSITION SERVICES
              1880 John F. Kennedy Boulevard
23                     15th Floor
            Philadelphia, Pennsylvania 19103
24                  (215) 988-9191
```

A. That's correct.

Q. Okay. Did you understand not only that East Coast Erectors but Lighthouse Construction, the owner, anyone else who was involved, was relying on O'Donnell, Naccarato & MacIntosh, as the design engineers, to analyze the drift condition and come up with a solution that's represented by this document?

A. Yes, I understood that.

Q. And you would agree with me that neither you nor anyone else you have talked to expected Mr. Mike Williams or anyone else at East Coast Erectors to either contribute to or come up with a solution for the drift problem?

A. No. There was no responsibility on them to do any of the analyses.

What we have done, I guess, and what some of the things that we've talked about, is that we have such a good relationship with East Coast Erectors

that at different times we may rely on each other to -- for convenience only, to make observations for the other one.

I mean, we've -- over the years, we have just such an integrated relationship, and that's probably the reason why we would rely on some of the feedback from Mike on such things as the general compliance for the existing building to the drawings.

But the responsibility for the analysis of the drifting and for making recommendations with regards to the drifting were our responsibility.

Q. If there is a problem with the design that's reflected in this Exhibit 66, Eziba 0018, you would not blame East Coast Erectors for any of that, would you?

A. No.

Q. Okay. There is one document in your files. It was marked as an exhibit somewhere in this deposition, but I don't know if I could lay my hands on