IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY a/s/o EZIBA.COM, INC./AVACET, INC., EBIZA SECURITIES CORP.   and MILLERS CAPITAL INSURANCE COMPANY a/s/o DEL-HOMES CATALOG GROUP, LLC, | ) ) ) ) ) ) ) | Civil Action No. 04-339/04-1322 JJF |
| | ) ) | CONSOLIDATED ACTION |
| Plaintiffs, | ) ) | JURY OF TWELVE DEMANDED |
| v. | ) ) ) | |
| LIGHTHOUSE CONSTRUCTION, INC., BECKER MORGAN GROUP, INC., and O'DONNELL, NACCARATO & MACINTOSH, INC. and EAST COAST ERECTORS, INC. | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| LIGHTHOUSE CONSTRUCTION, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) ) | |
| EAST COAST ERECTORS, INC., | ) ) | |
| Third-Party Defendant. | ) | |

**APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANT/THIRD-PARTY
DEFENDANT EAST COAST ERECTORS, INC'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT BASED UPON THE STATUTE OF REPOSE**

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Exhibit A | - | Excerpts of Deposition of Robert MacLeish | C1 |
| Exhibit B | - | Excerpts of Deposition of Joseph Anastasi | C7 |
| Exhibit C | - | Excerpts of Deposition of Charles N. Timbie, P.E. | C13 |
| Exhibit D | - | *Padilla v. R&R Drywall, Inc.*, 1997 Del. Super. LEXIS 242 | C20 |
| Exhibit E | - | *McConaghie v. Wakefern Food Corp.*, 2004 Del. Super. LEXIS 165 | C23 |
| Exhibit F | - | Excerpts of Deposition of Michael Williams | C25 |

# EXHIBIT "A"



Page 288

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
---------------------x
FEDERAL INSURANCE    : CIVIL ACTION
COMPANY a/s/o        :
EZIBA.COM./AVACET,   : NO. 04-339
INC., EZIBA          :
SECURITIES CORP.,    :
        Plaintiff(s), :
        v.            :
LIGHTHOUSE           :
CONSTRUCTION, INC., :
BECKER MORGAN GROUP, :
INC., and O'DONNELL, :
NACCARATO &          :
MACINTOSH, INC.,     :
        Defendant(s). :
---------------------x
MILLERS CAPITAL      : CIVIL ACTION
INSURANCE COMPANY    :
a/s/o DEL-HOMES      : NO. 04-1322-JJF
CATALOG GROUP, LLC,  :
        Plaintiff(s), :
        v.            :
LIGHTHOUSE           :
CONSTRUCTION, INC., :
BECKER MORGAN GROUP, :
INC., and O'DONNELL, :
NACCARATO &          :
MACINTOSH, INC.,     :
        Defendant(s)  :
and                  :
LIGHTHOUSE           :
CONSTRUCTION, INC., :
        Defendant and :
        Third-Party   :
        Plaintiff,    :
        v.            :
EAST COAST ERECTORS, :
INC.,                :
        Third-Party   :
        Defendant.    :
---------------------x
```

VOLUME 2

Page 289

1          Continued oral deposition of

2     ROBERT C. MacLEISH, held at the law

3     offices of CHRISSINGER & BAUMBERGER, 3

4     Mill Road, Suite 301, Wilmington, DE

5     19806, on Monday, April 11, 2005,

6     beginning at 9:15 a.m., before Debra J.

7     Weaver, a Federally Approved RPR, CRR,

8     CSR of NJ (No. XI 01614) and Delaware

9     (No. 138-RPR, Expiration 1/31/08), and a

10    Notary Public of New Jersey, Pennsylvania

11    and Delaware.

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES
              1880 John F. Kennedy Boulevard
23                      15th Floor
              Philadelphia, Pennsylvania 19103
24                   (215) 988-9191

ESQUIRE DEPOSITION SERVICES

C2

ca9d1628-4c14-490d-84b2-f6cfc749a047

ROBERT C. MacLEISH

Page 389

1    Q.    You don't think so?

2    A.    No.

3    Q.    Okay.  Where do you think it
4    is?

5    A.    If I could get a set of
6    foundation plans, it would probably be
7    easier for --

8    Q.    For the '99 building?

9    A.    Yes.

10    Q.    Okay.  I think they
11    correspond, but it's not important enough
12    to take the time right now to do it.

13         I'm not going to fish out
14    the documents.  Let's see if we can do
15    this without them.

16         But do you recall the
17    scope-of-work document that was
18    transmitted to East Coast Erectors?

19    A.    Yes, sir.

20    Q.    And if we need to look at
21    it, I think Mr. Pingitore may be pulling
22    it up for us now, but did you understand,
23    with respect to any design engineering,
24    that that would be subcontracted or

ROBERT C. MacLEISH

1  referred to a design engineering firm by
2  East Coast Erectors?
3      A.    Can I see the scope of work?
4      Q.    Sure.
5      A.    I think I actually have it.
6      Q.    I think it might be actually
7  numbered Moore-8.  Is that it?
8      A.    Yes, I believe it is.
9      Q.    Go ahead and take a look at
10 it.
11     A.    Yes.  Under work to be
12 included, under item number one, we said
13 the structural design, the steel and
14 concrete foundation is complete,
15 coordinate with architect in completing
16 design.  The architect is BM2OR, Ernie
17 Olds.
18     Q.    Now, is -- what that meant
19 to you is that the structural design of
20 the 1999 structure would be provided by
21 some design engineer?
22     A.    Yes, a licensed engineer.
23     Q.    Right.  And you looked to
24 East Coast Erectors to locate and engage

ROBERT C. MacLEISH

Page 391

1  a licensed engineer for that purpose?

2       A.    Yes, sir.

3       Q.    Okay.  You knew, at the

4  time, that they had located and

5  identified O'Donnell Naccarato &

6  MacIntosh as that structural engineer?

7       A.    Yes.  After -- yes, when we

8  saw the drawings.

9       Q.    And was that agreeable and

10 acceptable to you at the time?

11      A.    Yes.

12      Q.    And you knew that East Coast

13 Erectors, just as you would, relied upon

14 that structural design engineer to design

15 all the structural aspects of this

16 project?

17           MR. BAUMBERGER:  Objection

18      to the form.

19           MR. BAILEY:  Objection.

20           MR. HILL:  That's a proper

21      objection.

22 BY MR. HILL:

23      Q.    You understood, with respect

24 to the structural design that was

ROBERT C. MacLEISH

Page 392

1   contemplated for the scope of work for

2   East Coast Erectors, that all of the

3   design work would be supplied by ONM?

4         A.    Oh, is that O'Donnell --

5         Q.    Yes.  I'm sorry.

6         A.    Yes, sir.

7         Q.    The only one talking any

8   more than you here is me, and I shorten

9   it when I can.

10         A.    Okay.

11         Q.    Now, with respect to Item C

12   that you were asked about earlier in your

13   deposition, did you understand also that

14   that design work would be provided by

15   ONM?

16         A.    Yes.

17         Q.    Okay.  That was acceptable

18   to you?

19         A.    That they would do that?

20   That ONM would do that work?

21         Q.    Yes.

22         A.    Yes.

23         Q.    Now, in the structural

24   design that is contemplated by Item 2C in

# EXHIBIT "B"



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
----------------------x
FEDERAL INSURANCE      : CIVIL ACTION
COMPANY a/s/o          :
EZIBA.COM./AVACET,     : NO. 04-339
INC., EZIBA            :
SECURITIES CORP.,      :
        Plaintiff(s), :
        v.             :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
BECKER MORGAN GROUP,   :
INC., and O'DONNELL,   :
NACCARATO &            :
MACINTOSH, INC.,       :
        Defendant(s). :
----------------------x
MILLERS CAPITAL        : CIVIL ACTION
INSURANCE COMPANY      :
a/s/o DEL-HOMES        : NO. 04-1322-JJF
CATALOG GROUP, LLC,    :
        Plaintiff(s), :
        v.             :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
BECKER MORGAN GROUP,   :
INC., and O'DONNELL,   :
NACCARATO &            :
MACINTOSH, INC.,       :
        Defendant(s)  :
and                    :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
        Defendant and  :
        Third-Party    :
        Plaintiff,     :
        v.             :
EAST COAST ERECTORS,   :
INC.,                  :
        Third-Party    :
        Defendant.     :
----------------------x
```

