# EXHIBIT A

 ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

**Wiss, Janney, Elstner Associates, Inc.**
14 Washington Road, Suite 501
Princeton Junction, New Jersey 08550
609.799.7799 tel | 609.799.7088 fax
www.wje.com

Via Fax (302-658-5686) and First Class Mail

9 September 2005

James F. Bailey, Esquire
Bailey & Associates, P.A.
Three Mill Road, Suite 306A
Wilmington, Delaware  19806

Re:  Building Collapse
     Del-Homes Catalog Group
     97 Commerce Way, Dover, Delaware
     WJE No. 2005.0245

Dear Mr. Bailey:

This letter constitutes our report regarding the collapse which occurred on February 17, 2005 at 97 Commerce Way, Dover Delaware and the involvement and the role of O'Donnell Naccarato & MacIntosh with regard to that collapse. I have read the complaints filed in the three cases, which essentially allege that O'Donnell Naccarato & MacIntosh (ONM) negligently provided structural engineering services in connection with the evaluation of the 1995 Building, as it has become known. It is alleged that the 1995 Building collapsed on February 17, 2003 under the weight of snow from a significant winter snow storm. Wiss, Janney, Elstner Associates, Inc. (WJE) was retained by the law firm of Bailey & Associates to assess the role of ONM.

I have had an opportunity in April 2005 to view the actual site where the collapse occurred. I did not view the site immediately after the collapse prior to debris clean-up. I have reviewed all drawings prepared by Varco-Pruden and A.F. Manns, drawings prepared in 1999 by the Becker Morgan Group, as well as by O'Donnell Naccarato & MacIntosh, Engineers. I have reviewed a number of photographs and have reviewed the SMI Joist file.

I am familiar with various industry standards and codes, including, but not limited to the BOCA, ASCE 7-95, and the AISC Steel Construction Manual.

In addition, I have read expert reports supplied by Plaintiffs' counsel including those by Moore, Davis, Krawitz and Timbie. The reports do set forth the essential history, but by way of very brief summary (since there is essential agreement on the work history of the building), I note that the building at issue was built in 1995 for a mail order catalog company. One end of the building is a two-story 48,000 square foot office. The balance of the building is a warehouse to store the lessee's product. The building was a Varco-Pruden pre-engineered metal building. A.F. Manns Associates, located in Wilmington, Delaware was the architect. The building was supplied by J.W. Walker & Sons, who subcontracted erection of the building to East Coast Erectors.

Headquarters & Laboratories–Northbrook, Illinois
Atlanta | Austin | Boston | Chicago | Cleveland | Dallas | Denver | Detroit | Honolulu | Houston
Los Angeles | Minneapolis | New Haven | New York | Princeton | San Francisco | Seattle | Washington, DC



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

James F. Bailey, Esquire
Bailey & Associates, P.A.
9 September 2005
Page 2

The construction of the 200 foot by 500 foot building consisted of a roof system of steel joists designed by SMI Joist that supported a 1.5 inch deep metal deck, 2 inch loose laid foam insulation board, and an EPDM rubber roof with stone ballast. The roof slope was 1/4 inch per foot, downward to the east. The joists were supported by 200 foot long tapered steel building frames spaced at 50 feet on center that were supported by four interior I-shaped columns and tapered columns on the exterior.

Subsequent plans of the property owner were to construct a larger addition adjacent to the east side of the above identified building. The new building is taller than the 1995 Building. Lighthouse Construction (Lighthouse) was the general contractor for this design build project. Subcontractor East Coast Erectors provided design, material, and erection services. The Becker Morgan Moore Olds and Ritcher firm (Becker Morgan) was retained as the architect by Lighthouse and ONM was retained as the structural engineer by East Coast.

The taller building addition was placed to abut the low side (east) of the 1995 Building for a distance of 200 feet starting at the north end of the 1995 Building. The height of the new building above the adjacent 1995 roof varied from slightly over 3 feet at the north end to slightly over 5 feet at the south end because of a slope in the new roof.

Little, if any, damage was reported to the new building as a result of the February 2003 snow storm.

One of the tasks assigned to the contracting parties was to evaluate the 1995 Building roof structure for potential snow drift and snow load. The determination was made to analyze the lower building roof and supply whatever structural components would be necessary to strengthen it so as to comply with applicable codes.

At the direction of the Becker Morgan Group, an internal roof drain system consisting of eight drains and piping was designed and installed in the 1995 Building roof along the 200 foot interface with the new building to remove roof rain water that drained toward the 1999 Building. It was reported that a 10 inch diameter drain line was suspended from the roof so as to direct water from the drains into a storm drain at the rear of the building.

The record reflects that the Varco-Pruden drawings and calculations for the 1995 Building were supplied by East Coast and delivered to ONM to be utilized in conducting the snow load analysis. Reliance was made on these drawings, as well as on communications from employees of East Coast verifying that the drawings accurately reflected field conditions. It was learned after the collapse that certain tapered beam, bottom flange braces at interior columns were missing and were apparently not installed when the building was erected. The absence of such braces significantly reduces the bending strength of the tapered beams. The information that the braces were not installed was not supplied to ONM during the snow load analysis. Of note, is that East Coast was involved in the construction of the 1995 steel framing and was, or should have been, very familiar with how the framing conformed or, more importantly, did not conform to the drawings.

Furthermore, the fact that the roof of the 1995 Building was EPMD membrane (ballasted) over insulation on top of metal decking was a fact not supplied to ONM. The Varco-Pruden drawings by their details and the specified dead loads did not reflect the presence of ballast, which can add 10 to 12 pounds per square foot to the roof.



