# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3       --------------------x
         FEDERAL INSURANCE      :  CIVIL ACTION
 4       COMPANY a/s/o          :
         EZIBA.COM./AVACET,     :  NO. 04-339
 5       INC., EZIBA            :
         SECURITIES CORP.,      :
 6            Plaintiff(s),     :
                  v.            :
 7       LIGHTHOUSE             :
         CONSTRUCTION, INC.,    :
 8       BECKER MORGAN GROUP,   :
         INC., and O'DONNELL,   :
 9       NACCARATO &            :
         MACINTOSH, INC.,       :
10            Defendant(s).     :
         --------------------x
11       MILLERS CAPITAL        :  CIVIL ACTION
         INSURANCE COMPANY      :
12       a/s/o DEL-HOMES        :  NO. 04-1322-JJF
         CATALOG GROUP, LLC,    :
13            Plaintiff(s),     :
                  v.            :
14       LIGHTHOUSE             :
         CONSTRUCTION, INC.,    :
15       BECKER MORGAN GROUP,   :
         INC., and O'DONNELL,   :
16       NACCARATO &            :
         MACINTOSH, INC.,       :
17            Defendant(s)      :
         and                    :
18       LIGHTHOUSE             :
         CONSTRUCTION, INC.,    :
19            Defendant and     :
              Third-Party       :
20            Plaintiff,        :
                  v.            :
21       EAST COAST ERECTORS,   :
         INC.,                  :
22            Third-Party       :
              Defendant.        :
23       --------------------x
24
```

COPY

1              Oral deposition of CHARLES N.

2    TIMBIE, P.E., held at the law offices of

3    CHRISSINGER & BAUMBERGER, 3 Mill Road, Suite

4    301, Wilmington, DE 19806, on Thursday, August

5    4, 2005, beginning at 9:10 a.m., on the above

6    date, before Debra J. Weaver, a Federally

7    Approved RPR, CRR, CSR of NJ (No. XI 01614) and

8    Delaware (No. 138-RPR, Expiration 1/31/08), and

9    a Notary Public of New Jersey, Pennsylvania and

10   Delaware.

11

12

13

14

15

16

17

18

19

20

21

22            ESQUIRE DEPOSITION SERVICES

      1880 John F. Kennedy Boulevard

23              15th Floor

      Philadelphia, Pennsylvania 19103

24            (215) 988-9191

ESQUIRE  DEPOSITION  SERVICES

3

```
 1   APPEARANCES:
 2          COZEN O'CONNOR
            BY:  STEVEN K. GERBER, ESQUIRE
 3          1900 Market Street
            Philadelphia, PA 19103-3508
 4          215.665.2088
            sgerber@cozen.com
 5
            --Representing the Plaintiff,
 6            Federal Insurance Company
 7
            WHITE AND WILLIAMS, LLP
 8          BY:  RON L. PINGITORE, ESQUIRE
            1800 One Liberty Place
 9          Philadelphia, PA  19103
            215.864.7000
10          pingitorer@whiteandwilliams.com
11          --Representing the Plaintiff,
              Millers Capital Insurance Co.
12
13          ROGUT McCARTHY TROY, LLC
            BY:  GEOFFREY W. VEITH, ESQUIRE
14          One First Avenue
            Suite 410
15          Conshohocken, PA    19428
            610.644.5900
16          gwv@rmtllc.com
17          --Representing Factory Mutual
              a/s/o Client Logic
18
19          CHRISSINGER & BAUMBERGER
            BY:  DAVID BAUMBERGER, ESQUIRE
20          3 Mill Road
            Suite 301
21          Wilmington, DE 19806
            302.777.0100
22          david.baumberger@libertymutual.com
23          --Representing the Defendant,
              Lighthouse Construction, Inc.
24
```

4

