**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FEDERAL INSURANCE COMPANY a/s/o EZIBA.COM, INC./AVACET, INC., EBIZA SECURITIES CORP.    and MILLERS CAPITAL INSURANCE COMPANY a/s/o DEL-HOMES CATALOG GROUP, LLC, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| LIGHTHOUSE CONSTRUCTION, INC., BECKER MORGAN GROUP, INC., and O'DONNELL, NACCARATO & MACINTOSH, INC. and EAST COAST ERECTORS, INC. | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| LIGHTHOUSE CONSTRUCTION, INC., | ) ) |
| Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| EAST COAST ERECTORS, INC., | ) ) |
| Third-Party Defendant. | ) ) |

Civil Action No. 04-339/04-1322 JJF


<u>CONSOLIDATED ACTION</u>


JURY OF TWELVE DEMANDED

**DEFENDANT/THIRD-PARTY DEFENDANT EAST COAST ERECTORS, INC.'S
RESPONSE IN OPPOSITION TO PLAINTIFF MILLERS CAPITAL INSURANCE
<u>COMPANY'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT</u>**

COMES NOW Defendant and Third-Party Defendant East Coast Erectors, Inc. ("ECE") and files this Response in Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint respectfully showing the Court as follows:

1.      Plaintiff Millers Capital Insurance Company ("Millers Capital") filed a motion for leave to file a second amended complaint on September 30, 2005. (D.I. 155) Plaintiff seeks to amend its complaint to add a claim of gross negligence against defendants ECE, Lighthouse

Construction, Inc. ("Lighthouse") and O'Donnell Naccarato & MacIntosh, Inc. ("ONM"). Plaintiff relies on the following to support its motion: 1996 BOCA Code, which was adopted by the City of Dover on January 27, 1997; March 16, 2005 deposition testimony of Robert MacLeish; June 14, 2005 deposition testimony of Mike Williams; July 13, 2005 expert report of Franklin Davis; August 4, 2005 deposition testimony of Charles Timbie; and the September 9, 2005 report of Glenn P. Rentschler.

2.    The Court has discretion in deciding whether to grant a motion for leave to amend pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Although the rules provide for liberal amendments to pleadings, leave can be denied with sufficient reason, "includ[ing] undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party…and futility of amendment." Centerforce Technologies, Inc. v. Austin Logistics Inc., 2000 U.S. Dist. LEXIS 6924, *9. Prejudice to the non-moving party is the benchmark for denial of an amendment. Lorenz v. CSX Corporation, 1 F.3d 1406, 1414 (3d Cir. 1993). Leave to amend may also be denied if the proposed amendment would not withstand a motion to dismiss. Massarsky v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983); see also Adams v. Gould Inc., 739 F.2d 858, 864 (3d Cir. 1984).

3.    ECE will be unduly prejudiced if plaintiff's motion is granted. Admittedly, plaintiff's motion was filed on the last day permitted by the scheduling order; however, factual discovery is completed, and all of plaintiff's experts have already been deposed. ECE will be severely prejudiced by its inability to take discovery on this new claim. Plaintiff delayed in seeking leave to file a claim of gross negligence. The facts relied upon by plaintiffs were known to it since Michael Williams' deposition on June 14, 2005. The expert reports and testimony relied upon do not provide any new facts in support of a claim of gross negligence against ECE.

2

If anything, the testimony of plaintiffs' experts, Mr. Timbie and Mr. Davis, that ECE was not responsible for obtaining permits should have prevented plaintiff from directing this claim towards ECE. *See* discussion *infra* pp. 4-5. This motion could have been filed months ago when discovery was still ongoing. By delaying until the completion of the key fact and plaintiffs' expert witness' depositions, plaintiff has unduly prejudiced ECE.

Furthermore, adding a claim of gross negligence against defendants in this subrogation action is futile. "In Delaware tort law, the term 'gross negligence' has little significance." Jardel Co. v. Hughes, 523 A.2d 518, 530 (Del. 1987). The only potential reason for permitting plaintiff to allege gross negligence would be to recover punitive damages; however, plaintiff does not seek punitive damages in its proposed second amended complaint. Even if it did, an allegation of gross negligence is not sufficient to justify recovery of punitive damages. Ayers v. Quillen, 2004 Del. Super. LEXIS 443, *19-20 (*citing* Jardel, 523 A.2d at 530). Furthermore, punitive damages are not available to plaintiff as this is a subrogation action to which the insured is not a party, and as such, plaintiff is only entitled to recover damages in the amount it paid to its insured, Del Homes Catalog Group, LLC. *See* Carolina Casualty Ins. Co. v. Local No. 612 Int'l Brotherhood of Teamsters, 136 F. Supp. 941, 943 (N.D. Ala. 1956); Maryland Casualty Co. v. Brown, 321 F. Supp. 309, 312 (N.D Ga. 1971).

It would be both prejudicial and futile to allow plaintiff to allege gross negligence against defendants; consequently, plaintiff's motion must be denied.

4.     Plaintiff's motion must also be denied because plaintiff's proposed amendment fails to state a claim for gross negligence against ECE. The primary basis for plaintiff's new allegation of gross negligence is the failure to produce sealed drawings and the failure to procure a building permit for the reinforcement of the 1995 building. Specifically, plaintiff alleges that

ECE, Lighthouse and ONM committed an extreme departure from the ordinary standard of care by: a) knowingly creating a roof collapse risk to property and persons; b) failing to secure a Building Permit and/or sealed construction plans for the 1995 building modifications to protect against the known risk; c) failing to adequately reinforce the 1995 building; and d) failing to secure a sealed structural analysis of the building.

Plaintiff's claim of gross negligence against ECE is not sufficient to withstand a motion to dismiss. First, there is absolutely no evidence that ECE knowingly created a risk of roof collapse. Plaintiff misrepresents ECE's obligation with respect to the modification of the 1995 building. In paragraph nine of its motion, plaintiff states, "Discovery has confirmed that Lighthouse was the General Contractor for the 1999 project and hired East Coast to, inter alia, evaluate the 1995 building to support the anticipated snow drift. East Coast, in turn, *consulted* with ONM to *participate in the evaluation* of the 1995 building." (Emphasis added). In fact, ECE, a steel erector, contracted with ONM, a licensed structural engineering firm, to, inter alia, evaluate and design the structural reinforcement of the 1995 building, in accordance with ECE's contractual requirements. It was never contemplated that ECE itself would structurally evaluate the 1995 building for potential snow drift loads. (Exhibit A, MacLeish dep. pp.389-392; Exhibit B, McKone dep. pp. 101-102.) ONM was not hired to *participate* in the evaluation; it was hired to *perform* the evaluation.

Second, ECE was not contractually required or permitted to obtain a permit for the modifications to the 1995 building. Section 107.3 of the 1996 BOCA Code states, in pertinent part, "Application for a permit shall be made by the *owner* or lessee of the building or structure, or agent of either, or by the *registered design professional* employed in connection with the proposed work." (Emphasis in original). Plaintiff's subrogor, Del Homes, Inc., was the owner,

4

Lighthouse was its agent, and ONM was the design professional.  The Code <u>requires</u> one of the aforementioned entities to have procured the permit for this work.  The Code did not permit ECE to procure it, and ECE was not contractually required to do so.  Both of plaintiffs' experts, Mr. Timbie and Mr. Davis, agreed that ECE was <u>not</u> responsible for procuring permits in this case. (Exhibit C, Timbie dep. p. 57; Exhibit D, Davis dep. pp.120-124.)

Third, ECE is not responsible for the sufficiency of ONM's design for the reinforcement of the 1995 building.  ECE installed the reinforcement steel as designed by ONM.  According to plaintiffs' own expert, Mr. Davis, ECE had no choice but to install exactly what was designed by ONM.