ESQUIRE DEPOSITION SERVICES

C7

895bc82b-3c20-45cd-845d-73d8f5eb1957

Page 2

1              Oral deposition of JOSEPH J.

2    ANASTASI, held at the law offices of

3    CHRISSINGER & BAUMBERGER, 3 Mill Road,

4    Suite 301, Wilmington, DE 19806, on

5    Tuesday, May 3, 2005, beginning at 9:35

6    a.m., on the above date, before Debra J.

7    Weaver, a Federally Approved RPR, CRR,

8    CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a

10   Notary Public of New Jersey, Pennsylvania

11   and Delaware.

12

13

14

15

16

17

18

19

20

21

              ESQUIRE DEPOSITION SERVICES
22        1880 John F. Kennedy Boulevard
                   15th Floor
23        Philadelphia, Pennsylvania 19103
                 (215) 988-9191
24

              ESQUIRE DEPOSITION SERVICES
                         C8                          895bc82b-3c20-45cd-845d-73d8f5eb1957

JOSEPH J. ANASTASI

Page 220

1      Q.     Did you have anything to do

2   with the analysis or the design of a

3   system of drainage consisting of piping

4   that was installed in the interior of the

5   building to drain the roof of the 1995

6   building?

7      A.     No, I did not.

8      Q.     I want to ask you generally

9   about the Varco-Pruden erection drawings

10  that you were provided with, a memo that

11  referred to them as as-built.

12          I mean, had you worked with

13  erection drawings of metal building

14  companies on other projects in the past,

15  not worked on preparing them or using

16  them but just developing a familiarity

17  about what they were?

18     A.     We get -- when we do

19  foundation work for a pre-engineered

20  building, we usually get a copy of the

21  shop drawings.  But we usually don't put

22  much review time with them at all.