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

James F. Bailey, Esquire
Bailey & Associates, P.A.
9 September 2005
Page 3

We have reviewed the Kravitz report as it relates to the likely snow drift loads on the 1995 Building at the time of collapse. We have also reviewed weather data for the days leading up to the collapse. Based on our review, the drift loads provided in the Kravitz report, which varied along the building interface, increasing from north to south, appear reasonable. The estimated maximum total snow load (drift plus uniform) at the drift area and the drift width in the Kravitz report were 67.7 psf and 17 feet, respectively, with a balanced roof snow load of 11.7 psf away from the drift. Based on our calculations, using the 1996 BOCA Code, the specified 15 psf ground snow for Dover, and a 0.7 exposure factor, the uniform design roof snow load is 10.5 psf. Using the Code procedures, the maximum design total loads (drift plus uniform) were calculated and found to vary from 49.5 psf at the north end to 82.7 psf at the south end of the 200 foot long building interface, with a drift width of 18.1 feet at the south end. Therefore, it appears the snowfall leading up to the 17 February collapse produced roof uniform and drift loads that were reasonably in agreement with Code specified design loads.

Using the BOCA design drift and uniform loads, a computerized structural analysis of the 1995 Building in the vicinity of the drift was performed. The purlins added by ONM and the wind struts and wind columns were included in the computer model. Based on the analysis, the bar joist stresses were found to be within allowable stresses. The stresses in the ONM-added purlins significantly exceeded the allowable stress. The wind strut and eave purlin stresses exceeded allowables by up to 7% and 12%, respectively. The analysis did not consider the effects of missing tapered beam braces.

As was indicated by Joseph Anastasi during the course of his deposition, knowledge of the presence of the 10 pounds per square foot ballasted roof would have been a red flag to him. Reduction in available joist snow load capacity caused by the presence of this particular roofing system was considerable. It was reasonable for ONM to assume that they would be advised as to the correct construction details of the 1995 roof by East Coast Erector, Lighthouse Construction or the Becker Morgan Group.

It was also reasonable for ONM to rely upon information supplied to them by East Coast, and it was also reasonable for ONM to rely upon staff of East Coast with regard to their field assessment of the 1995 roofing structure. As a result, ONM did not budget any site visits during the design phase. East Coast was a company well-known to ONM, and according to the record, there was a history between the two companies that resulted in a degree of confidence being placed in the staff of East Coast by the staff of ONM, thus obviating the need for a field inspection by ONM. East Coast held itself out as reputable and knowledgeable in the construction of buildings such as the 1995 Building. To the extent that the drawings and communications received from East Coast failed to identify missing components as indicated above, it is not, in my professional opinion, something which can or should be made the responsibility of ONM. While a field inspection was possible and may have revealed these defects, it was reasonable for ONM to rely upon other companies involved as part of the design and construction team to supply this information. It is doubtful, in my opinion, that a field inspection by ONM would have noted the missing braces, as these missing braces were not in the immediate vicinity of the drift load region which needed to be reinforced.

Although it is suggested by others that the details of the structural review and repair recommendations for reinforcing the 1995 Building roof should have been signed and sealed as a part of the permit set submitted to officials in the City of Dover, Delaware for the new building, it is pure speculation as to whether this would have led to identification of deficiencies in the roof design and reinforcements in the 1995 Building by City of Dover building officials.



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

James F. Bailey, Esquire
Bailey & Associates, P.A.
9 September 2005
Page 4

To our knowledge, ONM was unaware of the design or of the details of the roof drainage system in the 1995 Building specified by Becker Morgan at the building interface. ASCE 7, referenced by BOCA, states that "each portion of the roof shall be designed to sustain the load of all rainwater that will accumulate on it if the primary drainage system for that portion is blocked." ONM should have been made aware of the drainage system in order to design the drainage pipe support hangers that were attached to the steel frame and to determine the affect of these loads on the roof framing. They also should have been made aware of details of the drainage system (cricket elevations, etc.) so they could have evaluated the roof for the weight of water that could accumulate on the roof if the drains were clogged, as specified in the Code, in order to provide any necessary roof reinforcement details. The documented melting of previous snow during the week prior to the collapse and rainfall during the weekend immediately before the collapse could have produced significant roof loads if the drains were clogged, or a more realistic possibility, if the drains were frozen under prior snows. It is not known if a secondary drainage system was provided.

The prime contractor was the entity assigned, under traditional construction conventions for a design build project, to coordinate the activities of the various parties, including that of ONM. I agree with the statement made by Mr. Davis in his report that the general contractor is the only party having a contractual relationship with the owner and that entity is fully responsible for performance of the subcontractors and third-parties to the construction contract. It was incumbent on Lighthouse Construction and East Coast Erectors to supply correct data as to existing conditions including the interior collateral and exterior roof loads. In our opinion, it is the responsibility of the contractor to present one complete set of full size contract drawings showing all as-built construction and variations in the field conditions from the contract drawings, including changes in the alignment or location, site conditions or work for the 1995 Building. The drawings should also contain details and exact dimensions. East Coast and Lighthouse did not convey the various discrepancies, hereinabove referred, to the attention of ONM, but instead indicated that the plans (the Varco-Pruden plans) were accurate and were in fact, a true representation of existing field conditions. Furthermore, the effect of the roof drains and the additional load placed on the roof structure was not information that was conveyed to ONM as it should have been by East Coast and/or Lighthouse Construction, who directly retained Becker Morgan. The failure of East Coast to communicate to ONM that the beam braces specified on the Varco drawings were not in the proper quantity or were omitted was a deviation from the standard of care expected of those parties.