```
 1    APPEARANCES: (cont'd)
 2            TIGHE, COTTRELL & LOGAN, P.A.
              BY:  VICTORIA K. PETRONE, ESQUIRE
 3            First Federal Plaza
              P.O. Box 1031
 4            Wilmington, DE 19899
              302.658.6400
 5            v.petrone@lawtcl.com
 6            --Representing the Defendant,
                 Becker Morgan Group, Inc.
 7
 8            BAILEY & ASSOCIATES, P.A.
              BY:  JAMES F. BAILEY, JR., ESQUIRE
 9            3 Mill Road
              Suite 306-A
10            Wilmington, DE 19806
              302.658.5686
11            jbailey@jfbailey.com
              (not present)
12
              --Representing the Defendant,
13               Robert MacIntosh
14
              McLAIN & MERRITT, P.C.
15            BY:  ROBERT B. HILL, ESQUIRE
              Suite 500
16            3445 Peachtree Road, N.E.
              Atlanta, GA  30326-1276
17            404.266.9171
              bhill@mcclain-merritt.com
18
                      AND
19
              WETZEL & ASSOCIATES, P.A.
20            BY:  NATALIE M. IPPOLITO, ESQUIRE
              The Carriage House, Suite 201
21            1100 North Grant Avenue
              Wilmington, DE  19805
22            302.652.1200
              nippolito@wetzellaw.com
23
              --Representing the Defendant,
24             East Coast Erectors, Inc.
```

CHARLES N. TIMBIE, P.E.

1    yes.

2          Q.       Okay.  Now, other than the

3    transmittal sheet, these drawings that were sent to

4    ONM, you would agree, were not marked as-built, were

5    they?

6          A.       They were not marked as-built.  Just

7    transmitted in that fashion.

8          Q.       Okay.  And do you know of your own

9    knowledge or from anything that you've read as to

10   whether O'Donnell Naccarato MacIntosh's employees,

11   specifically Joe Anastasi, relied on those as

12   as-built drawings in the traditional sense?

13         A.       I believe he did.

14         Q.       Okay.  And isn't it your conclusion

15   in this case, Mr. Timbie, that the fault of ONM, I

16   call O'Donnell Naccarato & MacIntosh ONM, was that

17   they didn't go out there themselves and see what the

18   situation was?

19         A.       I believe they should have done that.

20         Q.       And don't you believe they should

21   have gone out and looked around and they should have

22   seen, if they'd done a good job, that the braces

23   were missing?

24         A.       I think so.  But, on the other hand,

25   they were relying on East Coast to provide certain

CHARLES N. TIMBIE, P.E.

1    information.  I agree with you, if they didn't get

2    enough information, they should conduct their own

3    survey, but these drawings were given as the

4    conditions that are out there, and that's what they

5    worked from.  They apparently were comfortable

6    working from those drawings.

7            Q.        But, as I hear you testify today, the

8    most you can say to criticize East Coast Erectors is

9    they transmitted that set of Varco-Pruden drawings

10   with a cover sheet that said as-built?  That's the

11   worst you have on East Coast; is that right?

12           A.        Yes.

13                     MR. VEITH:  Object to the form.

14                     THE WITNESS:  As I sit here, yes.

15   BY MR. HILL:

16           Q.        How are you doing break-wise?

17           A.        Would that be me in particular?

18           Q.        You in particular.

19           A.        I'm fine.

20           Q.        I'm not going to be fine for long

21   here.  I'm going to have to take a break.  Just give

22   me a second.

23                     MR. HILL:  Mr. Veith, do you want to

24   share with me what you think is wrong with my

25   question?

CHARLES N. TIMBIE, P.E.

1           MR. VEITH:  I think it oversimplified
2    what he testified to.
3           THE WITNESS:  Can I get back to that
4    question?
5    BY MR. HILL:
6           Q.      Sure.
7           A.      If it's still open.
8           Q.      We'll reopen it for you.
9           A.      I believe O'Donnell Naccarato were
10   supposed to inspect the '99 building, and then that
11   would certainly be another opportunity to catch any
12   errors or omissions in the original building.  And I
13   think East Coast should have required that they go
14   out there, and they didn't.
15          Q.      Is that it?
16          A.      That would be it.
17          Q.      Okay.  So the fact that East Coast
18   transmitted that set of drawings with a sheet and
19   the fact that they didn't compel O'Donnell Naccarato
20   MacIntosh's piece to go out and look at the site,
21   that that's the worst criticisms you have of East
22   Coast; is that right?
23          A.      That's as I sit here now, yes.
24          Q.      Okay.  If anything else comes up, are
25   you going to tell me about it?

CHARLES N. TIMBIE, P.E.

1          A.          You betcha.

2                      Do you mind if I go back to that

3      question again, Mr. Hill?

4          Q.          No, no.

5          A.          East Coast was the steel erector for

6      the '99 building, and a part of their work scope was

7      to go into the '95 building and add whatever bracing

8      O'Donnell Naccarato & MacIntosh comes up with.  The

9      document they came up with was a doodle on a piece

10     of draft paper, and it was given to East Coast

11     Erectors.  It didn't say what bays to reinforce or

12     how many bays or exactly where to put the Z.  I

13     think there's enough -- and there's no seal on it.

14     It's not signed.  There's enough ambiguity in that

15     document to go back to O'Donnell, Naccarato &

16     MacIntosh and say, could you please clarify this,

17     tell me where this goes, how many bays, exactly

18     where the Z goes.  It says to alter the X bracing to

19     accommodate the Z.  How do I do that?  Instead, they

20     took it on themselves to determine where these go

21     and how to install them.

22         Q.          You're saying if East Coast Erectors

23     got an ambiguous drawing, they should go back to the

24     designer, ONM, and ask what they mean?

25         A.          Yes.

CHARLES N. TIMBIE, P.E.

1          Q.        Okay.  And do you have any evidence

2     that either East Coast Erectors didn't understand it

3     or that they failed to go back and ask, what does it

4     mean?

5          A.        No.  There was no other documents

6     generated, so, no.  To me it's an ambiguous

7     document.  It's a hard document to work from.

8          Q.        You're critical of the design, right?

9          A.        Yes, I'm critical of the design.  But

10     my criticism is sort of accepted by East Coast when

11     they went ahead and did the work based on this one

12     drawing.

13          Q.        Are you assuming that?

14          A.        Yes, I am.

15          Q.        Mr. Timbie, what I'm hearing is that

16     you would expect a contractor, if he doesn't

17     understand what a drawing means, to ask the

18     engineer?  That's what I'm hearing from this?  Is

19     that a good summary of it?

20          A.        Yes.

21          Q.        Okay.  And you don't know whether

22     that occurred or not, whether they asked or not?

23          A.        No.  But I know of no other documents

24     or sealed drawings that were produced.

25          Q.        Isn't it the engineer's

CHARLES N. TIMBIE, P.E.

1    responsibility to figure out whether or not he's

2    going to seal a document or not?

3         A.        Not in a building of this size.  I

4    mean, this is major structural renovation of a

5    building that should be sealed and signed.  It