> Q.    Isn't it correct, Mr. Davis, that the contractor who is installing the members of the building is required to follow the drawings and specifications of the designer?
> A.    That's the requirement.
>
> * * *
>
> Q.    In fact, if I read it, it says, "The contractor is required to follow the drawings and specifications and cannot be held to guarantee that the completed project will be free of defects and accomplish the purpose intended."  Now, do you believe that statement to be true, correct?
> A.    I do believe that.
>
> * * *
>
> Q.    Well, in this case, and according to that statement that you cited in your opinion, isn't it correct that East Coast Erectors had no choice but to comply with the design for the reinforcement?
> A.    That's what they did.  That's what they did.

(Exhibit D, Davis dep. pp. 118-119.)  If the reinforcement as designed was inadequate, that responsibility rests solely with the designer, ONM, and not with ECE.

Finally, ECE was not contractually required to procure sealed design drawings.  (Exhibit D, Davis dep. p. 123.)  It is the design professional's responsibility, in this case ONM, to seal its own drawings.  Robert MacIntosh, ONM's President, was the Delaware licensed engineer responsible for sealing ONM's design drawings for this project.  (Exhibit E, MacIntosh dep. pp.

5

101-102, 110.) ECE cannot be held responsible because Mr. MacIntosh did not seal the design for the reinforcement to the 1995 building.

Under no set of circumstances can ECE be found grossly negligent as alleged by plaintiff in its motion for leave file a second amended complaint. Consequently, plaintiff's motion must be denied.

5.    For the reasons set forth herein, plaintiff's motion for leave to amend to file a second amended complaint must be denied as to ECE.

Respectfully submitted,

WETZEL & ASSOCIATES, P.A.

/s/ Natalie M. Ippolito
Benjamin C. Wetzel, III (I.D. No. 985)
Natalie M. Ippolito (I.D. No. 3845)
The Carriage House, Suite 201
1100 N. Grant Avenue
Wilmington, DE 19805
(302) 652-1200
nippolito@wetzellaw.com

Robert B. Hill, Admitted Pro Hac Vice
MCLAIN & MERRITT, P.C.
3445 Peachtree Road N.E., Suite 500
Atlanta, GA 30326

*Attorneys for Defendant East Coast Erectors, Inc.*

Dated: October 14, 2005

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FEDERAL INSURANCE COMPANY
a/s/o EZIBA.COM, INC./AVACET, INC.,
EBIZA SECURITIES CORP.    and
MILLERS CAPITAL INSURANCE
COMPANY a/s/o DEL-HOMES
CATALOG GROUP, LLC,

      Plaintiffs,

      v.

LIGHTHOUSE CONSTRUCTION, INC.,
BECKER MORGAN GROUP, INC.,
and O'DONNELL, NACCARATO &
MACINTOSH, INC. and EAST COAST
ERECTORS, INC.

      Defendants,

      and

LIGHTHOUSE CONSTRUCTION, INC.,

      Third-Party Plaintiff,

      v.

EAST COAST ERECTORS, INC.,

      Third-Party Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 04-339/04-1322 JJF


CONSOLIDATED ACTION


JURY OF TWELVE DEMANDED

## ORDER

      **AND NOW,** this _____ day of _____, 2005, upon consideration of

Plaintiff Millers Capital Insurance Company's Motion for Leave to File a Second

Amended Complaint, and Defendant/Third-Party Defendant East Coast Erectors, Inc.'s

opposition thereto,

**IT IS HEREBY ORDERED** that Plaintiff Millers Capital Insurance Company's Motion for Leave to File a Second Amended Complaint is DENIED.  Plaintiff cannot allege gross negligence against defendant East Coast Erectors, Inc.

_____
JOSEPH J. FARNAN, JR.
UNITED STATES DISTRICT JUDGE

1 of 100 DOCUMENTS

**CENTERFORCE TECHNOLOGIES, INC., Plaintiff, v. AUSTIN LOGISTICS INC., Defendant.**

Civil Action No. 99-243 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2000 U.S. Dist. LEXIS 6924; 55 U.S.P.Q.2D (BNA) 1124*

February 2, 2000, Argued
March 10, 2000, Decided

**DISPOSITION:** [*1] CenterForce's motion to amend granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** Patricia Smink Rogowski, Esquires, and Francis DiGiovanni, Esquire, Connolly, Bove, Lodge & Hutz LLP, Wilmington, Delaware, for Plaintiff.

William E. Wallace III, Esquire, Gregory S. Lewis, Esquire, Tyler R. Goodwyn, IV, Esquire, Margaret S. Izzo, Esquire, and Melvin L. Barnes, Jr., Esquire, Of Counsel, Morgan, Lewis & Bockius LLP, Washington, D.C., for Plaintiff.

Richard D. Kirk, Esquire, and Gretchen A. Bender, Esquire, Of Counsel, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, for Defendant.

Robert Neuner, Esquire, Of Counsel, Baker & Botts, L.L.P., New York, New York, for Defendant.

Patrick O. Keel, Esquire, and Robert W. Holland, Esquire, Baker & Botts, L.L.P., Austin, Texas, for Defendant.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

### MEMORANDUM OPINION

Argued: February 2, 2000
Dated: March 10, 2000

Murray M. Schwartz

**Senior District Judge**

#### I. Introduction

CenterForce Technologies, Inc. ("CenterForce") is the owner by assignment of three patents relating to methods for optimizing telephone campaigns. Its U. [*2] S. Patent No. 5,436,965 (the '965 patent), filed on November 16, 1993 and entitled "Method and System for Optimization of Telephone Contact Campaigns," issued on July 25, 1995. CenterForce filed a continuation-in-part application of the '965 patent application on June 7, 1995, which resulted in the second patent, U.S. Patent No. 5,621,790 (the '790 patent), issued on April 15, 1997. On April 14, 1997, CenterForce filed a continuation of the '790 patent application, which resulted in the issuance of the third patent, U.S. Patent No. 5,889,799 (the '799 patent), on March 30, 1999.

CenterForce filed a complaint against Austin Logistics Inc. ("ALI") on April 13, 1999, alleging that ALI had infringed the '799 patent, that ALI engaged in false patent marking, and that ALI made false and misleading representations in violation of the Lanham Act, *15 U.S.C. § 1051, et seq.* Docket Item ("D.I.") 1. ALI filed an answer and counterclaim on May 24, denying CenterForce's allegations and seeking a declaratory judgment that the '799 patent is invalid, unenforceable, and not infringed. D.I. 14. ALI subsequently amended its counterclaim to assert a Lanham Act claim against [*3] CenterForce. D.I. 46.

On October 26, 1999, CenterForce moved for leave to file an amended complaint. D.I. 80. In the amended complaint, CenterForce seeks to allege infringement of the '965 patent, and to add a claim for willful infringement of both the '799 and '965 patents. CenterForce also seeks recovery of treble damages. ALI opposes CenterForce's motion to amend. For the reasons set forth below, the Court will grant CenterForce's motion to amend the complaint.

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

## II. Factual Background

The three CenterForce patents describe methods and systems for enhancing telephone contact campaigns by scheduling calls based on probabilities of right party contact with the targeted individual in order to enhance the rate of correct party contact and operator productivity. CenterForce markets and sells its telephone scheduling systems under the name "Optimizer," to, for example, debt collection and telemarketing firms.

ALI is also in the business of selling call optimization systems. ALI markets its "CallTech" system, previously known as "Stalker," in competition with CenterForce's Optimizer system.

CenterForce's president and chief operating officer, Robert F. Kelly, learned of the Stalker [*4] system as early as November 1994 when he was employed by EIS International. Kelly had received two documents, a facsimile of a brochure cover or data sheet describing Stalker and a two-page general product overview. D.I. 91, at B-9-11. Early in 1995, Kelly met with representatives of ALI to discuss ALI's product development generally, but "no technical specifics" were discussed. *Id.* at B-15.