23          I mean, we may scan through

24  just the anchor bolt plans because they

JOSEPH J. ANASTASI

Page 221

1    reflect to our scope of work.

2         Q.    You don't need the whole

3    erection drawing set to do the

4    foundations?

5         A.    No.

6         Q.    But do you understand, or

7    did you understand, when you got the

8    Varco-Pruden drawings, that they were

9    erection drawings simply showing how to

10   assemble the various components of the

11   building?

12        A.    Sure.  I had looked through

13   the drawings just to get a feel for the

14   building.

15        Q.    You knew that there was no

16   structural data, such as member sizes and

17   member properties, in those?

18        A.    I could not locate any of

19   that type of material of properties.

20        Q.    Now -- and were you aware,

21   at that time, that the Varco-Pruden

22   drawings showed nothing but the steel

23   framing of the structures, maybe with an

24   anchor bolt plan, but steel framing?

JOSEPH J. ANASTASI

Page 222

1       A.      It was mainly steel framing.

2  And the elevation showed the sidings and

3  the girts in schematic format.

4       Q.      All right.  And would it be

5  fair to say that the Varco-Pruden

6  drawings would show -- the erection

7  drawings were showing how the building

8  was intended to be erected?

9       A.      I would agree with that.

10      Q.      And -- but not -- erection

11  drawings aren't what you'd call

12  as-builts, such as modified drawings that

13  are marked up and edited in order to show

14  true field conditions?

15      A.      They show intent.

16      Q.      Okay.  And you were also

17  aware that they did not show anything

18  about the structural -- pardon that.

19  Strike that.  Let me revise that.

20          You were aware, at the time,

21  that they did not show how the roof was

22  built above the bar joists and decking?

23      A.      That's correct.  I did not

24  see any details to that final

JOSEPH J. ANASTASI

Page 223

1  construction.

2          Q.    In fact, I don't think there

3  is even a sheathing plan in there, is

4  there?  Do you know if the roof sheathing

5  was incorporated in those plans?

6          A.    I don't recall that.

7          Q.    Let's just take a look and

8  see.

9                Is there any provision in

10  the Varco-Pruden drawings for sheathing

11  over the roof of the structure?  Take a

12  look and just tell me.

13                MR. VEITH:  Object to the

14          form.  Do you mean to include

15          decking and sheathing?

16                MR. HILL:  Decking,

17          sheathing, panels.

18                THE WITNESS:  I don't see

19          any reference to any of that.  It

20          just seems to be primary and

21          secondary structural elements.