In summary, it has been acknowledged by ONM that mistakes were made by them in the calculation of the roof snow drift load that led to insufficient strengthening of the 1995 Building roof. However, it is not clear that this fact alone led to the entire collapse of the warehouse portion of the building. Other factors beyond the control of ONM added to high stresses in roof framing elements that, to a reasonable degree of engineering probability, contributed to the collapse. These include:

- The presence of an additional 10 to 12 pounds per square foot of roof dead load due to the ballasted roof
- The absence of beam lateral bracing at interior column locations that reduced the beam bending capacity
- The installation of a new roof drainage system that led to increased roof framing loads in the drift area due to pipe hanger attachment to roof framing
- The installation of a new roof drainage system that produced rooftop ponding design loads.



James F. Bailey, Esquire
Bailey & Associates, P.A.
9 September 2005
Page 5

ONM was not made aware by others on the design build team who knew, or who should have known, about these four load-producing or roof strength reduction factors. The first two items should have been conveyed to ONM by East Coast, who was involved with and familiar with the construction of the 1995 Building and provided ONM with Varco-Pruden drawings that were represented to reflect the as-built construction. ONM had every reason to rely on East Coast for as-built information because of their relationship with East Coast, the experience of East Coast in erecting buildings, and East Coast's familiarity with the 1995 Building. The last two items should have been conveyed to ONM by Becker Morgan through Lighthouse, since the design build team structure on this project did not provide for the direct architect-to-engineer relationship that normal design-bid-build projects afford. Had all these factors been known to ONM, it is likely that additional strengthening of the building would have been installed. Then, although the drift load calculation errors may have led to stresses beyond allowable limits, it is possible that collapse may not have occurred because of the inherent design safety factors.

Every opinion offered by me within this report is provided within a reasonable degree of engineering probability. When and as additional information is developed through the course of any discovery or in any other fashion, I reserve the right to modify my opinions accordingly. If you have any additional questions, please contact me at any time.

Very truly yours,

WISS, JANNEY, ELSTNER ASSOCIATES, INC.

Glenn P. Rentschler, Ph.D., P.E.
Project Manager

GPR:gb

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3       --------------------x
         FEDERAL INSURANCE        : CIVIL ACTION
 4       COMPANY a/s/o            :
         EZIBA.COM./AVACET,       : NO. 04-339
 5       INC., EZIBA SECURITIES   :
         CORP.,                   :
 6               Plaintiff(s),    :
                 v.               :             ORIGINAL
 7       LIGHTHOUSE               :
         CONSTRUCTION, INC.,      :
 8       BECKER MORGAN GROUP,     :
         INC., and O'DONNELL,     :
 9       NACCARATO & MACINTOSH,   :
         INC.,                    :
10               Defendant(s).    :
         --------------------x
11       MILLERS CAPITAL          : CIVIL ACTION
         INSURANCE COMPANY        :
12       a/s/o DEL-HOMES          : NO. 04-1322-JJF
         CATALOG GROUP, LLC,      :
13               Plaintiff(s),    :
                 v.               :
14       LIGHTHOUSE               :
         CONSTRUCTION, INC.,      :
15       BECKER MORGAN GROUP,     :
         INC., and O'DONNELL,     :
16       NACCARATO & MACINTOSH,   :
         INC.,                    :
17               Defendant(s)     :
         and                      :
18       LIGHTHOUSE               :
         CONSTRUCTION, INC.,      :
19               Defendant and    :
                 Third-Party      :
20               Plaintiff,       :
                 v.               :
21       EAST COAST ERECTORS,     :
         INC.,                    :
22               Third-Party      :
                 Defendant.       :
23       --------------------x
24
```

```
 1              Oral deposition of MICHAEL A.

 2   WILLIAMS, held at the law offices of WETZEL &

 3   ASSOCIATES, P.A., The Carriage House, Suite

 4   201, 1100 North Grant Avenue, Wilmington,

 5   Delaware, 19805, on Tuesday, June 14, 2005,

 6   beginning at 9:25 a.m., on the above date,

 7   before Debra J. Weaver, a Federally Approved

 8   RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

 9   (No. 138-RPR, Expiration 1/31/08), and a Notary

10   Public of New Jersey, Pennsylvania and

11   Delaware.

12

13

14

15

16

17

18

19

20

21

22            ESQUIRE DEPOSITION SERVICES

             1880 John F. Kennedy Boulevard

23                   15th Floor

             Philadelphia, Pennsylvania 19103

24                (215) 988-9191
```

3

```
 1   APPEARANCES:
 2
             COZEN O'CONNOR
 3           BY:  STEVEN K. GERBER, ESQUIRE
             1900 Market Street
 4           Philadelphia, PA 19103-3508
             215.665.2088
 5           sgerber@cozen.com
 6           --Representing the Plaintiff,
               Federal Insurance Company
 7
 8
             WHITE AND WILLIAMS, LLP
 9           BY:  RON L. PINGITORE, ESQUIRE
             1800 One Liberty Place
10           Philadelphia, PA   19103
             215.864.7000
11           pingitorer@whiteandwilliams.com
12           --Representing the Plaintiff,
               Millers Capital Insurance Co.
13
14
             CHRISSINGER & BAUMBERGER
15           BY:  DAVID BAUMBERGER, ESQUIRE
             3 Mill Road
16           Suite 301
             Wilmington, DE 19806
17           302.777.0100
             david.baumberger@libertymutual.com
18
             --Representing the Defendant,
19             Lighthouse Construction, Inc.
20
21
22
23
24
```

Esquire Deposition Services