6    should be part of the permit.  It should be on the

7    construction drawings.  It should go through the

8    review of the building department and be a part of

9    the permit.

10        Q.        Okay.  And so who's responsible in

11   this case from your review for getting the permits?

12        A.        It would be Lighthouse.

13        Q.        Here's exhibit Williams-118.  Have

14   you ever seen it?

15        A.        I believe I have.

16        Q.        Are you sure?

17        A.        I'm not positive this is the exact

18   document.

19        Q.        Okay.  Assuming just for the purpose

20   of this question that you've seen that or a copy of

21   it, did you make any significant use of it in

22   connection with your analysis?

23        A.        No.

24        Q.        Thank you.

25                  MR. BAUMBERGER:  What exhibit number

# EXHIBIT E

# REGULAR COUNCIL MEETING

The Regular Council Meeting was held on January 27, 1997 at 7:30 p.m. with Council President Christiansen presiding. Council members present were Mr. Lambert, Mr. Pitts, Mr. Leary, Mr. Truitt, Mrs. Malone, Mr. Fenimore, Mr. Salters and Mr. Hare.

Council staff members present were Chief Smith, Mr. Lucas, Mr. O'Connor, Mr. DePrima, Mrs. Boaman and Mr. Rodriguez. Chief Carey was absent.

## OPEN FORUM
The Open Forum was held at 7:15 p.m., prior to commencement of the Official Council Meeting. Council President Christiansen declared the open forum in session and reminded those present that Council is not in official session and cannot take formal action.

Mr. Al Hedgecock, Executive Director of the Central Dover Chamber of Commerce, spoke on behalf of the Chamber members. He relayed that the Chamber supports a paid Mayor for the City of Dover. Noting that the Legislative and Finance Committee has just recommended approval of such a position, Mr. Hedgecock stated the support of the Chamber and urged Council approval. Although they support a paid Mayor, they do not take a position on the level of compensation for the position, feeling this subject is a function of City Council.

Mr. Javan Davis of 635 Nimitz Drive referred to the City's Comprehensive Annual Financial Report, commending the City on its financial position. Mr. Davis also voiced his support for a paid Mayor and increased compensation for City Council members, stating that the citizens of Dover are fortunate to have the outstanding representation that the current Mayor and members of Council provide. He commended the Legislative and Finance Committee for dealing with this sensitive issue and urged City Council to follow through on the committee's recommendations.
The invocation was given by Elder Wallace Dixon, followed by the Pledge of Allegiance which was led by Girl Scout Cadet Unit #622 of the Fairview Elementary School.

## AGENDA ADDITIONS/DELETIONS
Council President Christiansen requested the deletion of item #3 (Resolution - Louis J. Amabili), stating that the presentation will be rescheduled for February 10, 1997. Mr. Salters moved for approval of the agenda as amended, seconded by Mrs. Malone and unanimously carried.

## ADOPTION OF MINUTES - REGULAR COUNCIL MEETING OF JANUARY 13, 1997
The Minutes of the Regular Council Meeting of January 13, 1997 were unanimously approved by motion of Mr. Fenimore, seconded by Mrs. Malone and bore the written approval of Mayor Hutchison.

## PROCLAMATION - AFRICAN AMERICAN HISTORY MONTH
The City Clerk read into the record the following Proclamation:

WHEREAS, African American History Month will be observed across America and abroad during February 1997; and

WHEREAS, the national theme of this year's observance will be "The Language of African Art"; and

WHEREAS, this observance alludes partly to African Americans being endowed with the proper tools and skills to plan and manage their futures independently, thus, enabling empowerment to become a

reality; and

WHEREAS, this observance will also provide an opportunity for students and the lay public to study how African Americans can help to eradicate poverty, further educate the community, and become involved in economic advancement. This will lead to the establishment of more African American organizations, whose purpose will be to develop business in communities, training schools, labor unions, arts and cultural programs.

NOW, THEREFORE, I, JAMES L. HUTCHISON, MAYOR OF THE CITY OF DOVER, do hereby proclaim February 1997 as NATIONAL AFRICAN AMERICAN HISTORY MONTH in the City of Dover and urge the citizens of Dover to recognize this event and participate fittingly in its observance.

The Proclamation was presented by Mayor Hutchison and Councilmen Salters and Pitts to Dr. Donald Parks, Director of the Arts Center at Delaware State University. Dr. Parks presented the City with a poster that represents what the University will be doing for the next three months to promote recognition of African art. They are planning lectures and tours throughout all counties in the State.

PROCLAMATION - AMERICAN HEART MONTH
The City Clerk read into the record the following Proclamation:

WHEREAS, about 954,000 Americans die each year from heart disease and stroke with cardiovascular disease being the number one killer in Dover; and

WHEREAS, lack of physical activity is a risk factor for heart disease and only twenty-two percent of all Americans get enough exercise to achieve cardiovascular fitness; and

WHEREAS, the American Heart Association is committed to public education about heart disease and stroke and this year urges everyone to "Get in on the Action!" by making physical activity a part of their daily lives; and

WHEREAS, the American Heart Association is committed to the support of ongoing medical research to advance knowledge in the areas of prevention and treatment of heart disease and stroke; and

WHEREAS, the American Heart Association is the largest voluntary non-profit organization whose mission is to reduce disability and death from heart disease and stroke.

NOW, THEREFORE, I, JAMES L. HUTCHISON, MAYOR OF THE CITY OF DOVER, do hereby proclaim the month of February as American Heart Month and urge all citizens to get in on the action by making physical activity a daily part of their lives. I also urge all citizens to support the lifesaving mission carried out by the more than 10,000 Delaware American Heart Association volunteers. Contributions of time and money will help in the fight against heart disease and stroke.

Mayor Hutchison presented the Proclamation to Mr. Marc Fisher, President of the American Heart Association. Mr. Fisher expressed his appreciation for the Proclamation and for the donations and support from the community which provides the opportunity for extensive research. Mr. Fisher stated that this research has greatly reduced the death rate from heart attack, stating that a 25% reduction in the death rate has occurred during the last decade.

PROCLAMATION - PERI-ANESTHESIA NURSE AWARENESS WEEK
The City Clerk read into the record the following Proclamation:

WHEREAS, the Chesapeake Society of Peri-Anesthesia Nurses associates and affiliates into one organization all licensed nurses in Dover, Delaware who are engaged, or otherwise especially interested in the care of patients in the immediate peri-anesthesia period; and

WHEREAS, peri-anesthesia nurses provide education with respect to peri-anesthesia patient care through conferences, courses, symposia, and the publishing of articles and bulletins that will maintain and upgrade standards of peri-anesthesia patient care and promote the professional growth of licensed nurses; and

WHEREAS, the peri-anesthesia nurses study, discuss, and exchange professional knowledge, share expertise and ideas on peri-anesthesia patient care and facilities cooperation between peri-anesthesia nurses and physicians and other medical personnel concerned with the care of the patient in the immediate peri-anesthesia period; and