In July 1995, representatives of CenterForce, then known as Automated Systems and Programming, Inc. ("ASPI"), obtained a copy of a Stalker brochure at a trade show. *Id.* at B-23. By a letter dated July 28, 1995, CenterForce's attorney wrote to ALI stating that the Stalker system as described in the brochure was "very similar to ASPI's [CenterForce's] Campaign Optimizer product." *Id.* at B-25. The letter went on to assert that "important aspects of the Campaign Optimizer are protected by the ['965 patent]" and that CenterForce had another patent application pending. *Id.* The letter closed with a warning that "ASPI [CenterForce] intends to enforce its patent rights vigorously and will not license potential competitors such as ALI. ALI should ensure that its products do not incorporate [*5] ASPI's [CenterForce's] patented technology." *Id.*

ALI's attorney responded in a letter dated October 12, 1995 asserting that "the ALI system cannot be considered as conflicting with [the] 965 Patent." *Id.* at B-34. The letter stated in pertinent part:

Although ALI's scheduling system is proprietary and I can, therefore, not disclose to you specifically what ALI's system does, I can set forth for you generally what the ALI system does not do relative to your client's 965 Patent. First, the ALI process does not prioritize accounts into relative priorities according to contact priority. The ALI system also does not al-

locate accounts in descending order of contact probability. Also, the ALI system does not create demographic profiles representative of contact probability.

*Id.* Enclosed with the letter were several pages of additional descriptive information including flow charts. *Id.* at B-36-43.

On January 30, 1996, CenterForce's attorney responded to the October 12, 1995 letter, acknowledging receipt of the materials describing Stalker and stating:

These materials, like the publicly-available information about the Stalker product that we reviewed [*6] earlier, suggest that the Stalker infringes claims of ASPI's [CenterForce's] U.S. Patent No. 5,436,965. However, you decline to provide further detail on the operation of the product on the grounds that the information is proprietary, and we lack sufficient independent information about the product to form a definitive infringement conclusion. We must therefore rely on the representations in your October 12 letter that the product does not meet the claim limitations that you identified.

*Id.* at B-44. The letter concluded by stating that CenterForce would "let this matter rest" until its next patent issued or "until [CenterForce] received additional information indicating that the '965 patent is infringed." *Id.*

On June 4, 1996, ALI's attorney wrote to CenterForce's attorney, expressing concern that certain CenterForce representatives had been representing in the marketplace that ALI's CallTech product infringed a CenterForce patent and demanding that such representations cease. CenterForce responded by letter dated June 25, 1996, stating that "in light of ALI's published material and your May 10 letter, and since ALI has refused to provide sufficient information [*7] to permit us to perform a definitive infringement analysis, [CenterForce] remains concerned that ALI is infringing one or more claims of [the '965] patent. Accordingly, [CenterForce] has expressed its concerns to others." *Id.* at B-45.

By letter dated July 7, 1997, CenterForce's attorney informed ALI that the '790 patent recently had issued. *Id.* at B-59. The letter asserted, "many of the claims of the '790 patent are directed to features of CenterForce's software that were not specifically claimed in the '965 patent and which may be used in ALI's product. Other

claims are directed to the same features as were claimed in the '965 patent and which CenterForce remains unsatisfied are not infringed by ALI's product." *Id.* In conclusion, CenterForce renewed its "demand that ALI explain why its CallTech product does not infringe CenterForce's patent rights." *Id.*

At least one of CenterForce's salesmen continued during 1998 to make representations to customers that CenterForce had "three broad based patents" covering the Optimizer and, therefore, it was "virtually impossible for ALI to be selling the same type of product." *Id.* at B-47, 50, 57.

On September 1, 1998, ALI [*8] received a patent for its CallTech system, U.S. Patent No. 5,802,161 (the '161 patent). The patent specification references the use of "scorecards" and "characteristics" in the specification and description of the preferred embodiment. *Id.* at B-68.

On April 15, 1999, CenterForce's president wrote ALI's president, announcing the issuance of the '799 patent on March 30, 1999, and advising ALI that CenterForce had filed this suit for alleged infringement of the '799 patent. *Id.* at B-82. In August 1999 the parties exchanged responses to document requests and interrogatories, and in September and October 1999 the parties engaged in depositions.

On December 14-15, 1999, the court held a *Markman* n1 hearing regarding construction of disputed claim terms of the '799 patent.

---

n1 *Markman v. Westview Instruments, Inc., 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).*

---

### III. Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleadings [*9] by "leave of the court" and that leave to amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)* (citing *Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996)).* This Rule "embodies a liberal pleading policy of the federal rules." *Barkauskie v. Indian River School Dist., 951 F. Supp. 519, 527 (D. Del. 1996).* A policy of favoring decisions on the merits, rather than on the technicalities, underlies this Rule. *Foman, 371 U.S. at 181-82.* While a trial court has the discretion to grant or deny leave to amend, leave to amend should be freely granted, as the Rule requires, unless there is sufficient reason to deny leave. *See id. at 182; Burlington Coat*

*Factory, 114 F.3d at 1434.* Sufficient reasons include undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, failure to cure deficiencies in former amendments, and futility of amendment. [*10] *See Foman, 371 U.S. at 182; Burlington Coat Factory, 114 F.3d at 1434.* The Third Circuit Court of Appeals has further elaborated on the exceptions to the policy of liberally granting leave to amend, stating that "the passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984), cert. denied, 469 U.S. 1122, 83 L. Ed. 2d 799, 105 S. Ct. 806 (1985); see also Procter & Gamble Co. v. Nabisco Brands, Inc., 125 F.R.D. 405, 409 (D. Del. 1987)* ("a showing of undue prejudice or unfair disadvantage to the nonmovant is required before delay provides an adequate basis for denial" (citations omitted)). Thus, "'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)* (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978)).* [*11]

### IV. Discussion

The Court now turns to consideration of the factors relevant n2 to determining whether to grant the motion to amend. n3

---

n2 There is no indication, and ALI has made no argument, that CenterForce's proposed amendments would be futile or that, by this amendment, CenterForce seeks to cure deficiencies it failed to make in former amendments. Therefore, the Court will not further consider these factors.

n3 As an initial matter, ALI urges that CenterForce's motion should be denied because it is not supported by any evidence, particularly affidavits of a CenterForce witness to support the assertions in the motion to amend about what CenterForce knew and when it knew it. In *Barkauskie, 951 F. Supp. at 527-28,* this Court found a letter from the plaintiff's treating psychiatrist supported her motion to amend her complaint. However, the Court knows of no authority that would require the filing of an affidavit to support a motion to amend. Moreover, as CenterForce points out, because the depositions which gave CenterForce comfort in filing the motion to amend were designated by ALI as "Attorneys Eyes Only," CenterForce's counsel could not

---

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

show or discuss the contents of these depositions with CenterForce executives.

[*12]

## A. Undue Delay

Delay in of itself will not serve as a basis for denying a motion to amend unless the defendant is prejudiced. *See Proctor & Gamble Co., 125 F.R.D. at 409; Jenn-Air Products Co., Inc. v. Penn Ventilator, Inc., 283 F. Supp. 591, 594 (E.D. Pa. 1968).* However, "because . . . a showing of long delay may ameliorate the degree of prejudice which a nonmovant must establish in order to defeat the proposed amendment," the Court will address the parties contentions regarding when CenterForce was in possession of sufficient information upon which to base a claim of infringement of the '965 patent. *Proctor & Gamble Co., 125 F.R.D. at 410.*

CenterForce asserts that it did not unduly delay amending the complaint to include infringement of the '965 patent, but rather quickly sought to amend when it received sufficient evidence of infringement through discovery in this case. CenterForce contends that it had concerns as early as 1995 that ALI's Stalker system, the predecessor to CallTech, infringed CenterForce's '965 patent and conveyed those concerns to ALI. D.I. 91, at B-44 & -45. However, CenterForce asserts it did not [*13] file and could not have filed a claim against ALI for infringement of the '965 patent earlier because, based on publicly available information about the Stalker product, ALI's refusal to provide additional product information on the ground such information was proprietary, and ALI's representations regarding the differences between the two products, *id.* at B-34, CenterForce could not form a definitive conclusion as to whether the product infringed the '965 patent. *Id.* at B-44 & 45. CenterForce maintains that it obtained sufficient information to form a good faith belief that ALI's products infringed the '965 patent through discovery in this case relating to the '799 infringement claim. In particular, CenterForce contends that, among the 30,000 pages of documents produced by ALI in August 1999, four technical documents relating to CallTech evidenced a possibility that ALI's CallTech infringed the '965 patent. CenterForce asserts it was not until October 4-8, 1999, however, during the depositions of ALI's President, Alexander N. Svoronos, and Vice-President, Daniel N. Duncan, that it received sufficient information regarding the functionality of the CallTech product, which furthered [*14] its understanding of the documents produced in August, to enable it to determine that CallTech infringed the '965 patent. In particular, CenterForce contends that CallTech infringes independent claim 4 and dependent claims 5 and 7 of the '965 patent, which involve the creation and use of a "demo-

graphic profile" representative of right party contact. Also after these depositions, CenterForce updated its claim chart regarding the '799 patent to assert that claim 9, which also references "demographic profile," is also infringed.