22  BY MR. HILL:

23          Q.    So, then, it would appear

24  that Varco-Pruden designed the building

# EXHIBIT "C"



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
---------------------x
FEDERAL INSURANCE     : CIVIL ACTION
COMPANY a/s/o         :
EZIBA.COM./AVACET,    : NO. 04-339
INC., EZIBA           :
SECURITIES CORP.,     :
        Plaintiff(s), :
          v.          :
LIGHTHOUSE            :
CONSTRUCTION, INC.,   :
BECKER MORGAN GROUP,  :
INC., and O'DONNELL,  :
NACCARATO &           :
MACINTOSH, INC.,      :
        Defendant(s). :
---------------------x
MILLERS CAPITAL       : CIVIL ACTION
INSURANCE COMPANY     :
a/s/o DEL-HOMES       : NO. 04-1322-JJF
CATALOG GROUP, LLC,   :
        Plaintiff(s), :
          v.          :
LIGHTHOUSE            :
CONSTRUCTION, INC.,   :
BECKER MORGAN GROUP,  :
INC., and O'DONNELL,  :
NACCARATO &           :
MACINTOSH, INC.,      :
        Defendant(s)  :
and                   :
LIGHTHOUSE            :
CONSTRUCTION, INC.,   :
        Defendant and :
        Third-Party   :
        Plaintiff,    :
          v.          :
EAST COAST ERECTORS,  :
INC.,                 :
        Third-Party   :
        Defendant.    :
---------------------x
```

Esquire Deposition Services

C13

3e12cc05-6437-4a00-90df-01e9644bb72a

Page 2

1          Oral deposition of CHARLES N.

2  TIMBIE, P.E., held at the law offices of

3  CHRISSINGER & BAUMBERGER, 3 Mill Road, Suite

4  301, Wilmington, DE 19806, on Thursday, August

5  4, 2005, beginning at 9:10 a.m., on the above

6  date, before Debra J. Weaver, a Federally

7  Approved RPR, CRR, CSR of NJ (No. XI 01614) and

8  Delaware (No. 138-RPR, Expiration 1/31/08), and

9  a Notary Public of New Jersey, Pennsylvania and

10  Delaware.

11

12

13

14

15

16

17

18

19

20

21

22          ESQUIRE DEPOSITION SERVICES
           1880 John F. Kennedy Boulevard
23                 15th Floor
           Philadelphia, Pennsylvania 19103
24               (215) 988-9191

CHARLES N. TIMBIE, P.E.

Page 51

1          A.       I know pigs and rabbits.

2          Q.       Okay.  This is my point.  You, as a

3    structural engineer, when you look at a set of

4    Varco-Pruden engineering drawings that aren't marked

5    or changed in any way, they appear to be a copy of

6    the original erection drawings, and they don't even

7    have a roof on it, you know that those aren't

8    as-built, don't you?

9                   MR. VEITH:  Object to the form.

10                  THE WITNESS:  Well, I think they were

11   purported to be as-built for the steel.  I mean,

12   it's true, the roofing was done by others, but the

13   steel was on those drawings.

14   BY MR. HILL:

15         Q.       What is an as-built?  What does that

16   term mean to you?

17         A.       It means that when the building is

18   completed, the -- what is in the building is what

19   was on those drawings as built.

20         Q.       Okay.  So is it normal for a set of

21   as-built drawings to be generated at some point

22   after completion of a structure, someone goes

23   through and marks the drawings themselves to show

24   as-built?

25         A.       That's generally the way it's done,

CHARLES N. TIMBIE, P.E.

Page 52

1    yes.

2           Q.       Okay.  Now, other than the

3    transmittal sheet, these drawings that were sent to

4    ONM, you would agree, were not marked as-built, were

5    they?

6           A.       They were not marked as-built.  Just

7    transmitted in that fashion.

8           Q.       Okay.  And do you know of your own

9    knowledge or from anything that you've read as to

10   whether O'Donnell Naccarato MacIntosh's employees,

11   specifically Joe Anastasi, relied on those as

12   as-built drawings in the traditional sense?

13          A.       I believe he did.

14          Q.       Okay.  And isn't it your conclusion

15   in this case, Mr. Timbie, that the fault of ONM, I

16   call O'Donnell Naccarato & MacIntosh ONM, was that

17   they didn't go out there themselves and see what the

18   situation was?

19          A.       I believe they should have done that.

20          Q.       And don't you believe they should

21   have gone out and looked around and they should have

22   seen, if they'd done a good job, that the braces

23   were missing?

24          A.       I think so.  But, on the other hand,

25   they were relying on East Coast to provide certain

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 53

1  information.  I agree with you, if they didn't get

2  enough information, they should conduct their own

3  survey, but these drawings were given as the

4  conditions that are out there, and that's what they

5  worked from.  They apparently were comfortable

6  working from those drawings.

7          Q.      But, as I hear you testify today, the

8  most you can say to criticize East Coast Erectors is

9  they transmitted that set of Varco-Pruden drawings

10  with a cover sheet that said as-built?  That's the

11  worst you have on East Coast; is that right?

12          A.      Yes.

13                  MR. VEITH:  Object to the form.

14                  THE WITNESS:  As I sit here, yes.

15  BY MR. HILL:

16          Q.      How are you doing break-wise?

17          A.      Would that be me in particular?

18          Q.      You in particular.

19          A.      I'm fine.

20          Q.      I'm not going to be fine for long

21  here.  I'm going to have to take a break.  Just give

22  me a second.

23                  MR. HILL:  Mr. Veith, do you want to

24  share with me what you think is wrong with my

25  question?

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 56

1          Q.          Okay.  And do you have any evidence
2     that either East Coast Erectors didn't understand it
3     or that they failed to go back and ask, what does it
4     mean?
5          A.          No.  There was no other documents
6     generated, so, no.  To me it's an ambiguous
7     document.  It's a hard document to work from.
8          Q.          You're critical of the design, right?
9          A.          Yes, I'm critical of the design.  But
10    my criticism is sort of accepted by East Coast when
11    they went ahead and did the work based on this one
12    drawing.
13         Q.          Are you assuming that?
14         A.          Yes, I am.
15         Q.          Mr. Timbie, what I'm hearing is that