```
 1  APPEARANCES: (cont'd)
 2          TIGHE, COTTRELL & LOGAN, P.A.
            BY:  VICTORIA K. PETRONE, ESQUIRE
 3          First Federal Plaza
            P.O. Box 1031
 4          Wilmington, DE 19899
            302.658.6400
 5          v.petrone@lawtcl.com
 6          --Representing the Defendant,
              Becker Morgan Group, Inc.
 7
 8          BAILEY & ASSOCIATES, P.A.
            BY:  JAMES F. BAILEY, JR., ESQUIRE
 9          3 Mill Road
            Suite 306-A
10          Wilmington, DE 19806
            302.658.5686
11          jbailey@jfbailey.com
12          --Representing the Defendant,
              Robert MacIntosh
13
14          McLAIN & MERRITT, P.C.
            BY:  ROBERT B. HILL, ESQUIRE
15          Suite 500
            3445 Peachtree Road, N.E.
16          Atlanta, GA  30326-1276
            404.266.9171
17          bhill@mcclain-merritt.com
18                  AND
19          WETZEL & ASSOCIATES, P.A.
            BY:  NATALIE M. IPPOLITO, ESQUIRE
20          BY:  BENJAMIN C. WETZEL, III, ESQ.
            The Carriage House, Suite 201
21          1100 North Grant Avenue
            Wilmington, DE  19805
22          302.652.1200
            nippolito@wetzellaw.com
23          bwetzel@wetzellaw.com
24          --Representing the Defendant,
```

1    ALSO PRESENT:

2

          ROGUT McCARTHY TROY, LLC

3         BY:   GEOFFREY W. VEITH, ESQUIRE

          One First Avenue

4         Suite 410

          Conshohocken, PA    19428

5         610.644.5900

          gwv@rmtllc.com

6

          --Representing Factory Mutual

7           a/s/o Client Logic

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

MICHAEL A. WILLIAMS

1    O'Donnell Naccarato for the 1999 building?

2         A.     Joe Anastasi.

3         Q.     And just focusing on

4    communications between East Coast and O'Donnell

5    Naccarato on the 1999 project, were the primary

6    representatives from each company you and Mr.

7    Anastasi?

8         A.     Yes.

9         Q.     Now just focusing on O'Donnell

10   Naccarato's role in the 1999 project, can you

11   describe for me what services O'Donnell

12   Naccarato provided?

13        A.     Their service was to design the

14   footings and the building structure itself.

15        Q.     Is that all you can recall?

16        A.     Yes.

17        Q.     Did those services at any point

18   extend to the 1995 building?

19        A.     Yes.

20        Q.     Can you explain for me how

21   O'Donnell Naccarato was involved with the 1995

22   building?

23        A.     They were also to check the '95

24   building to see if reinforcement was required

MICHAEL A. WILLIAMS

1   where the two buildings joined together.

2        Q.      And what was your understanding

3   as to what was causing the potential need for

4   the reinforcement where the two buildings

5   joined together?

6        A.      Snow drift.

7        Q.      Was that created by the 1999

8   building, given its higher roof level?

9        A.      Yes.

10       Q.      And was that a task that you

11   specifically gave to O'Donnell Naccarato?

12       A.      No.  It was part of the scope of

13   work from Lighthouse.

14       Q.      But that scope of work went from

15   Lighthouse to East Coast, correct?

16       A.      I don't know what you mean by

17   that.

18       Q.      Well, who created the scope of

19   work for the 1999 project?

20       A.      Lighthouse Construction.

21       Q.      All right.  And at some point you

22   came in possession of the scope of work,

23   correct?

24       A.      Yes.

MICHAEL A. WILLIAMS

1          Q.      And how did that scope of work in

2    turn get to O'Donnell Naccarato?

3          A.      I submitted it to them.

4          Q.      Okay.  I'm just trying to follow

5    the flow of the scope.  The scope of work,

6    which was a document, correct?

7          A.      Yes.

8          Q.      Went from Lighthouse to East

9    Coast, correct?

10         A.      Yes.

11         Q.      And then East Coast supplied it

12   to O'Donnell Naccarato, right?

13         A.      That's correct.

14         Q.      And that scope of work included

15   the need to check the 1995 building to see if

16   reinforcement was required, correct?

17         A.      That's correct.

18         Q.      And that particular service was

19   provided pursuant to a relationship that East

20   Coast created with O'Donnell Naccarato?

21                 MR. HILL:  Object to the form of

22         the question.

23                 THE WITNESS:  Could you repeat

24         the question?

MICHAEL A. WILLIAMS

1    BY MR. PINGITORE:

2         Q.       Was there a contractual

3    relationship between East Coast and O'Donnell

4    Naccarato for the 1999 building project?

5         A.       Yes.

6         Q.       And did that contractual

7    relationship involve O'Donnell Naccarato

8    providing engineering services?

9         A.       Yes.

10        Q.       And those engineering services

11   related to the 1999 project; is that correct?

12        A.       Correct.

13        Q.       And those engineering services

14   included designing footings, designing the

15   building structure and checking the 1995

16   building to see if reinforcement was required;

17   is that correct?

18        A.       That's correct.

19        Q.       Were there any other services

20   that were provided by O'Donnell Naccarato

21   pursuant to a contractual relationship between

22   East Coast and O'Donnell Naccarato?

23        A.       No.

24        Q.       Within the scope of services that

MICHAEL A. WILLIAMS

1    East Coast requested from O'Donnell Naccarato,

2    was there any request for O'Donnell Naccarato

3    to provide inspections during construction?

4           A.      Could you repeat that, please.

5           Q.      Within the scope of services that

6    O'Donnell Naccarato provided to East Coast, was

7    there any requirement for inspections by

8    O'Donnell Naccarato during construction?

9           A.      No requirement.

10          Q.      To your knowledge, did O'Donnell

11   Naccarato provide any inspections during the

12   construction process of the 1999 building?

13          A.      I can't recall.

14          Q.      Do you recall any instances where

15   representatives of East Coast and O'Donnell

16   Naccarato met on site at the 1995 or 1999

17   building in the course of the 1999 project?

18          A.      I cannot recall.

19          Q.      And would you have been the

20   primary person with East Coast who would have

21   interfaced with representatives of O'Donnell

22   Naccarato?

23          A.      Yes.