WHEREAS, peri-anesthesia nurses encourage specialization and research in peri-anesthesia nursing, promote public awareness and understanding of the care of peri-anesthesia patients, and cooperate with universities, governmental agencies and any other organizations in matters affecting the purposes of the Society.

NOW, THEREFORE, I, JAMES L. HUTCHISON, MAYOR OF THE CITY OF DOVER, do hereby proclaim February 3 - 9, 1997 as PERI-ANESTHESIA NURSE AWARENESS WEEK in the City of Dover and urge all citizens to join me in this worthy observance.

MONTHLY REPORTS - December 1996
By motion of Mr. Hare, seconded by Mr. Salters, the following monthly reports were accepted:

> Chief of Police Report
> Planning and Inspections Report
> City Assessor Report
> City Clerk/Alderman Report (Fines)
> City Manager's Report
> Mayor's Report
> General Fund, Cash Receipts & Budget Report
> Water/Sewer Fund, Revenue & Budget Report
> Electric Revenue Fund, Revenue & Budget Report
> Improvement and Extension Fund, Cash Receipts & Budget Report
> Internal Service Fund, Revenue & Budget Report

CONFIRMATION OF POLICE PENSION RESULTS - MAJOR KEITH I. FAULKNER
The term of Retired Sergeant Steven Rogers on the Police Pension Board expires on January 31, 1997. Pursuant to Section 18-47(2)(b) of the Pension Plan, notice of an election was given to all plan members. A nomination for Major Keith I. Faulkner was the only nomination received, therefore, no election was held. The term will expire on January 31, 2000.

Mr. Salters moved to confirm the election of Major Keith I. Faulkner to the Police Pension Board, seconded by Mr. Hare and unanimously carried.

FINAL READING - PROPOSED ORDINANCES
The First Reading of the following proposed ordinances was accomplished during the Council Meeting

of January 13, 1997.

Mr. Hare moved that the final reading of the proposed ordinances be acknowledged by title only, seconded by Mr. Leary and unanimously carried.

Mr. Lambert moved for adoption of the following ordinance, seconded by Mr. Fenimore and carried by a unanimous roll call vote:

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 7 <u>Fire Prevention and Protection</u>, Article I <u>In General</u>, of the Dover Code of Ordinances by creating a new Section 7.1 to read as follows:

**7.1 Means of Egress**

(a) The means of egress for an occupancy shall be kept continuously free of all obstructions or impediments to full instant use in case of fire or other emergency.

(b) All required exit doors shall be unlocked and under the control of the occupants within the building or area. This section is to include fenced in outdoor events.

(c) It shall be the responsibility of the owner, manager, principal or any other person responsible for the day to day operations of the occupancy to insure that exits are unobstructed and unlocked prior to the opening of the occupancy to the general public.

(d) The most current edition of the National Fire Prevention Life Safety Code shall be used to determine the definition of a means of egress.

(e) In mercantile occupancies merchandise is prohibited from being displayed in any required exit access, exit, or exit discharge.

(f) Any exit access, exit, or exit discharge with the exception of a locked exit door, found to be in violation of this section, a $25.00 summons shall be issued for the first offense and a $50.00 summons for any second offense or subsequent offenses. Any required exit door found to be locked against egress shall be in violation of this section and a $100.00 summons shall be issued for each locked exit.

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 7. <u>Fire Protection and Prevention</u>, Art. IV. <u>Fire Prevention: Public Occupancies</u>, Section 7-63 <u>Safety and fire prevention requirement</u>, by deleting in its entirety and by inserting in lieu thereof, the following:

**Sec. 7-63. Safety and fire prevention requirement.**

No person shall use or permit to be used any public occupancy structure which does not comply with the 1996 N.F.P.A. Life Safety Code 101 or the most currently published edition of N.F.P.A. Life

Safety Code 101.

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 7. Fire Protection and Prevention, Article III. Fire Prevention Code, Section 7-72 Requirements for a fire alarm in a place of assemble, Subsections (a) & (b) by deleting in its entirety and by inserting in lieu thereof, the following:

**Sec. 7-72. Requirements for a fire alarm in a place of assembly.**

(a) For the purpose of this article the requirements set forth in the 1996 N.F.P.A. Life Safety Code Section 4-1.2 shall or its most currently published edition of the N.F.P.A. Life Safety Code shall be used to determine if an occupancy is a place of assembly.

(b) For the purpose of this article the requirements set forth in the 1996 N.F.P.A. Life Safety Code Section 5-3.1 or its most currently published edition shall be used to determine the occupant load of a place of assembly.

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 7. Fire Protection and Prevention, Article III. Fire Prevention Code, Section 7-56 Adopted, by deleting in its entirety and by inserting in lieu thereof, the following:

**Sec. 7-56. Adopted.**

There is hereby adopted by reference that certain publication known as the BOCA National Fire Prevention Code 1996, recommended by the Building Officials and Code Administrators, International, Inc. or the most recently published edition of the National Fire Codes (excluding NFPA Codes 11C, 13E, 402M -41s, 422 424M-473, 901-906, 1001-1041, 1201-1410, 1452-1999) recommended by the National Fire Protection Association. Three (3) copies of each publication is on file in the office of the fire marshal, and such publication is adopted and incorporated as if set out at length herein. The more restrictive requirements of either the BOCA National Fire Prevention Code, 1996 or the most recently published edition of the National Fire Codes shall apply whenever they may be in conflict.

It shall be unlawful for any person to violate any of the provisions of the publication adopted in subsection (1). (Code 1968, § 14-1; Ord. of 3-12-72, § 2; Ord. of 4-9-84, § 4; Ord. of 3-11-91; Ord. of 11-22-93)

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 5. Building and Building Regulations, Article II. Building Code, Section 5-16 Adopted,

by deleting in its entirety and by inserting in lieu thereof, the following:

Sec. 5-16. Adopted.

(a) There is hereby adopted by reference that certain publication known as the BOCA National Building Code 1996, published by the Building Officials and Code Administrators International, Inc.. Three (3) copies of such publication are on file in the office of the building inspector, and such publication is adopted and incorporated as if set out at length herein.

(b) It shall be unlawful for any person to violate any of the provisions of the publication adopted in subsection (a).

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 5. Building and Building Regulations, Article IV. Mechanical Code, Section 5-56 Adopted, by deleting in its entirety and by inserting in lieu thereof, the following:

Sec. 5-56. Adopted.

(a) There is hereby adopted by reference that certain publication known as the International Mechanical Code 1996, published by International Code Council, Inc.. Three (3) copies of such publication are on file in the office of the building inspector, and such publication is adopted and incorporated as if set out at length herein.

(b) It shall be unlawful for any person to violate any of the provisions of the publication adopted in subsection (a).