ALI counters that CenterForce unduly delayed in bringing its claim for infringement of the '965 patent because it had the necessary information to make the infringement determination prior to filing the original complaint. In particular, ALI contends that the information CenterForce claims to have learned in discovery was already known to CenterForce through the following materials: (1) brochures on the Stalker system given to Robert Kelly in 1994; (2) a brochure on CallTech obtained by CenterForce at a trade show in 1995; (3) the October 12, 1995 letter from ALI's counsel accompanied by a product description and flow charts; and (4) ALI's '161 patent. ALI maintains [*15] these materials indicated that its system used "scorecards" and "characteristics" to determine right party contact probabilities and that CenterForce should have been well aware that the scorecards could be determined based on characteristics that included demographic data representative of right party contact.

"The issue of undue delay is inherently ambiguous. Any consideration of it frequently necessitates an inquiry into the applicability of *Rule 11 [of the Federal Rules of Civil Procedure]* and the incidental issues of dilatory motive, unfair surprise or bad faith. It is difficult, even through the gift of hindsight, for the Court to determine precisely when counsel possessed sufficient information upon which to base an amendment." *Proctor & Gamble Co., 125 F.R.D. at 411.* Rule 11 mandates that upon signing a pleading, an attorney is "certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances," the claims and allegations therein are well grounded in fact and warranted by law. *Fed. R. Civ. P. 11(b).* CenterForce contends that it was following the requirements of Rule 11 on advice of counsel [*16] by waiting for the discovery process to reveal whether or not there was sufficient basis to assert a claim that CallTech infringed the '965 patent.

In light of Rule 11's mandate, the Court cannot conclude that CenterForce unduly delayed asserting a claim for infringement of the '965 patent. Here, correspondence between attorneys for ALI and CenterForce, beginning as early as 1995, indicates a consistent position by CenterForce that it was concerned that ALI's product infringed the '965 patent, but that it did not have sufficient information to make a definitive infringement interpretation. ALI refused CenterForce's requests for additional information on its product, citing its proprietary nature. ALI also asserted that its product did not infringe the

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

'965 patent, citing differences, including a representation in the October 12, 1995 letter that "the ALI system does not create demographic profiles representative of contact probability." B-34. Moreover, as far as the Court can determine, the brochures and other information available to CenterForce, including ALI's '161 patent, while indicating that the Stalker and CallTech systems used "scorecards" and "characteristics," do not explicitly [*17] reference use of demographic information in calculating contact probabilities. ALI argues that anyone with any sort of expertise in the credit collection business would understand that a credit scoring system, like ALI's product, necessary used demographic data. D.I. 134, Transcript 2/2/00, at 27-29. However, in light of the fact that ALI was clearly on notice of CenterForce's position that it did not have sufficient information to make a conclusive infringement analysis, ALI's refusal to provide additional information, and ALI's explicit representation that its product did not create demographic profiles, the Court concludes CenterForce did not unduly delay in asserting the claim for infringement of the '965 patent. n4

n4 ALI cites *DRR, L.L.C. v. Sears, Roebuck & Co., 171 F.R.D. 162 (D. Del. 1997)* to support its argument that CenterForce unduly delayed in asserting a claim for infringement of the '965 patent. The Court finds *DRR* to be distinguishable from the present case. In *DRR*, of primary importance to the court's finding of undue delay and undue prejudice was the fact that the plaintiff sought leave to amend the complaint to add a new legal theory after summary judgment had been granted, more than two and one-half years after the original complaint was filed. *Id. at 167-68.* In the present case, by contrast, fact discovery has yet to close and there have been no determinations on the merits. Moreover, in *DRR*, unlike the present case, the plaintiff offered no explanation for its failure to assert the new legal theory before summary judgment was entered against it. *Id. at 167.*

[*18]

**B. Undue Prejudice**

CenterForce contends the proposed amendment would not be prejudicial to ALI because the '965 patent is the grandparent of the '799 patent and the claims of the two patents are substantially similar. CenterForce asserts the addition of the '965 patent would not introduce any new claim terms, that extensive discovery has been taken already on the '965 patent, and, therefore, that little additional discovery will be required. Finally, CenterForce

maintains it would be preferable for all concerned to dispose of the '965 patent infringement claims in one proceeding, rather than forcing CenterForce to file a separate lawsuit, given the substantial similarity between the patents, the claims involve the same infringing product, and the substantial overlap in discovery.

ALI maintains that permitting amendment of the complaint would unduly prejudice ALI because the additional claims and the additional defenses to such claims would necessitate additional discovery regarding the '965 patent and claim terms. ALI further asserts that it would have excellent grounds for defending the new claim on the basis of laches and equitable estoppel. Although ALI may have affirmative [*19] defenses to the '965 infringement claim based upon the doctrine of estoppel and laches, this can only be determined after adjudication on the merits including the required factual findings regarding the elements of these defenses. *See Jenn-Air Products Co., Inc., 283 F. Supp. at 594.* In addition, ALI may need to conduct additional discovery related to these defenses, as well as the defense of advice of counsel to the willful infringement claim that CenterForce seeks to add.

"'Prejudice' for the purpose of Rule 15(a) does not concern potential prejudice resulting from the nature of the claims sought to be added; it concerns only the prejudice resulting from the fact of adding new claims at a late date." *Barkauskie, 951 F. Supp. at 528.* While the Court agrees with ALI that some additional discovery will be needed, the Court does not believe this need for additional discovery creates "undue prejudice" within the meaning of *Foman, 371 U.S. at 182. See id.* As was the case in *Barkauskie*, a trial date has not been set in this case, and defendants will be able to conduct discovery with respect to the additional claims and defenses. [*20] *See id.* Moreover, prejudice to ALI is diminished because the claims relate to the same product, the patents are substantially similar, and significant discovery regarding the '965 patent has been conducted already in this litigation.

ALI also maintains that any delay of the case by extending scheduling order deadlines would unduly prejudice ALI because it would extend CenterForce's ability to use this litigation "as a club against ALI in the marketplace." D.I. 90, at 14. This argument is not persuasive. Were this Court to deny CenterForce's motion to amend the complaint, CenterForce would be entitled to file a separate suit for infringement of the '965 patent (and would then, presumably, have a very good argument for consolidation of that action with this one). It would seem that, were the Court to deny the motion to amend and CenterForce were to file a separate suit, as it asserts it would, it would extend even longer CenterForce's ability to use infringement litigation "as a club in the market-

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

place against ALI." ALI counters that resolution of the '799 claim will essentially end the litigation for all practical purposes. n5 At this point, however, the Court has no way of knowing [*21] whether this is correct. Therefore, because discovery has not yet closed, the '965 patent is closely related to the '799 patent, both claims involve the same product, the trial of this case has not been set, and, if CenterForce's instant motion is denied, CenterForce could, and represents it would, institute a separate action against ALI, the Court concludes ALI will not be unduly prejudiced by allowing the motion to amend.

> n5 At the hearing on the motion to amend, ALI also put forth the following argument: ALI asserts that the claims of the '799 patent are drawn more broadly than those of the '965 patent and, therefore, if CenterForce were to prevail on its claim for infringement of the '799 patent, it would get the same relief as it would under the '965 patent because CenterForce is claiming the benefit of the earlier filing date. D.I. 134, at 41. However, if CenterForce were to prevail on a claim for infringement of the '965 patent, which issued in 1995, it would appear to be eligible for four additional years of damages than it would be were it to prevail only on the '799 patent, which issued in 1999. *See generally* 5 DONALD S. CHISUM, *CHISUM ON PATENTS § 16.04*[2]-[3] (1999) (liability and remedy for infringing acts only during term of patent, which begins when patent issues) and cases cited therein.