16    you would expect a contractor, if he doesn't
17    understand what a drawing means, to ask the
18    engineer?  That's what I'm hearing from this?  Is
19    that a good summary of it?
20         A.          Yes.
21         Q.          Okay.  And you don't know whether
22    that occurred or not, whether they asked or not?
23         A.          No.  But I know of no other documents
24    or sealed drawings that were produced.
25         Q.          Isn't it the engineer's

3e12cc05-6437-4a00-90df-01e9644bb72a

CHARLES N. TIMBIE, P.E.

Page 57

1   responsibility to figure out whether or not he's

2   going to seal a document or not?

3           A.      Not in a building of this size.  I

4   mean, this is major structural renovation of a

5   building that should be sealed and signed.  It

6   should be part of the permit.  It should be on the

7   construction drawings.  It should go through the

8   review of the building department and be a part of

9   the permit.

10          Q.      Okay.  And so who's responsible in

11  this case from your review for getting the permits?

12          A.      It would be Lighthouse.

13          Q.      Here's exhibit Williams-118.  Have

14  you ever seen it?

15          A.      I believe I have.

16          Q.      Are you sure?

17          A.      I'm not positive this is the exact

18  document.

19          Q.      Okay.  Assuming just for the purpose

20  of this question that you've seen that or a copy of

21  it, did you make any significant use of it in

22  connection with your analysis?

23          A.      No.

24          Q.      Thank you.

25                  MR. BAUMBERGER:  What exhibit number

3e12cc05-6437-4a00-90df-01e9644bb72a

# EXHIBIT "D"

3 of 100 DOCUMENTS

**ALEJANDRA PADILLA, MIRTA VELEZ and HENRY VELEZ, wife and husband, Plaintiffs, v. R&R DRYWALL, INC., R.C. PEOPLES, INC., and GLASGOW SHOPPING CENTER CORPORATION, Delaware corporations, Defendants.**

**C.A. No. 95C-05-232 SCD**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1997 Del. Super. LEXIS 242*

**February 10, 1997, Date Submitted**
**February 24, 1997, Date Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:**

Defendant R&R Drywall, Inc.'s Motion for Summary Judgment Granted. Defendant R.C. Peoples's Motion for Partial Summary Judgment Granted.

**JUDGES:** Judge Susan C. Del Pesco

**OPINIONBY:** Susan C. Del Pesco

**OPINION:**

ORDER

Upon Defendant R&R Drywall, Inc.'s Motion for Summary Judgment

Upon Defendant R.C. Peoples's Motion for Partial Summary Judgment

This 24th day of February, 1997, upon consideration of Defendants' motions for summary judgment, it appears to the Court that:

(1) This personal injury action arises from an accident in which drywall and ceiling materials fell on the plaintiffs causing personal injuries. The accident occurred at Hair Trends Beauty Salon ("Unit 630") of Peoples Plaza, Newark ("Plaza"). Plaintiffs Alejandra Padilla, Mirta Velez and Henry Velez sue R&R Drywall, Inc. ("R&R"), R.C. Peoples, Inc. ("Peoples"), and Glasgow Shopping Center Corporation ("Glasgow") for injuries sustained as a result of the incident. R&R seeks summary judgment on this action and Peoples joins with a motion for partial summary judgment on the grounds that certain claims are barred by 10 [*2] *Del. C. § 8127.* n1

n1 *10 Del. C. § 8127* reads in pertinent part:

(b) No action, whether in or based upon a contract (oral or written, sealed or unsealed), in tort, or otherwise, to recover damages or for indemnification or contribution for damages, resulting:

(1) From any alleged deficiency in the construction or manner of construction of an improvement to real property and/or in the designing, manner, supervision and/or observation of any such construction or manner of construction shall be brought against any person performing or furnishing, or causing the performance or furnishing of, any such construction of such an improvement or against any such designing, planning, supervision, and/or observation of any such construction or manner of construction of such an improvement, after the expiration of 6 years from whichever of the following dates shall be earliest:

***

d. The date when payment in full has been received by the person

1997 Del. Super. LEXIS 242, *

against whom the action is brought for the particular phase of such construction or for the particular phase of such designing, planning, supervision, and/or observation of such construction or manner of such construction, as the case may be, in which such alleged deficiency occurred.

[*3]

(2) The facts in the light most favorable to the plaintiffs are as follows. On or about August 23, 1993, plaintiffs Alejandra Padilla and Mirta Velez were injured at Unit 630 in the Plaza when some drywall, ceiling materials, and other products fell from the store's ceiling. R&R installed this drywall on the ceiling and walls of Unit 630. Peoples owns and operates Peoples Plaza and was responsible for the construction, repair and maintenance of the unit. Glasgow owns and operates Glasgow Shopping Center Corporation and was also responsible for the construction, repair and maintenance of Unit 630.

(3) R&R completed drywall installation of Unit 630 on or about June 10, 1987 and was paid for its work on or about June 15, 1987. R&R later performed work on the interior walls of Unit 630 on November 10, 1989, when the unit was prepared for a new tenant. On June 15, 1993, some drywall material fell from the ceiling in Unit 630 at the same location at which it fell on August 23, 1993. However, no one was injured on June 15, 1993.

(4) Summary judgment is appropriate where the moving party shows that there is no genuine issue of material fact, and that it is entitled to judgment as a matter [*4] of law. Super. Ct. Civ. R. 56(c). The Court accepts as established all undisputed factual assertions made by either party, and accepts the nonmovant's version of any disputed facts. *Merrill v. Crothall-American, Inc, Del. Supr., 606 A.2d 96, 99-100 (1992).* All rational inferences which favor the nonmoving party are drawn from those accepted facts. *Id.* A motion for partial summary judgment is treated as a motion for summary judgment with regards to the burden placed upon the moving party. Defendants R&R and Peoples now seek summary judgment and partial summary judgment on the grounds that there are no material facts in dispute and that they are entitled to summary judgment as a matter of law.