24          Q.      To your knowledge, had O'Donnell

MICHAEL A. WILLIAMS

1    Naccarato ever visited the 1995 or 1999

2    building in the course of providing services

3    related to the 1999 project?

4            A.        To my knowledge, no.

5            Q.        Do you recall any job meetings

6    where representatives of East Coast and

7    O'Donnell Naccarato were present and the 1999

8    project was discussed?

9            A.        Yes.

10           Q.        Where did those job meetings take

11   place?

12           A.        The only one that comes to mind

13   took place in Lighthouse Construction's office.

14           Q.        Where is that office located?

15           A.        In Dover, Delaware.

16           Q.        Do you have any recollection as

17   to when that meeting took place?

18           A.        To the best of my recollection,

19   I'm thinking early April.

20           Q.        Of 1999?

21           A.        Yes.

22           Q.        Was that at a point when the

23   construction process was underway?

24           A.        Yes.

MICHAEL A. WILLIAMS

1          Q.      Is there a reason they're not
2    sealed?
3          A.      It's not required.
4          Q.      When is it required that drawings
5    be sealed, if you know?
6          A.      To my knowledge, it's not
7    required by any government or building code.
8          Q.      For shop drawings to be sealed?
9          A.      For shop drawings to be sealed,
10   correct.
11         Q.      Are there other drawings to your
12   understanding that must be sealed?
13         A.      The structural drawings for the
14   project must be sealed.
15         Q.      By a registered engineer?
16         A.      That's correct.
17         Q.      Okay.  Now, as of March 22, 1999,
18   had O'Donnell Naccarato supplied its $20,000
19   worth of engineering services?
20         A.      For the most part, yes.
21         Q.      What services then were not yet
22   complete?
23         A.      I would have to say that by the
24   end of March they probably had not completed

MICHAEL A. WILLIAMS

1  for payment that we've marked as Exhibit 123,

2  that the reinforcement of the 1995 building was

3  completed between May 19, 1999, and June 4,

4  1999?

5          A.      Yes.

6          Q.      Okay.   Let me show you yet

7  another document, single-page document,

8  previously Bates stamped ECE 0649.  We'll mark

9  it as Exhibit 125.

10                 (Whereupon, Deposition Exhibit

11         No. Williams-125, Sketch from ONM,

12         Bates ECE 0649, was marked for

13         identification.)

14 BY MR. PINGITORE:

15         Q.      Once you have a chance to

16 familiarize yourself with the document, please

17 identify it for the record.

18         A.      This is a sketch from O'Donnell

19 Naccarato MacIntosh showing the additional

20 purlin that was added to the 1995 building.

21         Q.      Then is the additional purlin

22 shown as 8Z105?

23         A.      Yes.

24         Q.      Do you know who specifically with

MICHAEL A. WILLIAMS

1    O'Donnell Naccarato created this drawing?

2         A.    Joe Anastasi.

3         Q.    And how do you know that Mr.

4    Anastasi created this drawing?

5         A.    I'm familiar with the document

6    and somewhat familiar with his handwriting.

7         Q.    Are you familiar with the

8    document in the context of the 1999 project

9    being undertaken?

10        A.    Yes.

11        Q.    And how was this document used by

12   East Coast, if at all?

13        A.    It was used to procure the

14   materials recommended and to install them.

15        Q.    Would this be considered a

16   construction document?

17        A.    I'm not sure how to answer that.

18        Q.    Well, to your understanding, was

19   this document intended to be used by East Coast

20   in order to construct the additional members to

21   reinforce the 1995 building?

22        A.    Yes.

23        Q.    And was this document then given

24   to East Coast's field personnel in order to

MICHAEL A. WILLIAMS

1    follow in the reinforcement of the 1995

2    building?

3              A.      Yes.

4              Q.      To your knowledge, were any other

5    documents created by O'Donnell Naccarato or

6    East Coast depicting the modifications to the

7    1995 building?

8              A.      I don't recall any.

9              Q.      And to your knowledge, was this

10   document ever sealed by a registered engineer?

11             A.      Not to my knowledge.

12             Q.      Did you ever request that

13   O'Donnell Naccarato seal this document?

14             A.      That I don't recall.

15             Q.      You don't recall ever asking

16   that?

17             A.      I don't recall asking that.

18             Q.      Are you aware of any sealed plan

19   or drawing showing alterations to the 1995

20   building?

21             A.      I'm not aware of any.

22             Q.      Do you know who was responsible

23   for securing a building permit for the work

24   shown on Exhibit 125?

MICHAEL A. WILLIAMS

1              MR. HILL:  Object to the form of

2         the question.

3    BY MR. PINGITORE:

4         Q.     To your understanding, would the

5    work depicted on Exhibit 125 require the

6    issuance of a building permit?

7         A.     That I couldn't answer.

8         Q.     With respect to the 1995 project,

9    who to your understanding was responsible for

10   securing building permits?

11        A.     Lighthouse Construction.

12        Q.     And to your knowledge, did

13   Lighthouse Construction secure a building

14   permit for the 1999 project?

15        A.     I don't have explicit knowledge,

16   but I assume that there was one issued.

17        Q.     Was East Coast involved at all

18   with the securing of building permits for the

19   1999 project?

20        A.     No.

21        Q.     Did Lighthouse ever ask East

22   Coast for specific documents from O'Donnell

23   Naccarato in the course of securing building

24   permits for the 1999 project?

MICHAEL A. WILLIAMS

1          A.      Yes.

2          Q.      What documents did Lighthouse

3    request of O'Donnell Naccarato through East

4    Coast?

5          A.      They requested the -- all the

6    structural plans showing, you know, the '99

7    building, from foundation plan to roof framing

8    plan to building sections.

9          Q.      And did East Coast facilitate

10   getting those plans from O'Donnell Naccarato to

11   Lighthouse?

12         A.      Yes.

13         Q.      Was that you personally that was

14   involved with that process?