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 5. Building and Building Regulations, Article V. Plumbing Code, Section 5-71 Adopted, by deleting in its entirety and by inserting in lieu thereof, the following:

Sec. 5-71. Adopted.

(a) There is hereby adopted by reference that certain publication known as the International Plumbing Code 1995, published by International Code Council, Inc. Three (3) copies of such publication are on file in the office of the building inspector, and such publication is adopted and incorporated as if set out at length herein.

(b) It shall be unlawful for any person to violate any of the provisions of the publication adopted in subsection (a) (Ord. of 4-9-84, Subsection 3; Ord. of 3-11-91).

ADOPTED: January 27, 1997

BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF DOVER, IN COUNCIL MET:

Amend Chapter 10. <u>Housing Code</u>, Article I. <u>General</u>, Section 10-1 <u>Adopted</u>, by deleting in its entirety and by inserting in lieu thereof, the following:

Sec. 10-1. Adopted.

(a) There is hereby adopted by reference that certain publication known as the BOCA National Property Maintenance Code 1996, published by the Building Officials and Code Administrators International, Inc.. Three (3) copies of such publication are on file in the office of the building inspector, and such publications is adopted and incorporated as if set out a length herein.

(b) It shall be unlawful for any person to violate any of the provisions of the publication adopted in subsection (a).

ADOPTED: January 27, 1997

Mr. Fenimore moved to adjourn, seconded by Mrs. Malone and unanimously carried.

Meeting Adjourned at 7:50 P.M.


DEBRAH J. BOAMAN
CITY CLERK

All orders, ordinances and resolutions adopted by City Council during their meeting of January 27, 1997, are hereby approved.


JAMES L. HUTCHISON
MAYOR

/DJB

**THIRTEENTH EDITION**

**ISSUED EVERY THREE YEARS**

# BOCA® *National*

## *Building Code/* 1996



**BUILDING OFFICIALS & CODE ADMINISTRATORS
INTERNATIONAL, INC.**

## SECTION 107.0 APPLICATION FOR PERMIT

**107.1 Permit application:** An application shall be submitted to the code official for the following activities, and these activities shall not commence without a permit being issued in accordance with Section 108.0.

1. Construct or alter a structure.
2. Construct an *addition*.
3. Demolish or move a structure.
4. Make a *change of occupancy*.
5. Install or alter any equipment which is regulated by this code.
6. Move a *lot line* which affects an existing structure.

**107.1.1 Repairs:** Application or notice to the code official is not required for ordinary repairs to structures. Such repairs shall not include the cutting away of any wall, partition or portion thereof, the removal or cutting of any structural beam or loadbearing support, or the removal or change of any required *means of egress*, or rearrangement of parts of a structure affecting the egress requirements; nor shall ordinary repairs include *addition* to, *alteration* of, replacement or relocation of any *standpipe*, water supply, sewer, drainage, drain leader, gas, soil, waste, vent or similar piping, electric wiring or mechanical or other work affecting public health or general safety.

**107.2 Form of application:** The application for a permit shall be submitted in such *written* form as the code official prescribes and shall be accompanied by the required fee as prescribed in Section 112.0.

**107.3 By whom application is made:** Application for a permit shall be made by the *owner* or lessee of the building or structure, or agent of either, or by the *registered design professional* employed in connection with the proposed work. If the application is made by a person other than the *owner* in fee, it shall be accompanied by an affidavit of the *owner* or the qualified applicant or a signed statement of the qualified applicant witnessed by the code official or his designee to the effect that the proposed work is authorized by the *owner* in fee and that the applicant is authorized to make such application. The full names and addresses of the *owner*, lessee, applicant and the responsible officers, if the *owner* or lessee is a corporate body, shall be stated in the application.

**107.4 Description of work:** The application shall contain a general description of the proposed work, the location of the proposed work, the occupancy of all parts of the building or structure and of all portions of the site or *lot* not covered by the building or structure, provisions for *special inspections* required by Section 1705.0, and such additional information as required by the code official.

**107.5 Construction documents:** The application for permit shall be accompanied by not less than two sets of *construction documents*. The code official is permitted to waive the requirements for filing *construction documents* when the scope of the work is of a minor nature. When the quality of the materials is essential for conformity to this code, specific information shall be given to establish such quality, and this code shall not be cited, or the term "legal" or its equivalent used as a substitute for specific information.

**107.6 Site plan:** The application for permit shall be accompanied by a site plan showing to scale the size and location of all new construction and all existing structures on the site, distances from *lot lines*, the established street grades and the proposed finished grades; and it shall be drawn in accordance with an accurate boundary line survey. In the case of demolition, the site plan shall show all construction to be demolished and the location and size of all existing structures and construction that are to remain on the site or plot.

**107.6.1 Private sewage disposal system:** The site plan shall indicate the location of a private sewage disposal system where a public sewer is not available. All technical data and soil data required by the private sewage disposal code listed in Chapter 35 shall be submitted with the site plan.

**107.7 Engineering details:** The code official shall require to be filed adequate details of structural, mechanical and electrical work, including computations, stress diagrams and other essential technical data. All engineering plans and computations shall bear the signature and seal of the engineer or architect responsible for the design as required by Section 114.1.

**107.8 Amendments to application:** Subject to the limitations of Section 107.9, amendments to a plan, application or other records accompanying the same shall be filed at any time before completion of the work for which the permit is sought or issued. Such amendments shall be deemed part of the original application and shall be filed therewith.

**107.9 Time limitation of application:** An application for a permit for any proposed work shall be deemed to have been abandoned six months after the date of filing, unless such application has been diligently prosecuted or a permit shall have been issued; except that the code official shall grant one or more extensions of time for additional periods not exceeding 90 days each if there is reasonable cause.

## SECTION 108.0 PERMITS

**108.1 Action on application:** The code official shall examine or cause to be examined all applications for permits and amendments thereto within a reasonable time after filing. If the application or the *construction documents* do not conform to the requirements of all pertinent laws, the code official shall reject such application in *writing*, stating the reasons therefor. If the code official is satisfied that the proposed work conforms to the requirements of this code and all laws and ordinances applicable thereto, the code official shall issue a permit therefor as soon as practicable.

**108.2 Suspension of permit:** Any permit issued shall become invalid if the authorized work is not commenced within six months after issuance of the permit, or if the authorized work is suspended or abandoned for a period of six months after the time of commencing the work.

**108.3 Previous approvals:** This code shall not require changes in the *construction documents*, construction or designated use group of a building for which a lawful permit has been heretofore issued or otherwise lawfully authorized, and the construction of which has been actively prosecuted within 90 days after the effective date of this code and is completed with dispatch.

**112.3.1 Fee schedule:** A fee for each plan examination, building permit and inspection shall be paid in accordance with the following schedule.

[JURISDICTION TO INSERT APPROPRIATE SCHEDULES.]