[*22]

## C. Bad Faith or Dilatory Motive

Finally, ALI makes two arguments that CenterForce has brought this motion in bad faith. First, ALI contends that CenterForce's conduct in the marketplace, in particular assertions by sales representatives that ALI's Call-Tech system infringes the '965 and '799 patents, demonstrates CenterForce's bad faith. Second, ALI asserts CenterForce is adding the claim for infringement of the '965 patent because it has come to realize that its case regarding the '799 patent is weak.

Regarding the representations of the CenterForce sales representative that ALI's system may infringe CenterForce's patents, the Court finds it hard to relate this action to any bad faith in bringing the motion to amend. ALI is essentially arguing their Lanham Act claim

against CenterForce as their argument for bad faith, and the ultimate success of the parties' claims on the merits is not properly before the Court at this procedural juncture. *See Proctor & Gamble Co., 125 F.R.D. at 412.* Moreover, in most instances, infringement litigation is a stronger "club" in the marketplace than a salesman's assertions that a competitor's products "may" violate CenterForce's [*23] patent rights. It follows it would make sense for CenterForce to assert its patent infringement claims as soon as possible, rather than delay.

Second, ALI argues that CenterForce is now seeking to assert a claim for infringement of the grandparent '965 patent because it made some bad decisions during the course of the current lawsuit and that during the course of discovery, CenterForce has been educated as to the weakness of its case regarding the '799 patent. D.I. 90, at 15; D.I. 134, at 39, 43-44. The success or failure of CenterForce's original claims is an issue for trial and cannot be decided on a motion to amend. *See Proctor & Gamble Co., 125 F.R.D. at 412.* Other than ALI's bald assertions, the Court has no indication at this stage of the proceedings that the original claims are unsupported. *See id.*

Finally, there is no evidence to indicate that motion to amend is simply a delaying tactic by CenterForce. CenterForce has argued that there is no need to change the current schedule, that very little, if any additional discovery would be necessitated by the additional claims. In sum, the Court cannot conclude there was bad faith or dilatory motive on the part [*24] of CenterForce.

## V. Conclusion

The Court concludes that CenterForce did not unduly delay in asserting a claim for infringement of the '965 patent, nor was the motion to amend brought in bad faith. In view of the fact that discovery has not yet closed, the '965 patent is closely related to the '799 patent, both claims involve the same product, and the trial of this case has not been set and ALI will have time to prepare its defenses to these new claims before the case is scheduled for trial, ALI will not be unduly prejudiced by granting the motion to amend. "Moreover, if plaintiff's motion were denied[,] . . . a separate action against the defendant could be instituted[,] and, in the absence of creating undue complications at trial, it is clearly preferable to dispose of all the contentions between these parties in one proceeding." *Jenn-Air Products Co., 283 F. Supp. at 594.* Therefore, an order will be issued granting CenterForce's motion to amend and addressing case management concerns.

LEXSEE

**Lisa Ayers v. Allen Quillen d/b/a Never Never Land Kennel & Cattery**

**C.A. No. 03C-02-004-RFS**

**SUPERIOR COURT OF DELAWARE, SUSSEX**

*2004 Del. Super. LEXIS 443*

**March 26, 2004, Submitted**
**June 30, 2004, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**LexisNexis(R) Headnotes**

**COUNSEL:** Martin J. Cosgrove, Esquire, Moore & Rutt, P.A., Georgetown, DE.

Colin M. Shalk, Esquire, Casarino, Christman & Shalk, P.A., Wilmington, DE.

**JUDGES:** RICHARD F. STOKES, JUDGE.

**OPINIONBY:** RICHARD F. STOKES

**OPINION:**

This is my decision on Defendant, Allen Quillen's Motion for Summary Judgment and Motion in Limine. For the following reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. Plaintiff may proceed in her cause of action under the *Consumer Fraud Act*, however, she has no cause of action under the *Deceptive Trade Practices Act.* Plaintiff will not be able to seek punitive damages. Defendant Quillen is not excused from liability on the basis that he is shielded by the incorporation of his business. Defendant's Motion in Limine is granted as to the limitation of compensatory damages for the negligence and negligent bailment claims. Plaintiff's request for an award of attorney's fees for the defense of these motions is denied.

**STATEMENT OF THE CASE**

In mid December 2002, Lisa Ayers ("Ayers") boarded her three dogs at Never Never Land Kennel [*2] & Cattery ("the Kennel"), a Delaware Corporation. Sometime on December 16, 2002, two of her dogs, Syd-

ney and Brie, were attacked by two homeless "rescue" dalmatians that had been taken in by the Kennel's owner, Allen Quillen ("Quillen"). Ayers' dogs were either in a communal yard or in their own boarding run, adjacent to the cage in which the dalmatians were housed. All cages are secured with a horse shoe lock and a clip latch. Somehow the dalmatians managed to escape their cage, either because the lock was not properly secured or because they managed to create a gap between the gate and the post by jumping against it.

Mr. Quillen was not present during the incident, however, the Kennel manager, Kimberly Wade ("Wade") who was present, notified him at his home on the Kennel grounds. They took the injured dogs to Rehoboth Animal Hospital where they were treated and prescribed medication. Quillen and Wade decided not to inform Ayers that her dogs had been injured, as she was coming the next day to pick them up. When Ayers picked up her dogs on December 17, 2002, Quillen told her that they had been bitten by one of the other dogs. In addition to covering the medical expenses from Rehoboth [*3] Animal Hospital (ranging from $ 500 to $ 800), Quillen did not charge Ms. Ayers for the time the dogs were boarded at the Kennel.

Plaintiff has filed suit based on the theories of gross negligence, negligence, consumer fraud, deceptive trade practices, and negligent bailment. As relief, she is seeking damages, compensatory damages, special damages, punitive damages, costs, attorneys fees, and any other relief the Court may deem appropriate. Ayers is seeking compensatory damages for follow-up veterinarian visits, including wound treatment, a follow-up exam and surgery on Sydney, and a physical exam for Brie. The total bill amounts to $ 822.28.

Defendant has filed this Motion for Summary Judgment seeking judgment in his favor on the issues of violations of the Deceptive Trade Practices Act, violations of the Consumer Fraud Act and Plaintiff's request for

2004 Del. Super. LEXIS 443, *

punitive damages. In addition, Defendant requests that all claims against Allen Quillen as an individual be dropped, as Ayers was dealing with the Kennel, which is a corporation. Moreover, Defendant has filed a Motion in Limine seeking to limit the amount of damages for negligence and negligent bailment.

## DISCUSSION

### [*4] A. Standard of Review

This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the nonexistence of material issues of fact. *Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Once the moving party meets its burden, the burden shifts to the nonmoving party to establish the existence of material issues of fact. *Id. at 681.* The court views the evidence in a light most favorable to the nonmoving party. *Id. at 680.*

Where the moving party produces an affidavit or other evidence sufficient under *Superior Court Civil Rule 56* in support of its motion and the burden shifts, the nonmoving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. *Super. Ct. Civ. R. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* If material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is not appropriate. *Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962).* [*5]

### B. Quillen's Liability as an Individual

Defendant has requested that all causes of action against Quillen as an individual be dropped. Plaintiff claims that she has a cause of action against Quillen because he was an agent for an undisclosed principal. According to this theory of liability, an agent who makes a contract, "purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract." *Restatement (Second) of Agency § 322 (1958). See Persia, Inc. v. Kennedy, 1984 WL 402552 (Del. Com. Pl.); Taylor v. Conforti, Del. Super. Ct., No. 361, 1975, Taylor, J. (September 15, 1975). See also 2A C.J.S. Agency § 363 (1972).* However, in this case, Plaintiff is not suing for breach of contract. Rather she is suing for negligence, gross negligence, negligent bailment n1 and pursuant to the Consumer Fraud Act and the Deceptive Trade Practices Act - all are tort or statute-based claims. Thus, the undisclosed principal doctrine does not apply to make Quillen liable as an individual. He is still not excused from liability, however.

n1 A party may elect to bring a cause of action for either breach of a bailment contract or for negligence of the bailee for the mishandling of property:

> Actions in tort or sounding in tort may also be appropriate when the bailee's violation of a duty or obligation imposed by the bailment is not only a breach of the bailment contract, but also a tort, and the bailor may elect to affirm the contract and, waiving the tort, bring an action ex contractu, or the bailor may abandon the contract and proceed against the bailee in an action ex delicto. Thus, in an action against a bailee for failure to return bailed property, the bailor may proceed on alternate theories of general negligence of the bailee, specific negligence of the bailee, or breach of the bailment contract.