(5) Plaintiffs contend that there are questions of material fact as to whether the work done by R&R in November, 1989, or the incident on June 15, 1993, give rise to a factual dispute as to whether the defendants were on notice of any problems with the drywall and whether the defendants were negligent for not inspecting or examin-

ing its previous drywall work done in June, 1987. Defendants R&R and Peoples argue that the plaintiffs were not injured until August 23, 1993, two months after the [*5] relevant time period for filing such an action expired. It is clear that *10 Del. C. § 8127* provides the answer to these contentions.

(6) Section 8127 of Title 10 is a statute of repose which forbids an action, whether based in contract or tort, to be brought for personal injuries arising from any alleged deficiency in the construction of an improvement to real property after the expiration of six years. The six year limitations period begins to run at the earliest of several designated dates, irrespective of the date of injury. The date and subsection which commences the six year period in this action is 8127(b)(6)(d). This subsection states that the limitations period begins at the date when payment in full is received by the person against whom the action is brought for the "particular phase" of the construction. All parties agree that this statute governs this action although they disagree on its application.

(7) Defendant Glasgow, who opposes the motion by R&R and Peoples, contends that the phrase "particular phase" should be interpreted to mean when the entire Plaza was completed, not just the initial phase to install drywall at the Plaza. The Courts find that the record [*6] and documents provided indicate that R&R was paid at the completion of drywall installation in each unit, based upon work done for each unit. R&R received payment in full for Unit 630, as well as several other separately documented units, on June 15, 1987. This clearly indicates payment in full for a particular phase of the construction.

(8) Plaintiffs make a different argument. They maintain that subsequent work by R&R in November, 1989, on the interior walls of Unit 630 placed a duty upon the defendants to reinspect their work and notice any additional future problems. Further, the plaintiffs argue that the fact that drywall fell from the ceiling on June 15, 1993, in the same place where it fell on the plaintiffs in August, 1993, shows negligence and notice by the defendants.

(9) There is affidavit testimony, provided by R&R, that the work done in November, 1989 was unrelated to the drywall installation previously performed on Unit 630. The November, 1989, work was performed on the interior walls below the ceiling when the unit was prepared for a new tenant. Plaintiffs only response to the affidavit is that R&R and Peoples "performed drywall work on Unit No. 630, People's Plaza, [*7] that may have been allegedly below the ceiling line in November, 1989." Further, Plaintiffs contend, without affidavit, contract or case law to support their assertion, that at that time, Defendants were under a duty to reinspect their

1997 Del. Super. LEXIS 242, *

work or notice any future problems. The Court finds that there is no issue of material fact as to these allegations. It is clear from the record provided that the work done in November, 1989, while on the same unit, was unrelated to the incident in August, 1993 when drywall materials fell from the ceiling. Defendants had no duty in 1989 to inspect unrelated work done in 1987.

(10) It is important to understand that *10 Del. C. § 8127* is a statute of repose, not limitations. The difference is critical to this case and the validity of the plaintiffs' claims. A statute of repose, unlike a statute of limitations, does not merely bar relief, rather, it extinguishes the existence of the substantive right. *Fountain v. Colonial Chevrolet Co., Del. Super., 1988 WL 40019,* Bifferato, J. (Apr. 13, 1988); *Becker v. Hamada, Del. Supr., 455 A.2d 353 (1982).* "Any failure to commence the action within the applicable time period extinguishes the right itself [*8] and divests the . . . court of any subject matter jurisdiction which it might otherwise have." *First Savings & Loan Assoc. v. First Federal Savings & Loan Assoc. of Hawaii, D. Hawaii, 547 F. Supp. 988, 995 (1982).* The limitations period, that of payment in full on June 15, 1987, begins to run, irrespective of the date of injury. "Thus, whether or not the *cause of action* is discoverable earlier, the passing of the six-year period deprives the injured party of a legal right to redress. 'The harm that has been done is *damnum absque injuria* - a wrong for which the law affords no redress.'" *Cheswold Vol. Fire Co. v. Lambertson Const., Del. Super., 462 A.2d 416, 419 quoting Rosenberg v. Town of North Ber-*

*gen, N.J. Supr., 61 N.J. 190, 293 A.2d 662, 667 (1972).* The fact that there may have been some notice of an alleged defect in the drywall on June 15, 1993 does not effect the fact that the plaintiffs did not bring this action until after the expiration of the six year period. Unlike the "inherently unknowable" exception or tolling by fraudulent concealment, no such exception is permitted by this statute of repose. *See generally Scott v. Delaware Tech. & Comm. College,* [*9] *1985 Del. Ch. LEXIS 400,* Del. Ch., C.A. No. 7387, Walsh, V.C. (Mar. 5, 1985). As noted by the Supreme Court in *Cheswold Vol. Fire Co. v. Lambertson Const., Del. Supr., 489 A.2d 413, 420,* "the application of the Statute here under consideration, like others, may cause harsh results on occasion. This case, we believe, constitutes one such occasion. Whether a statute is wise or effective is not, of course, within the province of the courts." *Id.* (citations omitted).

(11) It is clear that under *10 Del. C. § 8127,* the plaintiffs' claims are beyond the statutory period for bringing such an action. Therefore, for the foregoing reasons, defendant R&R's motion for summary judgment is GRANTED and defendant Peoples' motion for partial summary judgment is GRANTED.

IT IS SO ORDERED this 24th day of February, 1997.

!

Judge Susan C. Del Pesco

# EXHIBIT "E"

LEXSEE 2004 DEL. SUPER. LEXIS 165

ROBERT MC CONAGHIE and JOANN MC CONAGHIE, Plaintiffs, v.
WAKEFERN FOOD CORPORATION t/a SHOPRITE OF WILMINGTON,
DELAWARE SUPERMARKETS, INC., MID-ATLANTIC REALTY TRUST t/a
BRANDYWINE COMMONS, INC., SUPERIOR ELECTRICAL SERVICE, INC.,