15         A.      I don't think it was me

16   personally.

17         Q.      Who would that have been?

18         A.      It could have been a number of

19   people in my office.  I'm not sure specifically

20   who.

21         Q.      Would you consider the work

22   depicted in Exhibit 125 to be structural in

23   nature?

24         A.      I guess that's a fair statement,

MICHAEL A. WILLIAMS

1    yes.

2            Q.        Was there ever a request by

3    Lighthouse through you to get a sealed document

4    showing the structural modifications depicted

5    in Exhibit 125?

6            A.        Not --

7                      MR. HILL:   Object to the form of

8            the question.

9    BY MR. PINGITORE:

10           Q.        You can answer it.

11           A.        Not to my knowledge.

12           Q.        The structural modifications

13   shown on Exhibit 125, they were actually

14   performed by East Coast, correct?

15           A.        Yes.

16           Q.        And can you just walk me through

17   the modification that's depicted in Exhibit 125

18   in terms of how you would accomplish the work.

19           A.        We would have supplied the 8Z105

20   member that would span column to column as well

21   as the angle, 6 X 4 by 5/16, depicted under it.

22   Those angles were field welded to the existing

23   columns.  The new purlin was field welded to

24   the new angle.  Then the purlin was screwed to

MICHAEL A. WILLIAMS

1    the low flutes of the roof deck.  That's pretty

2    much the sequence of events.

3         Q.     And where the new purlin was

4    screwed to the roof deck, would there be any

5    preparation work required at the roof deck

6    level, or was all of the work completed on the

7    underside of the roof deck?

8         A.     All completed from underneath.

9         Q.     Would that screw then that

10   connects the top, I'll call it flange of the

11   purlin to the roof deck, penetrate the roof

12   deck itself?

13        A.     Yes.

14        Q.     And then the lower flange of the

15   purlin was welded, if I understand it

16   correctly?

17        A.     That's correct.

18        Q.     As of today, do you hold any

19   opinions regarding the cause of the collapse at

20   issue in this litigation?

21        A.     No.

22        Q.     Do you hold any opinions

23   regarding the weight of snow, ice or water on

24   the roof immediately prior to the collapse?

MICHAEL A. WILLIAMS

1          A.      Do I hold an opinion to the

2    weight of the snow, is that what you asked me?

3          Q.      Yeah.  I want to know if you hold

4    any opinions regarding the weight of the snow,

5    ice and/or water on the roof immediately prior

6    to the collapse.

7          A.      Not an opinion, no.

8          Q.      Do you hold -- do you have some

9    type of an understanding as to the weight?

10          A.      More or less that it was

11    excessive.

12          Q.      And how would you define

13    excessive?

14          A.      I'm not sure.  It was pretty much

15    a one-in-100-year storm or something, and there

16    was very excessive snow on this roof.

17          Q.      Can you express your belief

18    regarding the weight in terms of pounds per

19    square foot or pounds per lineal foot or any

20    other type of measurement?

21          A.      No, I can't.

22          Q.      Has anyone shared with you their

23    opinion regarding the cause of the collapse?

24          A.      Not specifically.

# EXHIBIT C

F. M. Davis Associates, Inc.
213 Hackney Lane
Schwenksville, PA 19473
Phone: 610-287-1111
Fax: 610-287-0585

# facsimile transmittal

To: RON PINGITORE.           Fax: 215·789-7504

From: Frank Davis           Date: JULY 13, 2005

Re: DEL-HOME GROUP          Pages: 8 INCLUDING FRONT PAGE

CC:

☐ Urgent    ☒ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

**MMG1490**

# F.M. DAVIS ASSOCIATES, INC.

213 HACKNEY LANE • SCHWENKSVILLE, PA 19473 • 610-287-1111 • FAX 610-287-0585

File #2705

July 13, 2005

Ron L. Pingitore, Esq.
White and Williams
1800 One Liberty Place
Philadelphia, PA  10103-7395

    RE:    **Insured:**    **Del-Homes Catalog Group, LLC**
              **D/O/L:** February 17, 2003
              **L/O/L:** 97 Enterprise Place, Dover DE
              **Miller's Mutual Policy No.:** 609497
              **Miller's Mutual Claim No.:** 1006317

Dear Mr. Pingitore:

My name is Franklin M. Davis, Jr., and I am the President of F. M. Davis Associates, Inc., of 213 Hackney Lane, Schwenksville, PA 19473. Our company is engaged in assessing residential, commercial, industrial and institutional property damage. We also estimate the cost of building repair and/or replacement when called upon to do so. F. M. Davis Associates, Inc., has been in operation since 1992. Prior to this employment I worked with Timbie Engineers, Inc., of Lansdowne, PA for 2-1/2 years also regarding structural problems, and prior to that spent 39 years at F. B. Davis Sons, Inc., in Bala Cynwyd, PA, also assessing property damage to various buildings as outlined above and making actual repairs when called upon. We also did new construction in homes, schools and other types of buildings from time to time. I hold a B.S. degree in Engineering with a specialization in architecture from Drexel University from the class of 1956.

Recently you called upon us to become involved in the investigation of the collapse damage, which occurred to the 1995 Varco-Pruden building at 97 Enterprise Place, Dover DE. Del-Homes Group, LLC hired Lighthouse Construction in 1999 as prime contractor to "design/build" a 250,000 square foot L-shaped addition, which would join with the 1995 building along the east wall at the north end of that building, occupied by Catalog Resources. A design/build contract is one in which the owner contracts with a single firm for the entire design and construction of the project. As noted in Article 1.20 of Construction Contracting, Sixth Edition by Clough and Sears, "The basic feature of the design-construct method is that it entails single responsibility for the entire project. Actually, it is an expansion of the single contract system to include design as well as construction." With reference to the single prime contract construction method. Article 1.18 states "The distinctive function of the prime contractor is to coordinate and direct the activities of the various parties and agencies involved with the construction and to

CONSTRUCTION • ENGINEERING CONSULTING • INSURANCE APPRAISAL • DAMAGE ANALYSIS

**MMG1491**

Page 2
7/12/05
File #2705