**112.4 Accounting:** The code official shall keep an accurate account of all fees collected; and such collected fees shall be deposited monthly in the jurisdiction treasury, or otherwise disposed of as required by law.

**112.5 Refunds:** In the case of a revocation of a permit or abandonment or discontinuance of a building project, the portion of the work actually completed shall be computed and any excess fee for the incompleted work shall be returned to the permit holder upon *written* request. All plan examination and permit processing fees and all penalties that have been imposed on the permit holder under the requirements of this code shall first be collected.

### SECTION 113.0 INSPECTION

**113.1 Preliminary inspection:** Before issuing a permit, the code official shall, if deemed necessary, examine or cause to be examined all buildings, structures and sites for which an application has been filed for a permit to construct, enlarge, *alter*, repair, remove, demolish or *change the occupancy* thereof.

**113.2 Required inspections:** After issuing a building permit, the code official shall conduct inspections from time to time during and upon completion of the work for which a permit has been issued. A record of all such examinations and inspections and of all violations of this code shall be maintained by the code official. The *owner* shall provide for *special inspections* in accordance with Section 1705.0.

**113.2.1 Approved inspection agencies:** The code official shall accept reports of *approved inspection agencies*, provided such agencies satisfy the requirements as to qualifications and reliability.

**113.2.2 Plant inspection:** Where required by the provisions of this code or by the *approved rules*, materials or assemblies shall be inspected at the point of manufacture or fabrication in accordance with Section 1703.3.

**113.3 Final inspection:** Upon completion of the building or structure, and before issuance of the certificate of occupancy required by Section 118.0, a final inspection shall be made. All violations of the approved *construction documents* and permit shall be noted and the holder of the permit shall be notified of the discrepancies.

**113.4 Right of entry:** The code official shall have the authority to enter at any reasonable time any structure or premises for which a permit has been issued but has not received a certificate of occupancy in accordance with Section 118.0.

For all other structures or premises, when the code official has reasonable cause to believe that a code violation exists, the code official is authorized to enter the structure or premises at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. If entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law.

**113.5 Coordination of inspections:** Whenever in the enforcement of this code or another code or ordinance, the responsibility of more than one code official of the jurisdiction is involved, it shall be the duty of the code officials involved to coordinate their inspections and administrative orders as fully as practicable so that the *owners* and occupants of the structure shall not be subjected to visits by numerous inspectors or multiple or conflicting orders. Whenever an inspector from any agency or department observes an apparent or actual violation of some provision of some law, ordinance or code not within the inspector's authority to enforce, the inspector shall report the findings to the code official having jurisdiction.

### SECTION 114.0 PROFESSIONAL ARCHITECTURAL AND ENGINEERING SERVICES

**114.1 General:** The *construction documents* for new construction, *alteration*, repairs, expansion, *addition* or modification for buildings or structures shall be prepared by a *registered design professional*. All *construction documents* required for a building permit application shall be prepared by a *registered design professional* consistent with the professional registration laws of the state in which the project is to be constructed. The *construction documents* shall include the name and address of the *registered design professional* and shall be signed, sealed and dated by the *registered design professional* in accordance with the professional registration laws of the state in which the project is to be constructed.

**114.2 Special inspections:** *Special inspections* shall be made in accordance with Section 1705.0.

**114.2.1 Building permit requirement:** This *special inspection* requirement shall be determined prior to the issuance of the building permit and shall be a requisite for the permit issuance as described in Section 1705.0.

**114.2.2 Fees and costs:** All fees and costs related to the performance of special professional services shall be borne by the *owner*.

### SECTION 115.0 WORKMANSHIP

**115.1 General:** All work shall be conducted, installed and completed in a workmanlike and acceptable manner so as to secure the results intended by this code.

### SECTION 116.0 VIOLATIONS

**116.1 Unlawful acts:** It shall be unlawful for any person, firm or corporation to erect, construct, *alter*, extend, repair, remove, demolish or occupy any building, structure or equipment regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

**116.2 Notice of violation:** The code official shall serve a notice of violation or order on the person responsible for the erection, construction, *alteration*, extension, repair, removal, demolition or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation.

# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3     - - - - - - - - - - - - - - - - - -x
       FEDERAL INSURANCE          :   CIVIL ACTION
 4     COMPANY a/s/o              :
       EZIBA.COM./AVACET,        :   NO. 04-339
 5     INC., EZIBA               :
       SECURITIES CORP.,         :
 6           Plaintiff(s),        :
             v.                   :
 7     LIGHTHOUSE                 :
       CONSTRUCTION, INC.,       :
 8     BECKER MORGAN GROUP,      :
       INC., and O'DONNELL,      :
 9     NACCARATO &               :
       MACINTOSH, INC.,          :
10           Defendant(s).        :
       - - - - - - - - - - - - - - - - - -x
11     MILLERS CAPITAL           :   CIVIL ACTION
       INSURANCE COMPANY         :
12     a/s/o DEL-HOMES           :   NO. 04-1322-JJF
       CATALOG GROUP, LLC,       :
13           Plaintiff(s),        :
             v.                   :
14     LIGHTHOUSE                 :
       CONSTRUCTION, INC.,       :
15     BECKER MORGAN GROUP,      :
       INC., and O'DONNELL,      :
16     NACCARATO &               :
       MACINTOSH, INC.,          :
17           Defendant(s)         :
       and                       :
18     LIGHTHOUSE                 :
       CONSTRUCTION, INC.,       :
19           Defendant and        :
             Third-Party          :
20           Plaintiff,           :
             v.                   :
21     EAST COAST ERECTORS,      :
       INC.,                     :
22           Third-Party          :
             Defendant.           :
23     - - - - - - - - - - - - - - - - - -x
24
```