*8A Am. Jur.2d Bailments § 206 (1997).*

Plaintiff has chosen to bring a cause of action under a negligence theory, thus this issue will be treated as one of tort law only.

### [*6]

In certain circumstances, corporate officers and directors in Delaware may be liable for their active participation in tortious conduct even if they are officially acting for the corporation. *T. V. Spano Bldg. Corp. v. Wilson, 584 A.2d 523, 530-31 (Del. Super. Ct. 1990), aff'd sub nom. T.V. Spano Bldg. Corp. v. Dep't. of Natural Res. and Envtl. Control, 628 A.2d 53, 61 (Del. 1993). Accord St. James Recreation, LLC v. Rieger Opportunity Partners, LLC, 2003 WL 22659875, at *6 (Del. Ch.); Stonington Partners, Inc. v. Lernout & Houspie Speech Products, N.V., 2002 WL 31439767, at *8 (Del. Ch.); State ex rel. Brady v. Preferred Florist Network, Inc., 791 A.2d 8, 21-22 (Del. Ch. 2001); Heronemus v. Ulrick, 1997 WL 524127, at *1 (Del. Super. Ct.).* As noted in *T.V. Spano Bldg. Corp. v. Wilson,* this rule of liability is based upon principles of agency law. *584 A.2d at 531.* The Supreme Court, in affirming the decision of the Superior Court on narrower grounds, refused to decide,

2004 Del. Super. LEXIS 443, *

however, whether anyone besides a corporate officer, i.e. a director, employee or agent, could be [*7] liable. *T. V. Spano Bldg. Corp. v. Dep't. of Natural Res. and Envtl. Control, 628 A.2d at 61 n.10(Del. 1993)("T.V. Spano")* (finding a corporate officer to be a "responsible party" under *7 Del. C. § 6308* such that he could be liable for improper disposal of hazardous waste.) Thus, a question arises as to in what capacity Quillen was serving with the Kennel and how his position would be treated under Delaware law for the purposes of determining personal liability.

In this regard, he was the owner, and he had a proprietary stake in the corporation. His mother owned the Kennel before him, and his interest was created about five years ago. Def.'s Mot. Ex. 2 at 53. Quillen was the person with the most control over the affairs of the corporation. When the dogs were injured, Wade, the Kennel's manager, contacted Quillen before any action was taken. He was present when Ayers came to pick up her dogs, and it was he who told her about the incident and who made the decision to cover the medical expenses himself and to not charge her for her dogs' stay at the Kennel. Viewing these facts from Ayers' perspective, Quillen was acting as an agent for [*8] the Kennel with a managerial or directorial role, despite his lack of an official title.

According to the *Restatement (Second) of Agency § 343* (1958), "an agent who does an act otherwise a tort is not relieved from liability by the fact that he acted . . . on account of the principal. . . ." As principles of agency are applied to corporate officers, directors and employees, the general rule is discussed in 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1135 (perm. ed. rev.vol.2002):

> A person is personally liable for all torts which that person committed, notwithstanding the person may have acted as the agent or under directions of another. This rule applies to torts committed by those acting in their official capacities as officers or agents of a corporation. It is immaterial that the corporation may also be liable.

*See also 18B Am. Jur. 2d Corporations § 1877* (1985); 19 C.J.S. *Corporations §* 544 (1990).

However, considering the purpose of limited liability, a principle central to corporate law, an injured party must prove the officer, [*9] director or agent participated in the tort. *See id.* § 1137. "Some knowledge and participation, actual or implied, must be brought home to

the agent." *Id. See also* 19 C.J.S. *Corporations §* 544 (1990) ("A director, officer, or agent is not liable for torts of the corporation merely because of his office; he is liable for torts in which he has participated or which he has authorized or directed.") This is also the case in Delaware for liability against an officer to ensue. "Knowledge of the act is not enough. . . . The corporate officer must have been actively involved in that the officer directed, ordered, ratified, approved or consented to the tort." *Heronemus, 1997 WL 524127,* at *2. An officer can only be held liable for misfeasance or active negligence and not for nonfeasance or the omission of an act. *Id. See also T. V. Spano, 628 A.2d at 61-62* (finding the officer, Spano, was not personally liable because he did not direct, order, ratify, approve or consent to the improper disposal of hazardous waste).

This standard also applies in this case, where an agent such as Quillen has significant responsibility in the corporation. Not only [*10] does he own the Kennel, but also he manages the business, much as an officer would manage and direct the daily affairs of a corporation. Thus, Quillen may be held personally liable for damages under tort theories, but Plaintiff will have the burden of proving his misfeasance or active negligence. Since neither side developed this issue, the Court will decide whether Ayers has met this burden at trial.

Regarding the statutory claims, Quillen has no liability to Ayers under the Deceptive Trade Practices Act under well settled principles of Delaware law. *See* discussion, *infra.* As to the Consumer Fraud Act, however, *6 Del. C. § 2513* applies to "any person." *Section 2511(5) of the Act* defines "any person" to mean "an individual, corporation, government, or . . . 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity." The Consumer Fraud Act is to be liberally construed in keeping with its primary purpose of protecting the consumer. *Young v. Joyce, 351 A.2d 857, 859 (Del. 1975). Accord Thomas v. Harford Mut. Ins. Co., 2003 WL 220511,* at *4 (Del. Super. Ct.). In T. V. Spano, 628 A.2d at 60,* [*11] the Supreme Court applied the common meaning to the undefined term, "responsible party," under *7 Del. C. § 6308* of the *Hazardous Waste Management Act.* In so doing, it found that a responsible party could be a "person," a term which was defined in *§ 6302(10) of the Act* to include "an individual, trust, firm, joint stock company, federal agency, corporation . . . or any interstate body." *Id.* The Court went on to say, "although the definition does not specifically mention officers of a corporation, the definition is broad enough to include a corporate officer as a responsible party. . . ." *Id.* The Chancery Court, in *State v. Preferred Florist Network, Inc., 791 A.2d 8, 21 (Del. Ch. 2001),* applied the reasoning of *T. V. Spano* to find that a corporate officer was not shielded from liability

2004 Del. Super. LEXIS 443, *

under the Consumer Fraud Act despite the fact he was acting in his corporate capacity.

As in *T. V. Spano*, under the Consumer Fraud Act, the intent of the legislature to make those individuals who are responsible for misleading consumers responsible for their actions is evident from the language used in the statute. "Any person" is defined [*12] to include "an individual," a "corporation," or "2 or more of any of the foregoing having a joint or common interest." The statute contemplates that both the corporation and an individual who might have a common interest in the profits and success of the business would be liable. This Court finds that the definition of "any person" is broad enough to include an agent of a corporation who is responsible for consumer fraud under the terms of the Act. Given Quillen's extensive role in the running of the Kennel and his status as owner, it would subvert the purpose of the Consumer Fraud Act to find that he could not be held liable for any role he might possibly have played in defrauding consumers. *See United States v. Northeastern Pharmaceutical, 810 F.2d 726, 745 (8th Cir. 1986), cited in T. V. Spano, 628 A.2d at 61* ("'imposing liability upon only the corporation, but not those corporate officers and employees *who actually make corporate decisions*, would be inconsistent with [the Legislature's] intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances'"). Once again, however, it is not enough [*13] that the officer, director, agent or other employee knew of the deception. "Rather, [he] must be shown to have been actively involved in the alleged violative activity." *See T. V. Spano Bldg. Corp., 628 A.2d at 61* (citation omitted).