EAGLE ELECTRICAL SERVICES, INC., SPARTAN ELECTRICAL COMPANY,
and DELLE DONNE & ASSOCIATES t/a HIGHLAND PARTNERSHIP, Defen-
dants.

C.A. No. 01C-05-230 MMJ

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2004 Del. Super. LEXIS 165*

April 5, 2004, Submitted
May 25, 2004, Decided

**DISPOSITION:** [*1] Summary judgment granted to
Delle Donne & Associates, Inc.

**LexisNexis(R) Headnotes**

**JUDGES:** Judge Mary M. Johnston.

**OPINIONBY:** Mary M. Johnston

**OPINION:**

ORDER

1. On May 24, 2001, Plaintiffs filed a complaint
seeking recovery for personal injury damages sustained
as a result of an incident that occurred on December 6,
1999 at the ShopRite supermarket in Brandywine Com-
mons, Wilmington, Delaware.

2. Plaintiffs contend that during construction or
renovation activities at the supermarket, energized elec-
trical wires were allowed to be left open and exposed in
the drop ceiling area. One of the Plaintiffs came into
contact with the open, energized wire and sustained inju-
ries.

3. Plaintiffs allege that Delle Donne negligently per-
formed construction activities at the ShopRite supermar-
ket, causing the existence of a dangerous condition that
resulted in injuries. In support of its motion for summary
judgment, Delle Donne presented evidence by affidavit
that Delle Donne does not own the property in question.
Delle Donne performed construction management ser-
vices in connection with the original construction of the
ShopRite supermarket. [*2] The commercial construc-

tion project was substantially competed on or before No-
vember 24, 1993. On January 5, 1994, New Castle
County issued a Certificate of Occupancy for the
ShopRite supermarket.

4. Delaware Builder's Statute, *10 Del. C. § 8127*,
provides that no action to recover any damages shall be
brought against any person performing supervision of
construction of improvement to real property after the
expiration of six years from the date of substantial com-
pletion. Like a statute of repose, Delaware's Builder's
Statute bars the right of action even before the injury has
occurred, if the injury occurred after the prescribed time
period of six years. On the other hand, if the injury oc-
curs before the expiration of the six-year time period, but
the suit is not filed until after the running of the time
limitation, the statute operates as an ordinary statute of
limitations to bar the claim.

5. Plaintiff does not dispute that if *Section 8127* ap-
plies, this action is time-barred as against Delle Donne.

6. Plaintiff argues in response to Delle Donne's mo-
tion:

> There has been no determination in this
> case that the energized, exposed electrical
> wires [*3] touched by the plaintiff and
> which resulted in his injuries were con-
> sidered to be "fixtures" as contemplated
> by the statute. Accordingly, there exists a
> genuine issue of material fact and sum-
> mary judgment is not appropriate.

C23

2004 Del. Super. LEXIS 165, *

7. This Court has espoused the "common sense" definition of "improvement" as the term is used in *Section 8127*. An "improvement" is "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." n1 Electrical wiring clearly falls within this definition. n2

> N1 *Hiab Cranes and Loaders, Inc. v. Service Unlimited, Inc., 1983 Del. Super. LEXIS 648, *6-7*, Martin, J. (Aug. 16, 1983).

> n2 *See id.; Kirkwood Dodge, Inc. v. Frederic G. Krapf, Jr., Inc., 1989 Del. Super. LEXIS 201, Del. Super., 1989 WL 48639*, Babiarz, J. (May 9, 1989) (circuit breaker panel box found to be "improvement" under "common sense" definition).

[*4]

8. Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Because Delle Donne has supported its motion by affidavit, the burden shifts to Plaintiffs to demonstrate that there are material issues of fact. n3 Superior Court Civil Rule 56(e) requires that the adverse party's response must be by affidavit or in such a manner presenting evidence beyond mere allegations, setting forth specific facts showing that there is a genuine factual issue for trial.

> n3 *Carriere v. Peninsula Insurance Co., 810 A.2d 349 (Del. 2002)*.

9. During oral argument, Plaintiffs asserted that further discovery might uncover facts which would place Delle Donne on the premises after issuance of the certificate of occupancy. However, Plaintiffs admitted that at this time, there are no facts indicating that Delle Donne provided anything other than construction supervision services during original construction.

10. It is undisputed that [*5] construction was substantially completed by November 24, 1994 and that the certificate of occupancy was issued on January 5, 1994. The six-year statute of limitations contained in *Section 8127* expired as of January 5, 2000. The complaint was filed May 24, 2001. The parties have agreed that this action is time-barred as against Delle Donne unless evidence exists that Delle Donne provided construction or maintenance services after May 24, 1994. In the absence of specific facts, supported by affidavit or beyond mere allegations, indicating a connection between the premises and Delle Donne after completion of original construction, summary judgment must be entered in favor of Delle Donne.

THEREFORE, the Motion for Summary Judgment of Delle Donne & Associates, Inc. is hereby **GRANTED.**

**IT IS SO ORDERED.**

Judge Mary M. Johnston

# EXHIBIT "F"



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
---------------------x
FEDERAL INSURANCE      : CIVIL ACTION
COMPANY a/s/o          :
EZIBA.COM./AVACET,     : NO. 04-339
INC., EZIBA SECURITIES :
CORP.,                 :
        Plaintiff(s),  :
           v.          :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
BECKER MORGAN GROUP,   :
INC., and O'DONNELL,   :
NACCARATO & MACINTOSH, :
INC.,                  :
        Defendant(s).  :
---------------------x
MILLERS CAPITAL        : CIVIL ACTION
INSURANCE COMPANY      :
a/s/o DEL-HOMES        : NO. 04-1322-JJF
CATALOG GROUP, LLC,    :
        Plaintiff(s),  :
           v.          :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
BECKER MORGAN GROUP,   :
INC., and O'DONNELL,   :
NACCARATO & MACINTOSH, :
INC.,                  :
        Defendant(s)   :
and                    :
LIGHTHOUSE             :
CONSTRUCTION, INC.,    :
        Defendant and  :
        Third-Party    :
        Plaintiff,     :
           v.          :
EAST COAST ERECTORS,   :
INC.,                  :
        Third-Party    :
        Defendant.     :
---------------------x
```