assume full, centralized responsibility to the owner for the delivery of the finished project within the specified time. The general contractor is the only party having a contractual relationship with the owner and is fully responsible for the performance of the sub-contractors and other third parties to the construction contract."

Lighthouse Construction in turn hired East Coast Erectors to design and build the structure, whereupon East Coast hired O'Donnell, Naccarato and MacIntosh as engineers to design the steel, which East Coast would then erect. Lighthouse also hired Becker Morgan Moore Olds and Richter Inc., to provide the necessary architectural drawings in order to secure the permit and code review. They provided surveying, necessary civil engineering and site planning for the job, together with parking lot design. They provided an outline of the building together with elevations in order to satisfy the local authorities. Drawing A2.3 shows the outline of the new building and the position of the 1995 building. Drawing A3.2 shows proposed elevations. There were a series of roof drains along the east wall of the 1995 building on A2.3 showing a suggestion as to how to handle the drainage flowing toward new the building. We do not believe the drains were evaluated from a structural load point of view by the engineer. Becker Morgan's role, however, was limited to the above-mentioned items and they did not participate in any supervision or other activities so that the job was not architect-driven, according to the deposition of Gregory Moore, Page 53, Lines 3-13. They had several meetings at the 1999 building site to discuss grade issues prior to construction, but did not check any live or snow loads for the 1995 building.

With the job set up in this manner it is our opinion that Lighthouse Construction took on the burden of coordinating all of the sub-contractors in such a way that the building would be completed as planned. In the East Coast proposal to Lighthouse Construction, Inc., of February 23, 1999, which was accepted on February 26, 1999, Article #4 says, "Allowance for reinforcing 200 lineal feet of existing bar joists and adding 4 roof drains." The condition of the roof of the 1995 building was of some concern to Mr. McLeish of Lighthouse Construction since in his deposition on Page 105 there is a quote, which reads, "Existing pre-engineered metal building will require additional support for snow loading caused by conditions. Include this work." We believe this request was directed toward East Coast Erectors, who then passed on the request for a study to Mr. MacIntosh, ONM (O'Donnell, Naccarato and MacIntosh) for consideration. We believe that this type of request should have necessitated a meeting for Lighthouse Construction, East Coast Erectors and Mr. MacIntosh at the site to walk through the building and observe existing conditions including interior collateral and exterior roof loads, and to determine what needed to be done in order to support a snow drift load, which could occur since the new building was higher than the existing one. This height difference was caused by the fact that the 1995 building sloped toward the new building creating a difference of 3' at the north end of the adjoining wall to a greater difference of 5' at the south end of the wall due to the northerly slope of the new building roof. According to Clough and Sears, Article 3.11, "Periodic meetings of various groups within company management are a

**MMG1492**

Page 3
7/12/05
File #2705

necessity. These meetings provide an opportunity to exchange ideas, resolve misunderstandings, and decide on future courses of action."

This type of meeting was evidently never held and the engineers depended on information supplied by the foreman of East Coast Erectors as to conditions in the 1995 building. Furthermore, we understand that the engineer was never on the site himself and neither was his subordinate, Mr. Joseph Anastasi, who we believe made calculations on possible snow conditions from his office. Another problem was that the engineer did not have the advantage of as-built drawings, but evidently was working from the Varco-Pruden erection drawings. Again quoting Clough and Sears, Article 10.21 states, "A common general contract requirement is that the contractor must maintain and prepare one set of full-size contract drawings marked to show various kinds of as-built information. These drawings show the actual manner, location and dimensions of all work as actually performed. This involves marking a set of drawings to show details of work items that were not performed exactly as they were originally shown, such as changed work, changed site conditions, and variations in alignment or location. In addition, details and exact dimensions are given for those work items that were not precisely located on the original contract drawings."

The lack of a site inspection of the 1995 building and the coordination necessary to get the parties together prevented some certain deficiencies in the building from being discovered such as lack of flange bracing, together with the presence of ballast on the roof in the form of rock, which in itself was a load of 10-12 lbs. per square foot according to the documents. According to Clough and Sears, Article 6.32, "The contractor is responsible for and warrants all materials and workmanship, whether put in place by his own forces or those of its sub-contractors. The contractor must call all obvious design discrepancies to the attention of the owner or architect-engineer." Not only did East Coast and Lighthouse Construction not call discrepancies to ONM's attention, but represented Varco Pruden plans as "as built" (MacIntosh 109) knowing that there were material discrepancies (omitted flange braces) at interior columns.

Also Mr. Anastasi used the wall height for the new building as 3' above the 1995 building, wherein it should have been at least 4' according to Mr. MacIntosh or even 5' for maximum snow drift load. Mr. MacIntosh also stated that Mr. Anastasi should have used a 500' length of roof instead of 200' in his snow accumulation calculations. The effect of the roof drains was not considered as far as structural loading was concerned.

The result of the calculations by Mr. Anastasi resulted in the installation of an 8z105 member between the columns in the first four bays and screwed to the underside of the metal deck. The ends were secured by shelf angles. Mr. Anastasi's drawing was not sealed and according to the sheet, was not checked by anyone. East Coast should have told ONM that column braces were not provided in the proper quantity and therefore were omitted.

**MMG1493**

Page 4
7/12/05
File #2705