1              Oral deposition of ROBERT C.

2   MacLEISH, held at the law offices of

3   CHRISSINGER & BAUMBERGER, 3 Mill Road,

4   Suite 301, Wilmington, DE 19806, on

5   Wednesday, March 16, 2005, beginning at

6   10:08 a.m., before Debra J. Weaver, a

7   Federally Approved RPR, CRR, CSR of NJ

8   (No. XI 01614) and Delaware (No. 138-RPR,

9   Expiration 1/31/08), and a Notary Public

10   of New Jersey, Pennsylvania and Delaware.

11

12

13

14

15

16

17

18

19

20

21

22          ESQUIRE DEPOSITION SERVICES

       1880 John F. Kennedy Boulevard

23                15th Floor

       Philadelphia, Pennsylvania 19103

24              (215) 988-9191

```
 1   APPEARANCES:
 2

 3           COZEN O'CONNOR
             BY:   STEVEN K. GERBER, ESQUIRE
             1900 Market Street
 4           Philadelphia, PA 19103-3508
             215.665.2088
 5           sgerber@cozen.com
 6           --Representing the Plaintiff,
                Federal Insurance Company
 7

 8           WHITE AND WILLIAMS, LLP
             BY:   RON L. PINGITORE, ESQUIRE
 9           1800 One Liberty Place
             Philadelphia, PA   19103
10           215.864.7000
             pingitorer@whiteandwilliams.com
11

12           --Representing the Plaintiff,
                Millers Capital Insurance Co.
13

             CHRISSINGER & BAUMBERGER
14           BY:   DAVID BAUMBERGER, ESQUIRE
             3 Mill Road
15           Suite 301
             Wilmington, DE 19806
16           302.777.0100
17           --Representing the Defendant,
                Lighthouse Construction, Inc.
18

19           TIGHE, COTTRELL & LOGAN, P.A.
             BY:   VICTORIA K. PETRONE, ESQUIRE
20           First Federal Plaza
             P.O. Box 1031
21           Wilmington, DE 19899
             302.658.6400
22           v.petrone@lawtcl.com
23           --Representing the Defendant,
                Becker Morgan Group, Inc.

24
```

```
 1    APPEARANCES: (cont'd)

 2

 3           BAILEY & ASSOCIATES, P.A.
             BY:  JAMES F. BAILEY, JR., ESQUIRE
             3 Mill Road
 4           Suite 306-A
             Wilmington, DE 19806
 5           302.658.5686
             jbailey@jfbailey.com

 6
             --Representing the Defendant,
 7             Robert MacIntosh

 8
             McLAIN & MERRITT, P.C.
 9           BY:  ROBERT B. HILL, ESQUIRE
             Suite 500
10           3445 Peachtree Road, N.E.
             Atlanta, GA  30326-1276
11           404.266.9171
             bhill@mcclain-merritt.com

12
                     AND
13
             WETZEL & ASSOCIATES, P.A.
14           BY:  BENJAMIN C. WETZEL, III, ESQ.
             BY:  NATALIE M. IPPOLITO, ESQUIRE
15           The Carriage House, Suite 201
             1100 North Grant Avenue
16           Wilmington, DE   19805
             302.652.1200
17           bwetzel@wetzellaw.com
             nippolito@wetzellaw.com

18
             --Representing the Defendant,
19             East Coast Erectors, Inc.

20

21

22

23

24
```