## C. The Deceptive Trade Practices Act

Plaintiff Ayers has filed a claim under *6 Del. C. § 2532, et seq.*, The Deceptive Trade Practices Act ("the DTPA"), alleging that Defendant created a likelihood of confusion or of misunderstanding by promoting the Kennel as safe. As the defendant points out, however, a consumer has no standing to state a cause of action under the DTPA. *See Grand Ventures Inc. v. Whaley, 632 A.2d 63 (Del. 1993)*. "The Act is intended to address unfair or deceptive trade practices that interfere with the promotion and conduct of another's business. Unlike the Consumer Fraud Act, the DTPA is not intended to redress wrongs between a business and its customers." *Id. at 65*. It is the Consumer Fraud Act, addressed *infra*, which provides a cause of action for a consumer.

> In short, the most logical interpretation of the Consumer Fraud [*14] Act in conjunction with the DTPA is that the Consumer Fraud Act provides remedies for

violations of the "vertical" relationship between a buyer (the consumer) and a producer or seller. . . . Conversely, the DTPA addresses unreasonable or unfair interference with the "horizontal" relationships between various business interests.

*Id. at 70.*

*See also Crosse v. BCBSD, Inc., 836 A.2d 492 (Table), 2003 WL 22214021, at *4 (Del.); S&R Assoc. v. Shell Oil Co., 725 A.2d 431, 440; Ewing v. Bice, 2001 WL 880120, at *7-8 (Del. Super. Ct.).* Since Ayers is a consumer of the services the Kennel provides and is not a competing business, she has no standing to bring a claim under the DTPA. As to this issue, Summary Judgment is granted on behalf of Defendant.

## D. Consumer Fraud Act

Ayers has brought a claim under *6 Del. C. § 2513(a)* of the Consumer Fraud Act, *6 Del. C. § 2511, et seq. Section 2513(a)* provides:

> (a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, [*15] suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Ayers alleges that Quillen and the Kennel engaged in consumer fraud by advertising the safety of its kennels on its web page with the claim that "no would be escape artist' could climb out." She also claims that the whole tone of the advertisement falsely represented that the Kennel was safe.

In *Brandywine Volkswagen Ltd., 306 A.2d 24, 27 (Del. Super Ct. 1973)*, the Court first set out the standard for resolving a cause of action under the Consumer Fraud Act, stating, "the common thread which runs through . . . actions under *6 Del.C. s 2513* is the making of a false or misleading statement or the concealment, suppression or omission of information, thereby creating a condition of falseness." The person making the false statement must

2004 Del. Super. LEXIS 443, *

know that it is untrue or must make it with reckless indifference to the truth. *Id.*

> The general rule is that a person [*16] is chargeable with a false statement if it was made under such circumstances as to raise a presumption of his knowledge of the falseness. This principle applies where a person has a duty to know the truth or where the facts are peculiarly within the knowledge of the person making the statement.

*Id.*

In addition to the requirement that there be a false statement, the statute requires that the person making the statement intend others to rely upon the deception, false promise or misrepresentation. *Id. at 29.* However, the consumer need not prove that she herself relied upon the false statement, only that the defendant made the statement with the intent that someone would rely upon it. *S&R Associates, Inc. v. Shell Oil Co., 725 A.2d 431, 440 (Del. Super. Ct. 1998).* The misleading statement must be made in connection with a sale, lease or advertisement, such that post-sale representations do not constitute consumer fraud under the Act. *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North America, Inc., 558 A.2d 1066, 1074 (Del. Super. Ct. 1989); Thomas v. Harford Mut. Ins. Co., 2003 WL 220511,* [*17] at *4 (Del. Super Ct.).

Defendant Quillen has requested summary judgment on the basis that no false statements or representations were made and that any representations that may have been made on the website were not discovered by Ayers until after she had already solicited the services of the Kennel and thus were made post-sale. He also claims that the allegedly deceptive statement on the site has nothing to do with the incident in this case. The full sentence in question states, "all of these runs have solid tops to protect the dogs from sun or rain or to be extra sure no would be escape artists can climb out." Def's Mot. Ex. 2 at 32-33. As to this last claim, while the statement specifically relates to dogs escaping through the roof of the kennels and this incident involves dogs escaping through the gate, this distinction is inapposite. Plaintiff has made it clear that it is the website as a whole which is misleading and not solely the one sentence quoted.

Quillen's contention that the representations were made post sale misconstrues the idea presented in *Norman Gershman's Things to Wear* and in *Thomas.* In *Norman Gershman's Things to Wear,* the court stated:

> this [*18] Court cannot ignore the clear language of the statute which restricts its application to deceptive practices in connection with the sale or advertisement' of the merchandise. Given this statutory limitation, it is clear that post-sale representations which are not connected to the sale or advertisement . . . do not constitute consumer fraud under the Act.

*558 A.2d at 1074. Accord Thomas, 2003 WL 220511,* at *4.

The website is an advertisement for Quillen's business. Any statements made on it are representations "in connection with the sale or advertisement" of the Kennel's services. It does not matter that Ayers did not find out about the website until after she had boarded her dogs because she need not prove that she relied upon the ad. Plaintiff need only prove that the website existed before she boarded at the Kennel and that the false statement was on the website before that time and that it was intended to mislead customers. In this regard, Ayers has stated that the copyright on the website is 2001, approximately a year before the incident occurred.

As to the falsity of the claims on the Kennel's website, however, Plaintiff must prove [*19] that Defendant knew the statements were false or that he negligently made the misrepresentation. *Norman Gershman's Things to Wear, 558 A.2d at 1074.* Ms. Ayers has presented evidence in testimony from a former employee of the Kennel, Angela Bailey ("Bailey"). She testified that the Kennel had "a recurring problem with employees forgetting to lock the gates with the snap latches." Pl.'s Response to Summary Judgment Mot. ("Pl.'s Response") P 13. These allegations create enough of an issue of material fact to preclude summary judgment as to the issue of consumer fraud.

**E. Punitive Damages**

**1. Plaintiff's Claim of Gross Negligence**

Ayers claims Quillen and the Kennel were grossly negligent in failing to keep other dogs away from her dogs. She alleges that, as the owner, he had a heightened duty to keep boarded dogs safe and that he should have notified her and followed her instructions in providing medical care to the dogs. Complaint P's 24-34. As a result of Quillen's gross negligence, Plaintiff is seeking an award of punitive damages.

2004 Del. Super. LEXIS 443, *

An allegation of gross negligence, however, does not suffice under Delaware law to justify a recovery of punitive damages. [*20]  As the Supreme Court stated in *Jardel Co. v. Hughes, 523 A.2d 518, 530 (Del. 1987)*, "in Delaware tort law the term gross negligence' has little significance. . . . Where reckless (wanton) or wilful conduct is required, either as a threshold for recovery, . . . or as a prerequisite for the recovery of punitive damages, as in this case, even gross negligence will not suffice." By pleading gross negligence and by failing to allege recklessness, Plaintiff has failed to meet her burden of showing Quillen had the requisite state of mind for an award of punitive damages.

In her Response to the Motion, Ayers does briefly mention gross recklessness, stating, "there are sufficient facts to establish gross negligence and gross recklessness and indifference to the rights of others." Pl.'s Response P 17. Putting aside for a moment the issues of whether recklessness must be specifically averred in the complaint and whether the complaint would need to be amended for Ayers to properly bring this claim, even if the Court were to assume Ayers has properly alleged a reckless state of mind, it still could not find, as a matter of law, that Quillen's behavior amounted to "outrageous" [*21] conduct.