ESQUIRE DEPOSITION SERVICES

C25

798293c5-1c9a-436a-8706-ffc3971e9314

Page 2

1          Oral deposition of MICHAEL A.

2    WILLIAMS, held at the law offices of WETZEL &

3    ASSOCIATES, P.A., The Carriage House, Suite

4    201, 1100 North Grant Avenue, Wilmington,

5    Delaware, 19805, on Tuesday, June 14, 2005,

6    beginning at 9:25 a.m., on the above date,

7    before Debra J. Weaver, a Federally Approved

8    RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9    (No. 138-RPR, Expiration 1/31/08), and a Notary

10   Public of New Jersey, Pennsylvania and

11   Delaware.

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES
                1880 John F. Kennedy Boulevard
23                       15th Floor
                Philadelphia, Pennsylvania 19103
24                    (215) 988-9191

MICHAEL A. WILLIAMS

Page 184

1    A.    Yes.

2    Q.    And what does that depict?

3    A.    That's a typical detail they
4    provided for the flange braces, which is pretty
5    much not applicable.

6    Q.    Not applicable in the -- in what
7    sense?

8    A.    It's a generic detail and it
9    doesn't reference the actual design of the
10   building.  This depicts purlins.  This building
11   has bar joists.

12   Q.    So the -- how would that then,
13   beyond the fact that there's a different
14   secondary member in the roof structurals, how
15   does that change the work, if at all, the work
16   that East Coast would do?

17   A.    Well, I believe we had to obtain
18   clarification as to how to attach them to the
19   bar joists.  And somewhere in this set of
20   drawings, or maybe a later version, there was a
21   reference to field welding it to the bar
22   joists.  One thing that is still the absence
23   of, that clarification for the field weld to
24   the bottom of the bar joists would be pretty

ESQUIRE DEPOSITION SERVICES
C27

798293c5-1c9a-436a-8706-ffc3971e9314

MICHAEL A. WILLIAMS

Page 185

1   much generic for the whole building with the

2   exception of the column, and there's no detail

3   provided at the column.  That detail will not

4   work there due to the stiffener being in place.

5        Q.      So is it that the stiffener would

6   render -- when you say that detail, you mean

7   the detail for welding it to the joists?

8        A.      In this detail they show the

9   flange brace bolted to the bottom flange of the

10  girder beam.  You could not do that in this

11  location.  There were no holes provided, and

12  the stiffener was impeding the flange brace, if

13  it were required there.

14       Q.      Physically it would have

15  obstructed the installation of the -- the

16  stiffener would have --

17       A.      There was no way to attach the

18  flange brace at the column.  There was no

19  provision made during fabrication.  There's no

20  detail on the drawing.  This is how that whole

21  deletion of those came about.

22       Q.      Okay.  Was the inability to

23  install a flange brace at the location where

24  the stiffener was, was that discussed with Mr.

MICHAEL A. WILLIAMS

Page 186

1    MacLeish?

2         A.     I believe so.

3         Q.     Okay.  And do you recall him

4    providing you with any explanation or

5    information from Varco-Pruden on that point?

6         A.     No.

7         Q.     As far as you were concerned, was

8    the flange brace discrepancy and flange brace

9    issue resolved once you were informed that no

10   flange brace would be necessary in the location

11   where there was a stiffener?

12        A.     Yes, that was my understanding.

13        Q.     And at that point did you have

14   any reason to inquire further about how or

15   whether one could install a flange brace at the

16   location where there was a stiffener?

17        A.     No.

18        Q.     And Varco-Pruden did not supply a

19   sufficient number of flange braces so that East

20   Coast would have been able to install a flange

21   brace at each one of these apparent locations

22   shown on the drawing?

23        A.     That's correct.

24        Q.     Are you aware of any -- I had