In checking the application for building permits in the City of Dover we could find no mention of any work to be done in the 1995 building. The City likewise has no record of a permit for work to be done on this building. It is our opinion that the building department should have been made aware of possible changes in the 1995 building regarding snow load, at which time they could have made their own inspection to add their experience on proper repair methods and procedures. We believe that the City of Dover, Dover DE adhered to the 1996 BOCA Code in 1999, which mentions building permits for altering a structure in 107.1. A description of the work is required in 107.4, and engineering details are required in 107.7. In 114.1, construction documents are to be signed by a registered design professional and dated in accordance with the professional registration laws of the state and the municipality. As far as we know this was not done in regards to the 1995 building. In 3408.4, "The existing building shall be investigated and evaluated in accordance with 3408.0", for structural issues.

When Mr. Anastasi was asked about the ballast on the roof, and his being unaware of same, he mentioned that had he known that it was there with the extra loading, it would have been a "red flag", which would have necessitated further investigation as mentioned in his deposition, Page 263-1. We believe that had the project been coordinated by an architect all the way through, the requirements for the roof would have been more carefully studied and a different conclusion reached as to required reinforcement. Obviously the reinforcing using the z-member was inadequate in coping with the loads produced by the February 2003 storm. In our opinion there is no substitute for proper supervision, which should have started with Lighthouse Construction, since the architect was not hired to do the overall coordination of the project.

Once more quoting Clough and Sears in Article 3.3.1, "The contractor shall supervise and direct the work using the contractor's best skill and attention. The contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the work under the contract, unless contract documents give other specific instructions concerning these matters."

In summary: Lighthouse Construction and East Coast did not fulfill their duties as General Contractor and sub-contractor to supervise their own work product as well as the work product of sub-contractors as evidenced by the following:
1. Failing to secure building permit for 1995 modifications.
2. Failing to secure sealed construction drawings for 1995 modifications.
3. Failing to give the engineer roof drain placement drawings for collateral load considerations.
4. Failing to coordinate design professionals and contractor.
5. Failing to create or secure as-built drawings.
6. Failing to compel site visits by consulting engineers.
7. Failing to disclose deviations from erection drawings.

MMG1494

Page 5
7/12/05
File #2705

The above failures, as further defined in this report resulted in the 1995 building being structurally unsafe and not in compliance with applicable BOCA Codes.

The opinions expressed by Clough and Sears concerning the various aspects of construction are in close agreement with ours, which are based on our experience in the construction field. Our opinions are expressed within a reasonable degree of professional certainty in the field of construction management, contracting and general construction.

If you have any questions concerning this report please don't hesitate to give us a call.

Sincerely,

*Franklin M. Davis*

Franklin M. Davis, Jr., B.S.E.

MMG1495

Page 6
7/12/05
File #2705


Documents and resources used in our investigation are as follows:

- BOCA Code 1996, as noted in report.
- Construction Contracting Sixth Edition, Clough and Sears.
- Depositions and exhibits.
    - Robert McLeish
    - Robert MacIntosh
    - Joseph Anastasi
    - Mike Williams
    - Gregory Moore
    - Ernest Olds
- Phone calls to City of Dover and discussions with building official, Grant Prichard.
- Various documents exchanged during Discovery, including drawings, A23, A32, S2 and the Varco-Pruden erection drawings.
- Photographs by Timbie Engineers.
- Photographs by East Coast Steel Erectors.
- Construction Contracting Sixth Edition, Clough & Sears

**MMG1496**

Page 7
7/12/05
File #2705

I have not published any articles in the past ten years. I have not given any depositions within the last four years. I was an expert witness in March 2002 in the trial of Pacific Indemnity as subrogee for Thomas and Melinda Stitt vs. Boyle and Penyak Painting Contractors, Case #1998-C-6882 for White & Williams

Sincerely,

*Franklin M. Davis J.*

Franklin M. Davis, Jr., B.S.E.

F. M. DAVIS ASSOCIATES, INC.

**MMG1497**

07/13/2005    22:41    FM DAVIS ASSOCIATES → 2157897504                    NO.242    D01

# FRANKLIN M. DAVIS, JR.

213 Hackney Lane
Schwenksville, PA 19743
610-2878-1111

| | |
|---|---|
| **SUMMARY OF QUALIFICATIONS:** | • A Bachelor of Science Degree in Engineering with a specialization in Architecture. |
| | • An extensive background in the construction industry, including cost estimating and project management for residential, commercial, industrial, and institutional properties. |
| | • A recognized expert in the field of structural assessment and property damage appraisal. |

**PROFESSIONAL EXPERIENCE:**

**1992-Present**       F. M. DAVIS ASSOCIATES, INC.                    Schwenksville, PA
Property Damage Appraiser/Structural Engineering Consultant
Serves as a property damage appraiser and structural engineering consultant for insurance companies and their legal representatives.

- Inspects residential, commercial, industrial, and institutional buildings and other structures to assess property damage.
- Recommends cost-effective remedies.
- Estimates repair and replacement costs.

Serves as an umpire for insurance arbitrations.

**1990-1992**       TIMBIE ENGINEERS, INC.                    Lansdowne, PA
Structural Engineering Consultant
Inspected residential, commercial, and industrial buildings.

- Identified structural problems.
- Recommended cost-effective remedies.

**1951-1990**       F. B. DAVIS SONS, INC.                    Bala Cynwyd, PA
*Residential, Commercial, Industrial, and Institutional Building Contractors*
Vice President (1965-1990)

- Assessed residential, commercial, industrial, and institutional property damage and estimated building repair and replacement costs for major insurance companies.
- Served as an umpire for insurance arbitrations.
- Served as project manager for new construction and reconstruction of damaged structures.

Junior Partner (1955-1965)

Estimator (1951-1955)

**EDUCATION:**       DREXEL UNIVERSITY                    Philadelphia, PA
Bachelor of Science Degree in Engineering, 1956
Specialization in Architecture

**MMG1498**