1  ALSO PRESENT:

2

       HECKER, BROWN, SHERRY AND

3      JOHNSON, LLP
       BY:  GEOFFREY W. VEITH, ESQUIRE

4      1700 Two Logan Square
       18th and Arch Streets

5      Philadelphia, PA  19103
       215.446.6236

6      gveith@heckerbrown.com

7      --Representing Factory Mutual
          a/s/o Client Logic

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ROBERT C. MACLEISH

1          Q.      Do you recall, I'm sure you

2     do, both yesterday and today, reviewing

3     the interior drain additions to the 1995

4     building?

5          A.      The information you're

6     talking about?

7          Q.      Yes.

8          A.      Yes.

9          Q.      And just to be -- I'm just

10    going to put Olds-15 in front of you, and

11    before I ask the follow-up question, what

12    I first want to know is, did you

13    understand Mr. Olds' explanation about

14    the area of the 1995 building that was

15    subject to wind drift and snow loads?

16               MR. BAUMBERGER:  Objection

17          to the form.

18               THE WITNESS:  When you're

19          asking me did I understand, what

20          is it that you want me to

21          understand?

22    BY MR. PINGITORE:

23          Q.      Did you understand his

24    explanation yesterday, during Mr. Olds'

ROBERT C. MACLEISH

1   testimony, as to why the section of the

2   roof where the 1995 building was adjacent

3   to the 1999 building was subject to

4   wind-drifted snow loads?

5                    MR. HILL:  Object to the

6            form.

7                    MR. VEITH:  You're talking

8            about the location?

9                    THE WITNESS:  If you're

10           asking me when he explained, I did

11           listen to what he was saying from

12           that perspective, yes.  I heard

13           what he was saying.

14  BY MR. PINGITORE:

15           Q.    Based on your understanding,

16  what portion of the 1995 building was

17  subjected to wind-drifted snow loads as a

18  result of the 1999 building being

19  constructed?

20           A.    Again, I'm not an engineer

21  or architect, you know.  From that

22  standpoint, I don't do design work, nor

23  am I implying that I do design work.

24  That's for others to decide.  We just

ROBERT C. MACLEISH

1    build them.

2                  If you're asking me was

3    there a roof height change between the

4    two?  Yes, there was a roof height

5    change.  That roof height change occurred

6    along column line 1.

7              Q.      On Olds-15?

8              A.      Yes.

9              Q.      And based on your experience

10   in the industry, would you agree that

11   where there's a roof height change, that

12   area, and particularly on the lower roof,

13   is subject to wind-drifted snow loads.

14             A.      There's a potential, yes.

15             Q.      And is that area that is

16   potentially exposed to wind-drifted snow

17   loads shown adjacent to column line 1 on

18   Olds-15?

19             A.      Yes.

20             Q.      And that would be on the

21   1995 building, correct?

22             A.      Yes.

23             Q.      Now, whose design was it to

24   locate interior drains along column line

ROBERT C. MACLEISH

1          Q.     Do you recall, I'm sure you

2    do, both yesterday and today, reviewing

3    the interior drain additions to the 1995

4    building?

5          A.     The information you're

6    talking about?

7          Q.     Yes.

8          A.     Yes.

9          Q.     And just to be -- I'm just

10   going to put Olds-15 in front of you, and

11   before I ask the follow-up question, what

12   I first want to know is, did you

13   understand Mr. Olds' explanation about

14   the area of the 1995 building that was

15   subject to wind drift and snow loads?

16              MR. BAUMBERGER:  Objection

17         to the form.

18              THE WITNESS:  When you're

19         asking me did I understand, what

20         is it that you want me to

21         understand?

22   BY MR. PINGITORE:

23         Q.     Did you understand his

24   explanation yesterday, during Mr. Olds'

ROBERT C. MACLEISH

1  testimony, as to why the section of the

2  roof where the 1995 building was adjacent

3  to the 1999 building was subject to

4  wind-drifted snow loads?

5           MR. HILL:  Object to the

6        form.

7           MR. VEITH:  You're talking

8        about the location?

9           THE WITNESS:  If you're

10       asking me when he explained, I did

11       listen to what he was saying from

12       that perspective, yes.  I heard

13       what he was saying.

14  BY MR. PINGITORE:

15       Q.    Based on your understanding,

16  what portion of the 1995 building was

17  subjected to wind-drifted snow loads as a

18  result of the 1999 building being

19  constructed?

20       A.    Again, I'm not an engineer

21  or architect, you know.  From that

22  standpoint, I don't do design work, nor

23  am I implying that I do design work.

24  That's for others to decide.  We just

ROBERT C. MACLEISH

1    build them.

2                  If you're asking me was

3    there a roof height change between the

4    two?  Yes, there was a roof height

5    change.  That roof height change occurred

6    along column line 1.

7                  Q.    On Olds-15?

8                  A.    Yes.

9                  Q.    And based on your experience

10   in the industry, would you agree that

11   where there's a roof height change, that

12   area, and particularly on the lower roof,

13   is subject to wind-drifted snow loads.

14                  A.    There's a potential, yes.

15                  Q.    And is that area that is

16   potentially exposed to wind-drifted snow

17   loads shown adjacent to column line 1 on

18   Olds-15?

19                  A.    Yes.

20                  Q.    And that would be on the

21   1995 building, correct?

22                  A.    Yes.

23                  Q.    Now, whose design was it to

24   locate interior drains along column line