Like negligence, the issue of whether punitive damages should be awarded is one normally left to trier of fact. *Jardel Co., Inc. v. Hughes, 523 A.2d 518, 527 (Del. 1987)*. The leading Delaware case on this issue is *Jardel*, in which the Supreme Court stated:

> The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous," because of "evil motive" or "reckless indifference to the rights of others." *Restatement (Second) of Torts § 908, comment b* (1979). Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice. *Id.* It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.

*Id. at 529.*

In order to find a defendant reckless, there must be an actual or constructive awareness of one's conduct and "a realization of its probable consequences, while negligence lacks any intent, actual or constructive." *Id. at 530.*

> Two [*22] significant elements must be present for recklessness to exist. The first is the act itself, e.g. in accident cases the negligent operation of a motor vehicle or aircraft. . . . The second, crucial element involves the actor's state of mind and the issue of foresee ability, or the perception the actor had or should have had of the risk of harm which his conduct would create. The actor's state of mind is thus vital.

Plaintiff has presented insufficient evidence that Quillen was even aware or could have been on notice that a dalmatian could escape and attack another boarded dog violently. *See Jardel, 523 A.2d at 531* (finding Jardel might have been on notice concerning incidents of general criminal conduct, but that no incident approached the level of violence of the crime alleged, rape). "Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment." *Id.* No evidence has been presented of previous attacks at the Kennel.

While Bailey stated [*23]  that there was a problem with securing snap latches, whether this problem could or would result in attack, could only have been speculation in the mind of Quillen. There is even a dispute as to whether it was the lack of a secure snap latch which allowed the dogs to escape. n2 Ayers claims that dalmatians are inherently dangerous dogs; however, there is no indication that Quillen knew this, or that he knew that these particular rescue dogs were themselves dangerous dogs. Nor has Ayers provided any substantive proof that dalmatians are dangerous or that this is a widely understood fact.

---

n2 Plaintiff Ayers alleges that there are three different explanations as to how the dogs escaped:

1) the horseshoe mechanism had turned somehow, although the bolts securing it were not loose;

2) the latch had slid because of the cold weather; or 3) the latch, which had not been seated properly, came undone (indicating it was not secured

2004 Del. Super. LEXIS 443, *

with a clip) when the dalmatians jumped against the gate. Defendant Quillen claims that the locks were secure but that because of the unusually cold weather, "the latch to which the lock and clip were both secured had loosened from the contracted pole and the dogs were able to create a gap in between the gate and the post large enough to get out." Def.'s Mot. for Summary Judgment ("Def's Mot.") P 6.

[*24]

In addition, Ayers claims Defendant was grossly negligent by not notifying her of the attack and by not following her instructions for medical care, specifically in taking the dogs to a different veterinary clinic than was indicated on an information sheet she had given to him. Here again, Quillen's actions do not rise to the level of recklessness. He made a calculated choice to take the dogs to a vet he felt was appropriate and not to tell Ayers about the incident that day. Although there is some dispute over whether Ayers' vet was available to see the dogs, she had signed a contract authorizing the Kennel to use its discretion in engaging veterinary services. Def.'s Mot. for Summary Judgment Ex.1 at 1. Quillen used the discretion he was authorized to use under the contract in making decisions about medical services for the dogs. The Court has seen no evidence that his intent was evil or that his actions were outrageous, or even that he recklessly or consciously disregarded Ayers' rights. The dogs received prompt treatment and Plaintiff was to return the next day to pick them up. In sum, there is nothing in the record tending to show that Defendant exhibited an "I don't care" attitude. [*25] See Craig v. A.A.R Realty Corp., 576 A.2d 688, 697 (Del. Super. Ct. 1989). On the contrary, he took the dogs to the vet immediately; he paid for that service and he did not charge Ayers for the cost of boarding her three dogs.

With this background, Plaintiff is not entitled to punitive damages as a matter of law for her tort claims.

**2. Plaintiff's Claim under the Consumer Fraud Act**

Under the Consumer Fraud Act, a plaintiff may recover punitive damages "if the fraud is 'gross, oppressive, or aggravated, or where it involves breach of trust or confidence." Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1076 (Del. 1983). Pursuant to the discussion of the facts above, the Court finds the plaintiff has failed to meet her burden of establishing that the alleged misrepresentation on the Kennel's website was "gross, oppressive, or aggravated." Nor could it be said the representations involved a breach of trust or confidence, when there is no evidence of any other incidents at the Kennel and when the most Quillen could have known was that there was a problem with securing latches properly and that some dalmatians might be dangerous dogs. It [*26] is one thing to punish the owner of a kennel for consistent problems, resulting in injuries and distress to the dogs entrusted to its care, but it is quite another to punish him when there has been minimal history of a lack of safety, which has resulted in no other reported attacks. See Id. ("Punitive damages operate to punish the individual defendant and deter similar conduct by others."). Mere allegations without supporting facts to show that Defendants' actions were in some way egregious are insufficient to support a recovery of punitive damages.

**6. Motion in Limine**

The Defendant initially presented a Motion in Limine to limit the measure of damages for negligence and negligent bailment to the cost of repair of the dogs since dogs are considered personal property and because there has been no change in value of the dogs' worth other than the vet bills. He claims this amount is $ 822.28, the cost for the remaining veterinary care. Plaintiff agrees that the compensatory damages are limited to the cost of repair of property or to the change in value of the property. She does not dispute the Defendant's contention that the measure of compensatory damages should be limited. [*27] Accordingly, compensatory damages will be limited to what the trier of fact determines is adequate to cover the cost of repair of the dogs.

**7. Attorney's fees**

Plaintiff has requested an award of attorney's fees for having to defend "such a meritless motion." Whether to award attorney's fees is within the discretion of the Court. Gannett Co. v. Board of Managers, 840 A.2d 1232, 1240 (Del. 2003). The Court is not convinced that Plaintiff has presented any legitimate reason for an award of attorney's fees. There is no real support for the allegation that Defendant's Motion for Summary Judgment is meritless. In truth, several issues have been decided in favor of the Defendant, negating any contention that the motion was without merit. Plaintiff's request for an award of attorney's fees is denied.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. Plaintiff's request for an award of attorneys fees is denied, and Defendant's Motion in Limine is granted. Compensatory damages are limited to costs incurred in the repair of Plaintiff's dogs due to the attack and subsequent treatment.

[*28] *IT IS SO ORDERED.*

2004 Del. Super. LEXIS 443, *

Richard F. Stokes

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2005, I electronically filed the within **Defendant/Third-Party Defendant East Coast Erectors, Inc.'s Response in Opposition to Millers Capital Insurance Company's Motion for Leave to File a Second Amended Complaint** with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

David L. Baumberger, Esquire
Chrissinger & Baumberger
Three Mill Road, Suite 301
Wilmington, DE 19806

Frank E. Noyes, II, Esquire
White & Williams, LLP
PO Box 709
Wilmington, DE 19899-0709

James F. Bailey, Jr., Esquire
Bailey & Associates
Three Mill Road, Suite 306A
Wilmington, DE 19806

Sean J. Bellew, Esquire
Cozen O'Connor
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

Robert K. Beste, Jr., Esquire
Cohen, Seglias, Pallas, Greenhall & Furman, PC
Nemours Building
1007 Orange Street, Suite 205
Wilmington, DE 19801

Victoria K. Petrone, Esquire
Tighe, Cottrell & Logan, PA
PO Box 1031
Wilmington, DE 19899

I hereby certify that on October 14, 2005, I mailed by United States Postal Service, the document to the following non-registered participants:

Ron L. Pingitore, Esquire
White and Williams, LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Steven K. Gerber, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Bruce W. McCullough, Esquire
McCullough & McKenty
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397

Geoffrey W. Veith, Esquire
Rogut McCarthy Troy, LLC
One First Avenue – Suite 410
Conshohocken, PA 19428

Dana Ostrovsky, Esquire
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
11th Floor, 1515 Market Street
Philadelphia, PA 19102

WETZEL & ASSOCIATES, P.A.

/s/ Natalie M. Ippolito
Natalie M. Ippolito (I.D. No. 3845)
The Carriage House, Suite 201
1100 N. Grant Avenue
Wilmington, DE 19805
(302) 652-1200
nippolito@wetzellaw.com