# EXHIBIT "G"

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
---------------------x
FEDERAL INSURANCE        : CIVIL ACTION
COMPANY a/s/o            :
EZIBA.COM./AVACET,       : NO. 04-339
INC., EZIBA SECURITIES   :
CORP.,                   :
        Plaintiff(s),    :
            v.           :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s).    :
---------------------x
MILLERS CAPITAL          : CIVIL ACTION
INSURANCE COMPANY        :
a/s/o DEL-HOMES          : NO. 04-1322-JJF
CATALOG GROUP, LLC,      :
        Plaintiff(s),    :
            v.           :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s)     :
and                      :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
        Defendant and    :
        Third-Party      :
        Plaintiff,       :
            v.           :
EAST COAST ERECTORS,     :
INC.,                    :
        Third-Party      :
        Defendant.       :
---------------------x
```

ESQUIRE DEPOSITION SERVICES

798293c5-1c9a-436a-8706-ffc3971e9314

A-16

Page 2

1        Oral deposition of MICHAEL A.

2  WILLIAMS, held at the law offices of WETZEL &

3  ASSOCIATES, P.A., The Carriage House, Suite

4  201, 1100 North Grant Avenue, Wilmington,

5  Delaware, 19805, on Tuesday, June 14, 2005,

6  beginning at 9:25 a.m., on the above date,

7  before Debra J. Weaver, a Federally Approved

8  RPR, CRR, CSR of NJ (No. XI 01614) and Delaware

9  (No. 138-RPR, Expiration 1/31/08), and a Notary

10 Public of New Jersey, Pennsylvania and

11 Delaware.

12

13

14

15

16

17

18

19

20

21

22              ESQUIRE DEPOSITION SERVICES
               1880 John F. Kennedy Boulevard
23                     15th Floor
              Philadelphia, Pennsylvania 19103
24                   (215) 988-9191

ESQUIRE DEPOSITION SERVICES

MICHAEL A. WILLIAMS

Page 66

1   specific point in time that there was a

2   realization of the need to remove downspouts

3   and install interior drains?

4           A.      I think it was generally

5   understood.

6           Q.      Do you know who was responsible

7   for that work?

8           A.      I do not.

9           Q.      Do you know if O'Donnell

10  Naccarato was made aware of the need to remove

11  downspouts and add interior drains in the

12  context of providing engineering services to

13  East Coast?

14          A.      I do not.

15          Q.      I just want to go over a few

16  documents.

17                  (Whereupon, Deposition Exhibit

18          No. Williams-118, Scope of Work, Bates

19          ECE 0575-0576, was marked for

20          identification.)

21  BY MR. PINGITORE:

22          Q.      Let me show you a two-page

23  document marked as 118.  It's previously Bates

24  stamped as ECE 0575 and 0576.  Could you take a

MICHAEL A. WILLIAMS

Page 67

1  moment to review that document, and when you

2  get a chance, please identify it for the

3  record.

4          A.     This looks like the scope of work

5  submitted to me by Lighthouse Construction for

6  purposes of bidding the project.

7          Q.     And this would then be the scope

8  of work that you provided to O'Donnell

9  Naccarato in order to provide engineering

10  services?

11          A.     That's correct.

12          Q.     On the second page of the

13  document, there are some dates handwritten in.

14  Do you see that?

15          A.     Yes.

16          Q.     Is that your handwriting?

17          A.     Yes.

18          Q.     And can you tell me the

19  significance of those dates, please?

20          A.     If I recall, they're nothing but

21  milestone dates.

22          Q.     Just a general schedule as to

23  when you would hope to complete the work?

24          A.     Yes.

MICHAEL A. WILLIAMS

Page 74

1    Q.    All right.  Just focusing on the
2  scope of services, O'Donnell Naccarato agreed
3  to visit the site two times during
4  construction, correct?

5    A.    Yes.

6    Q.    And you just do not know if they
7  in fact visited the site at all, correct?

8    A.    That's correct.

9    Q.    Do you know if East Coast ever
10 countersigned this proposal where provided for
11 on page two?

12   A.    I do not know.

13   Q.    I show you another document I'll
14 mark as Exhibit 120, previously Bates stamped
15 ECE 0532 through ECE 0534.  Take a minute to
16 familiarize yourself with the document.  Let me
17 know when you're ready to proceed.

18           (Whereupon, Deposition Exhibit
19       No. Williams-120, Proposal dated
20       2/23/99, Bates ECE 0532-0534, was
21       marked for identification.)

22 BY MR. PINGITORE:

23   Q.    Are you ready?

24   A.    Yes.  This appears to be our

ESQUIRE DEPOSITION SERVICES

798293c5-1c9a-436a-8706-ffc3971e9314

MICHAEL A. WILLIAMS

Page 75

1   proposal submitted to Lighthouse Construction

2   for the work on the '99 building.

3           Q.      And this proposal is dated

4   February 23, 1999, correct?

5           A.      Yes.

6           Q.      And it's signed by you on page

7   three?

8           A.      Yes.

9           Q.      Focusing on the first paragraph,

10  if I understand that sentence correctly, your

11  proposal relied on a drawing marked A2.1 and

12  specifications dated February 8, 1999, correct?

13          A.      Yes.

14          Q.      And were the specifications dated

15  February 8, 1999, the same specifications that

16  we've previously marked as Exhibit 118?

17          A.      Yes.

18          Q.      And at the point you provided

19  this proposal that we've marked as Exhibit 120,

20  did you already have the benefit of O'Donnell

21  Naccarato's engineering fee?

22          A.      Yes.

23          Q.      And would that proposal include

24  O'Donnell Naccarato's engineering fee?

798293c5-1c9a-436a-8706-ffc3971e9314

MICHAEL A. WILLIAMS

Page 89

1       A.      Yes.

2       Q.      Okay.  I show you another
3   document.  It's previously Bates stamped ECE
4   0525.  It will be marked as Exhibit 121.

5               (Whereupon, Deposition Exhibit
6           No. Williams-121, Letter dated 2/26/99
7           to East Coast Erectors from Lighthouse
8           Construction, Bates ECE 0525, was
9           marked for identification.)

10  BY MR. PINGITORE:

11      Q.      When you're ready, would you
12  please identify the document for the record.

13      A.      This is a letter from Lighthouse
14  Construction accepting my proposal.

15      Q.      And this letter is dated February
16  26th, 1999, correct?

17      A.      Yes.

18      Q.      And your base bid, as well as all
19  options, were accepted, correct?

20      A.      Yes.

21      Q.      For a total contract price of
22  $1,115,960, right?

23      A.      Yes.

24      Q.      And then in the paragraph under

MICHAEL A. WILLIAMS

Page 92

1      Q.      -- and 120?

2              They form the basis of the

3   contract between you, being East Coast, and

4   Lighthouse, at least to your understanding,

5   right?

6      A.      Yes.

7      Q.      I show you another document that

8   was previously Bates stamped ECE 0763 through

9   ECE 0765, a three-page document that we'll mark

10  as Exhibit 122.

11              (Whereupon, Deposition Exhibit

12          No. Williams-122, Requisition for

13          payment dated 3/22/99, Bates ECE

14          0763-0765, was marked for

15          identification.)

16  BY MR. PINGITORE:

17      Q.      Take a look at the document.

18  When you're ready, we'll identify it for the

19  record.

20              MR. HILL:  Let me take just a

21          minute to look at this.

22              MR. PINGITORE:  Okay.

23              THE WITNESS:  This appears to be

24          our first requisition for payment dated

MICHAEL A. WILLIAMS

Page 93

1          March 22nd, 1999.

2    BY MR. PINGITORE:

3          Q.      And this is -- this requisition

4    is directed to Mike McKone at Lighthouse

5    Construction, correct?

6          A.      Yes.

7          Q.      On the first page, which is ECE

8    0763, under description, the first description

9    is engineering.  Do you see that?

10         A.      Yes.

11         Q.      Can you tell me what that relates

12   to?

13         A.      That relates to O'Donnell

14   Naccarato's -- O'Donnell Naccarato MacIntosh's

15   services for the project.

16         Q.      And the amount charged is

17   $22,000, correct?

18         A.      Yes.

19         Q.      Is there a reason you charged

20   $22,000 as opposed to the $20,000?

21         A.      I was trying to make a little bit

22   of money.  That's just our mark-up.

23         Q.      So that's a 10 percent mark-up?

24         A.      10 percent mark-up, yes.

MICHAEL A. WILLIAMS

Page 203

1    Q.    And how do you recall that date
2    specifically?
3    A.    It is stamped with a received
4    file -- or received stamp from my office as to
5    when I received it.
6    Q.    Okay.  All right.  Here's the
7    next one, Lighthouse Bates stamp 01484, letter
8    to East Coast, Attention: Mike Williams, dated
9    April 6th, 1999.  Do you recall receiving that
10   document?
11   A.    Yes.
12   Q.    Okay.  And the body of the
13   document indicates that enclosed is two copies
14   of the contract; is that right?
15        MR. HILL:  That's not what it
16        says.
17        MR. BAUMBERGER:  I can't read it
18        upside down.
19   BY MR. BAUMBERGER:
20   Q.    "Standard Form Agreement Between
21   Contractor and Subcontractor for Work to be
22   Performed at the Catalog Resources Building."
23   Is that right?
24   A.    That's what it says, yes.

798293c5-1c9a-436a-8706-ffc3971e9314

A-25

MICHAEL A. WILLIAMS

Page 204

1      Q.    And is this document that's in
2  front of you, also called Standard Form
3  Agreement, the document that came along with
4  that letter to your recollection?
5      A.    Yes.
6      Q.    Okay.  Did you make any revisions
7  or objections to it when you received it?
8      A.    No.
9      Q.    Okay.  Did you negotiate any of
10  the terms of that Standard Form Agreement with
11  Lighthouse?
12      A.    No, I wouldn't say negotiate any
13  of the terms of this with them.
14      Q.    Okay.  Did you request any
15  changes to any of the terms in writing?
16      A.    No.
17      Q.    Okay.
18      MR. BAUMBERGER:  Let's mark the
19      cover letter as the next exhibit.
20      (Whereupon, Deposition Exhibit
21      No. Williams-131, Letter dated 4/6/99
22      with attachment, was marked for
23      identification.)
24  BY MR. BAUMBERGER:

ESQUIRE DEPOSITION SERVICES

MICHAEL A. WILLIAMS

Page 205

1    Q.    Did you understand, when you
2  received the April 6th letter enclosing the
3  Standard Form Agreement, that that was the
4  contract that East Coast was receiving from
5  Lighthouse?
6    A.    I did not.
7    Q.    What did you understand it to be?
8    A.    My understanding was my proposal
9  and this letter to precede was my contract.  I
10  left a space for Lighthouse to sign.  And on
11  the 26th I received this letter, and we went to
12  work.  And I didn't see this document show up
13  for approximately two months.  So as far as I
14  was concerned, I had proceeded for two months
15  based on this and this, and that was my
16  contract.
17    Q.    Okay.  What did you understand
18  the purpose of forwarding to you and requesting
19  your signature and return of the Standard Form
20  Agreement to mean?
21    A.    Well, as I say, this is dated the
22  6th, but it came the 19th, almost two months
23  after we had began construction.  As a matter
24  of fact, we were imminently going to start

ESQUIRE DEPOSITION SERVICES

MICHAEL A. WILLIAMS

Page 206

1   erecting the building.  And I just -- I'm not
2   going to say I disregarded it, but they didn't
3   ask me for the signature, I didn't provide it,
4   and I didn't think the document was important
5   because I was working from these two.
6           Q.    They asked you for a signature in
7   the letter of April 6th, correct?
8           A.    Yes.  The letter asks me to sign
9   it.
10          Q.    Okay.  Did you consciously not
11  sign it or simply forget or decide -- strike
12  that.
13                Did you consciously decide not to
14  sign it?
15          A.    Yes.
16          Q.    And why was that?
17          A.    As I said, I didn't feel it was
18  necessary to sign it as I was well underway
19  based on these documents, and I was comfortable
20  with that.
21          Q.    And did you know whether the
22  other party to the contract was comfortable
23  with that?
24          A.    Did not.  Can't speak for him.

MICHAEL A. WILLIAMS

Page 211

1      Q.    Okay.  You continue to perform
2  under the -- strike that.
3            You continued to perform your
4  work after you received the terms of this
5  agreement?
6            MR. HILL:  Which document are you
7            referring to, please?
8            MR. BAUMBERGER:  The Standard
9            Form Agreement between contractor and
10           subcontractor.
11           THE WITNESS:  Your question was
12           did I continue to perform after I
13           received it?
14           MR. BAUMBERGER:  Yes.
15           THE WITNESS:  Yes.
16  BY MR. BAUMBERGER:
17      Q.    You didn't raise any objections
18  to this in writing?
19      A.    No.  I'd like to note that I also
20  performed prior to getting it as well.
21      Q.    Okay.  You didn't make anybody at
22  Lighthouse aware of any objections you had to
23  this particular document?
24      A.    No.

MICHAEL A. WILLIAMS

Page 213

1  an indemnity or warranty provision?

2          A.      There's really nothing normal

3  today about contracts any more.  More often

4  than not, this standard form is not used as

5  individual contractors have opted for their own

6  version of a contract.

7          Q.      Well, in 1999, were you operating

8  or did you perform contracts that had no

9  provisions for indemnification, warranties?

10         A.      I'm sure I did.

11         Q.      Okay.  You received final payment

12 of this project from Lighthouse?

13         A.      Yes.

14         Q.      Did you execute a waiver of

15 liens?

16         A.      I'm not sure.  If it was

17 requested, I would have.

18         Q.      Did you bring up this Standard

19 Form Agreement with Lighthouse at any time

20 after you received it?

21         A.      No.

22                 MR. BAUMBERGER:  Let me mark the

23         version with everything in front of

24         Attachment A as the next exhibit then.

MICHAEL A. WILLIAMS

Page 214

1       (Whereupon, Deposition Exhibit

2   No. Williams-132, Insurance

3   certificate, was marked for

4   identification.)

5       MR. HILL:  May I see it?

6       MR. BAUMBERGER:  I need to get a

7   copy of that.

8       MR. HILL:  You want a copy of it

9   now?

10       MR. BAUMBERGER:  Yes.  If you can

11   get it, that would be great.

12       MR. HILL:  This is a 12-page

13   document marked Exhibit Williams-132,

14   which is not Bates numbered, and we'll

15   take a second and get a copy.

16       (Off the record.)

17 BY MR. BAUMBERGER:

18     Q.    Mr. Williams, let me show you

19 another document.  Again, this is Bates stamped

20 LH 01450.  Have you seen that document before?

21     A.    I possibly have.  It's from my

22 company, but I can't recall specifically.

23     Q.    Okay.  Do you recognize that

24 document, generally, what it is?

ESQUIRE DEPOSITION SERVICES

798293c5-1c9a-436a-8706-ffc3971e9314

A-31

# EXHIBIT "H"

THE   AMERICAN   INSTITUTE   OF   ARCHITECTS



*AIA Document A401*

# Standard Form of Agreement
# Between Contractor and Subcontractor

## 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH
AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

This document has been approved and endorsed by
the American Subcontractors Association and the Associated Specialty Contractors, Inc

**AGREEMENT**

made as of the 15th                         day of March                    in the year of
Nineteen Hundred and Ninety Nine

**BETWEEN** the Contractor:   Lighthouse Construction, Inc.
*(Name and Address)*          630 West Division Street, Suite 202
                              Dover, DE 19904

and the Subcontractor:        East Coast Erectors, Inc.
*(Name and Address)*          PO Box 448
                              New Castle, DE 19720

The Contractor has made a contract for construction dated                    with
The Owner: Del-Homes, Inc.
*(Name and Address)* 1575 McKee Road, Suite 202
                     Dover, DE 19903

For the following Project:   Catalog Resources Building Addition
*(Name and Location)*        Enterprise Business Park
                             Commerce Way
                             Dover, DE

EXHIBIT
Williams-132
DEBRA J. WEAVER
11-04-05

which Contract is hereinafter referred to as the Prime Contract and which provides for the furnishing of labor, materials, equipment
and services in connection with the construction of the Project. A copy of the Prime Contract, consisting of the Agreement Between
Owner and Contractor (from which compensation amounts may be deleted) and the other Contract Documents enumerated therein
has been made available to the Subcontractor.
The Architect for the Project is:   BM2OR
*(Name and Address)*                738 S. Governors Avenue, PO Box 1326
                                    Dover, DE 19903

The Contractor and the Subcontractor agree as set forth below.

Copyright 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, ©1987 by the American Institute of Architects, 1735
New York Avenue, N.W., Washington, D.C. 20006. Reproduction of the material herein or substantial quotation of its provisions
without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006          A401-1987   1

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-32

```
┌─────────────────────────────────────────────────────┐
│        TERMS AND CONDITIONS OF AGREEMENT              │
│     BETWEEN CONTRACTOR AND SUBCONTRACTOR              │
└─────────────────────────────────────────────────────┘
```

## ARTICLE 1
### THE SUBCONTRACT DOCUMENTS

**1.1.** The Subcontract Documents consist of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein, including Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Agreement between the Owner and Contractor and Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement, and other Contract Documents, if any, listed in the Owner-Contractor Agreement; (3) other documents listed in Article 16 of this Agreement; and (4) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

**1.2** The Subcontractor shall be furnished copies of the Subcontract Documents upon request, but the Contractor may charge the Subcontractor for the cost of reproduction.

## ARTICLE 2
### MUTUAL RIGHTS AND RESPONSIBILITIES

**2.1** The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that provisions of the Prime Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under the Prime Contract, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under the Prime Contract, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, under the Prime Contract, has against the Contractor, and the Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor which the Contractor, under the Prime Contract, has against the Owner, insofar as applicable to this Subcontract. Where a provision of the Prime Contract is inconsistent with a provision of this Agreement, this Agreement shall govern.

**2.2** The Contractor may require the Subcontractor to enter into agreements with Sub-subcontractors performing portions of the Work of this Subcontract by which the Subcontractor and the Sub-subcontractor are mutually bound, to the extent of the Work to be performed by the Sub-subcontractor, assuming toward each other all obligations and responsibilities which the Contractor and Subcontractor assume toward each other and having the benefit of all rights, remedies and redress each against the other which the Contractor and Subcontractor have by virtue of the provisions of this Agreement.

## ARTICLE 3
### CONTRACTOR

**3.1    SERVICES PROVIDED BY THE CONTRACTOR**

**3.1.1** The Contractor shall cooperate with the Subcontractor in scheduling and performing the Contractor's Work to avoid conflicts or interference in the Subcontractor's Work and shall expedite written responses to submittals made by the Subcontractor in accordance with Paragraph 4.1 and Article 5. As soon as practicable after execution of this Agreement, the Contractor shall provide the Subcontractor copies of the Contractor's construction schedule and schedule of submittals, together with such additional scheduling details as will enable the Subcontractor to plan and perform the Subcontractor's Work properly. The Subcontractor shall be notified promptly of subsequent changes in the construction and submittal schedules and additional scheduling details.

**3.1.2** The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work. Additional costs to the Subcontractor resulting from relocation of such facilities at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.

**3.1.3** Except as provided in Article 14, the Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms.

**3.2    COMMUNICATIONS**

**3.2.1** The Contractor shall promptly make available to the Subcontractor information which affects this Subcontract and which becomes available to the Contractor subsequent to execution of this Subcontract.

**3.2.2** The Contractor shall not give instructions or orders directly to employees or workmen of the Subcontractor, except to persons designated as authorized representatives of the Subcontractor.

**3.2.3** The Contractor shall permit the Subcontractor to request directly from the Architect information regarding the percentages of completion and the amount certified on account of Work done by the Subcontractor.

**3.2.4** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Contractor, a subcontractor or anyone directly or indirectly employed by them (other than the Subcontractor), the Contractor shall, prior to harmful exposure of the Subcontractor's employees to such substance, give written notice of the chemical composition thereof to the Subcontractor in sufficient detail and time to permit the Subcontractor's compliance with such laws.

**3.3    CLAIMS BY THE CONTRACTOR**

**3.3.1** Liquidated damages for delay, if provided for in Paragraph 9.3 of this Agreement, shall be assessed against the Subcontractor only to the extent caused by the Subcontractor, the Subcontractor's employees and agents, Sub-subcontractors, suppliers or any person or entity for whose acts the Subcon-

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A401-1987    2

tractor may be liable; and in no case for delays or causes arising outside the scope of this Subcontract

**3.3.2** Except as may be indicated in this Agreement, the Contractor agrees that no claim for payment for services rendered or materials and equipment furnished by the Contractor to the Subcontractor shall be valid without prior notice to the Subcontractor and unless written notice thereof is given by the Contractor to the Subcontractor not later than the tenth day of the calendar month following that in which the claim originated.

## 3.4   CONTRACTOR'S REMEDIES

**3.4.1** If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within three working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after three days following receipt by the Subcontractor of an additional written notice, and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the cost thereof from the payments then or thereafter due the Subcontractor, provided, however, that if such action is based upon faulty workmanship or materials and equipment, the Architect shall first have determined that the workmanship or materials and equipment are not in accordance with requirements of the Prime Contract

## ARTICLE 4
## SUBCONTRACTOR

### 4.1   EXECUTION AND PROGRESS OF THE WORK

**4.1.1** The Subcontractor shall cooperate with the Contractor in scheduling and performing the Subcontractor's Work to avoid conflict, delay in or interference with the Work of the Contractor, other subcontractors or Owner's own forces.

**4.1.2** The Subcontractor shall promptly submit Shop Drawings, Product Data, Samples and similar submittals required by the Subcontract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other subcontractors.

**4.1.3** The Subcontractor shall submit to the Contractor a schedule of values allocated to the various parts of the Work of this Subcontract, aggregating the Subcontract Sum, made out in such detail as the Contractor and Subcontractor may agree upon or as required by the Owner, and supported by such evidence as the Contractor may direct. In applying for payment, the Subcontractor shall submit statements based upon this schedule

**4.1.4** The Subcontractor shall furnish to the Contractor periodic progress reports on the Work of this Subcontract as mutually agreed, including information on the status of materials and equipment which may be in the course of preparation or manufacture.

**4.1.5** The Subcontractor agrees that the Architect will have the authority to reject Work which does not conform to the Prime Contract. The Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Prime Contract

**4.1.6** The Subcontractor shall pay for materials, equipment and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory

evidence, when requested by the Contractor, to verify compliance with the above requirements

**4.1.7** The Subcontractor shall take necessary precautions to protect properly the Work of other subcontractors from damage caused by operations under this Subcontract.

**4.1.8** The Subcontractor shall cooperate with the Contractor, other subcontractors and the Owner's own forces whose Work might interfere with the Subcontractor's Work. The Subcontractor shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, specifically noting and advising the Contractor of potential conflicts between the Work of the Subcontractor and that of the Contractor, other subcontractors or the Owner's own forces.

### 4.2   LAWS, PERMITS, FEES AND NOTICES

**4.2.1** The Subcontractor shall give notices and comply with laws, ordinances, rules, regulations and orders of public authorities bearing on performance of the Work of this Subcontract. The Subcontractor shall secure and pay for permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Prime Contract.

**4.2.2** The Subcontractor shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts and workers' or workmen's compensation acts insofar as applicable to the performance of this Subcontract.

### 4.3   SAFETY PRECAUTIONS AND PROCEDURES

**4.3.1** The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property in accordance with the requirements of the Prime Contract. The Subcontractor shall report to the Contractor within three days any injury to an employee or agent of the Subcontractor which occurred at the site.

**4.3.2** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Subcontractor, the Subcontractor's Subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

**4.3.3** In the event the Subcontractor encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) which has not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and report the condition to the Contractor in writing. The Work in the affected area shall resume in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless, by written agreement of the Contractor and Subcontractor, or in accordance with final determination by the Architect on which arbitration has not been demanded, or by arbitration as provided in this Agreement. The Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB)

3   A401-1987     AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

.4.3.4  To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's Sub-subcontractors, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos or polychlorinated biphenyl (PCB) and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Contractor, Architect, Owner, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Subparagraph 4.3.4.

## 4.4  CLEANING UP

4.4.1  The Subcontractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The Subcontractor shall not be held responsible for unclean conditions caused by other contractors or subcontractors.

## 4.5  WARRANTY

4.5.1  The Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work of this Subcontract will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents.

## 4.6  INDEMNIFICATION

4.6.1  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 4.6

4.6.2  In claims against any person or entity identified under this Paragraph 4.6 by an employee of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Paragraph 4.6 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Subcontractor or the Subcontractor's Sub-subcontractors under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

4.6.3  The obligations of the Subcontractor under this Paragraph 4.6 shall not extend to the liability of the Architect, the Architect's consultants, and agents and employees of any of them arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, the Architect's consultants, and agents and employees of any of them, provided such giving or failure to give is the primary cause of the injury or damage.

## 4.7  REMEDIES FOR NONPAYMENT

4.7.1  If the Contractor does not pay the Subcontractor through no fault of the Subcontractor, within seven days from the time payment should be made as provided in this Agreement, the Subcontractor may, without prejudice to other available remedies, upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate adjustment, be increased by the amount of the Subcontractor's reasonable costs of shutdown, delay and start-up.

## ARTICLE 5
## CHANGES IN THE WORK

5.1  The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Upon receipt of such a Modification issued subsequent to the execution of the Subcontract Agreement, the Contractor shall promptly notify the Subcontractor of the Modification. Unless otherwise directed by the Contractor, the Subcontractor shall not thereafter order materials or perform Work which would be inconsistent with the changes made by the Modifications to the Prime Contract.

5.2  The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents

5.3  The Subcontractor shall make claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Subcontract

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

A401-1987    4

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A–35

Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the Subcontractor to make such a timely claim shall bind the Subcontractor to the same consequences as those to which the Contractor is bound.

## ARTICLE 6
## ARBITRATION

**6.1** Any controversy or claim between the Contractor and the Subcontractor arising out of or related to this Subcontract, or the breach thereof, shall be settled by arbitration, which shall be conducted in the same manner and under the same procedure as provided in the Prime Contract with respect to claims between the Owner and the Contractor, except that a decision by the Architect shall not be a condition precedent to arbitration. If the Prime Contract does not provide for arbitration or fails to specify the manner and procedure for arbitration, it shall be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

**6.2** Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to the Subcontract shall include, by consolidation or joinder or in any other manner, any person or entity not a party to the Agreement under which such arbitration arises, unless it is shown at the time the demand for arbitration is filed that (1) such person or entity is substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, (3) the interest or responsibility of such person or entity in the matter is not insubstantial, and (4) such person or entity is not the Architect, the Architect's employee, the Architect's consultant, or an employee or agent of any of them. This agreement to arbitrate and any other written agreement to arbitrate with an additional person or persons referred to herein shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**6.3** The Contractor shall give the Subcontractor prompt written notice of any demand received or made by the Contractor for arbitration if the dispute involves or relates to the Work, materials, equipment, rights or responsibilities of the Subcontractor. The Contractor shall consent to inclusion of the Subcontractor in the arbitration proceeding whether by joinder, consolidation or otherwise, if the Subcontractor requests in writing to be included within ten days after receipt of the Contractor's notice.

**6.4** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**6.5** This Article 6 shall not be deemed a limitation of rights or remedies which the Subcontractor may have under Federal

law, under state mechanics' lien laws, or under applicable labor or material payment bonds unless such rights or remedies are expressly waived by the Subcontractor.

## ARTICLE 7
## TERMINATION, SUSPENSION OR ASSIGNMENT
## OF THE SUBCONTRACT

**7.1    TERMINATION BY THE SUBCONTRACTOR**

**7.1.1** The Subcontractor may terminate the Subcontract for the same reasons and under the same circumstances and procedures with respect to the Contractor as the Contractor may terminate with respect to the Owner under the Prime Contract, or for nonpayment of amounts due under this Subcontract for 60 days or longer. In the event of such termination by the Subcontractor for any reason which is not the fault of the Subcontractor, Sub-subcontractors or their agents or employees or other persons performing portions of the Work under contract with the Subcontractor, the Subcontractor shall be entitled to recover from the Contractor payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**7.2    TERMINATION BY THE CONTRACTOR**

**7.2.1** If the Subcontractor persistently or repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Agreement and fails within seven days after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after seven days following receipt by the Subcontractor of an additional written notice and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work, such excess shall be paid to the Subcontractor, but if such expense exceeds such unpaid balance, the Subcontractor shall pay the difference to the Contractor.

**7.3    ASSIGNMENT OF THE SUBCONTRACT**

**7.3.1** In the event of termination of the Prime Contract by the Owner, the Contractor may assign this Subcontract to the Owner, with the Owner's agreement, subject to the provisions of the Prime Contract and to the prior rights of the surety, if any, obligated under bonds relating to the Prime Contract. If the Work of the Prime Contract has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted.

**7.3.2** The Subcontractor shall not assign the Work of this Subcontract without the written consent of the Contractor, nor subcontract the whole of this Subcontract without the written consent of the Contractor, nor further subcontract portions of this Subcontract without written notification to the Contractor when such notification is requested by the Contractor.

---

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**5    A401-1987**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-36

## ARTICLE 8
### THE WORK OF THIS SUBCONTRACT

8.1    The Subcontractor shall execute the following portion of the Work described in the Subcontract Documents, including all labor, materials, equipment, services and other items required to complete such portion of the Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others:
*(Insert a precise description of the Work of this Subcontract, referring where appropriate to numbers of Drawings, sections of Specifications and pages of Addenda, Modifications and accepted Alternates.)*

The scope of this contract shall include but not be limited to East Coast Erectors, Inc. Proposal date February 23, 1999, Drawing A2.1 proposed floor plan dated February 2, 1999 drawn by Becker, Morgan, Moore, Olds and Richter, Inc. and attachment "A" structural steel, joist and siding contract discription.

## ARTICLE 9
### DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

9.1    The Subcontractor's date of commencement is the date from which the Contract Time of Paragraph 9.3 is measured; it shall be the date of this Agreement, as first written above, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Contractor.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

As mutually agreed upon

9.2    Unless the date of commencement is established by a notice to proceed issued by the Contractor, or the Contractor has commenced visible Work at the site under the Prime Contract, the Subcontractor shall notify the Contractor in writing not less than five days before commencing the Subcontractor's Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

9.3    The Work of this Subcontract shall be substantially completed not later than
*(Insert the calendar date or number of calendar days after the Subcontractor's date of commencement. Also insert any requirements for earlier Substantial Completion of certain portions of the Subcontractor's Work, if not stated elsewhere in the Subcontract Documents.)*

As mutually agreed upon

, subject to adjustments of this Subcontract Time as provided in the Subcontract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time.)*

9.4    Time is of the essence of this Subcontract.

9.5    No extension of time will be valid without the Contractor's written consent after claim made by the Subcontractor in accordance with Paragraph 5.2.

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006                    A401-1987    6

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-37

## ARTICLE 10
### SUBCONTRACT SUM

**10.1**  The Contractor shall pay the Subcontractor in current funds for performance of the Subcontract the Subcontract Sum of **One Million Thirty Nine Thousand** Dollars ($ 1,039,000.00 ), subject to additions and deductions as provided in the Subcontract Documents.

**10.2**  The Subcontract Sum is based upon the following alternates, if any, which are described in the Subcontract Documents and have been accepted by the Owner and the Contractor:
*(Insert the numbers or other identification of accepted alternates.)*

Alt. No. 1 – Two (2) additional dock leveler frame – $800.00
Alt. No. 2 – White primer on underside of deck – $23,000.00
Alt. No. 3 – Metal studs at parapet walls – $49,000.00
Alt. No. 4 – Reinforce existing 200 LF of roof – $4,160.00
                and add 4 roof drain frames

**10.3**  Unit prices, if any, are as follows:

## ARTICLE 11
### PROGRESS PAYMENTS

**11.1**  Based upon applications for payment submitted to the Contractor by the Subcontractor, corresponding to Applications for Payment submitted by the Contractor to the Architect, and Certificates for Payment issued by the Architect, the Contractor shall make progress payments on account of the Subcontract Sum to the Subcontractor as provided below and elsewhere in the Subcontract Documents.

**11.2**  The period covered by each application for payment shall be one calendar month ending on the last day of the month, or as follows:

Bill is to be submitted by the 25th of month.  Payment will be made within 45 days from the 30th of the month billed for.  There is a 5% retainage on the entire contract amount.  Please note attached billing cycle.

**11.3**  Provided an application for payment is received by the Contractor not later than the day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next Application for Payment which the Contractor is entitled to submit to the Architect. The Contractor shall pay the Subcontractor each progress payment

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS. 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006     A401-1987   7

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-38

within three working days after the Contractor receives payment from the Owner. If the Architect does not issue a Certificate for Payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in Paragraphs 11.7 and 11.8.

**11.4**    If an application for payment is received by the Contractor after the application date fixed above, the Subcontractor's Work covered by it shall be included by the Contractor in the next Application for Payment submitted to the Architect.

**11.5**    Each application for payment shall be based upon the most recent schedule of values submitted by the Subcontractor in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the Subcontractor's Work and be prepared in such form and supported by such data to substantiate its accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the Subcontractor's applications for payment.

**11.6**    Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment.

**11.7**    Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as follows:

**11.7.1**    Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Subcontractor's Work by the share of the total Subcontract Sum allocated to that portion of the Subcontractor's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the Subcontractor. Pending final determination of cost to the Contractor of changes in the Work which have been properly authorized by Construction Change Directive, amounts not in dispute may be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

**11.7.2**    Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's Application for Payment;

**11.7.3**    Subtract the aggregate of previous payments made by the Contractor; and

**11.7.4**    Subtract amounts, if any, calculated under Subparagraph 11.7.1 or 11.7.2 which are related to Work of the Subcontractor for which the Architect has withheld or nullified, in whole or in part, a Certificate of Payment for a cause which is the fault of the Subcontractor

**11.8    SUBSTANTIAL COMPLETION**

**11.8.1**    When the Subcontractor's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the Subcontractor, make prompt application for payment for such Work. Within 30 days following issuance by the Architect of the Certificate for Payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the Subcontractor, deducting any portion of the funds for the Subcontractor's Work withheld in accordance with the Certificate to cover costs of items to be completed or corrected by the Subcontractor. Such payment to the Subcontractor shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the Subcontractor's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the Subcontractor, will reduce the retainage on the Subcontractor's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the Certificate

### ARTICLE 12
### FINAL PAYMENT

**12.1**    Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Contract Documents, the Architect has issued a Certificate for Payment covering the Subcontractor's completed Work and the Contractor has received payment from the Owner. If, for any cause which is not the fault of the Subcontractor, a Certificate for Payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within three working days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand
*(Insert provisions for earlier final payment to the Subcontractor, if applicable)*

Final bill be submitted.

**12.2**    Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work have been satisfied

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**A401-1987    8**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## ARTICLE 13
### INSURANCE AND BONDS

13.1   The Subcontractor shall purchase and maintain insurance of the following types of coverage and limits of liability:

See attachment "B"

13.2   Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Subcontractor's Work until date of final payment and termination of any coverage required to be maintained after final payment.

13.3   Certificates of Insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Subcontractor with reasonable promptness according to the Subcontractor's information and belief.

13.4   The Contractor shall furnish to the Subcontractor satisfactory evidence of insurance required of the Contractor under the Prime Contract.

13.5   Waivers of Subrogation. The Contractor and Subcontractor waive all rights against (1) each other and any of their Subcontractors, Sub-subcontractors, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other perils to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as fiduciary. The Subcontractor shall require of the Subcontractor's Sub-subcontractors, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

13.6   The Contractor shall promptly, upon request of the Subcontractor, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

13.7   Performance Bond and Payment Bond:
*(If the Subcontractor is to furnish bonds, insert the specific requirements here.)*

## ARTICLE 14
### TEMPORARY FACILITIES AND WORKING CONDITIONS

14.1   The Contractor shall furnish and make available to the Subcontractor the following temporary facilities, equipment and services; these shall be furnished at no cost to the Subcontractor unless otherwise indicated below:

Lighthouse Construction Inc., will supply temporary electric and toilet facilities.

14.2   Specific working conditions:
*(Insert any applicable arrangements concerning working conditions and labor matters for the Project.)*

If time is lost due to weather, Saturdays are to be worked to maintain schedule.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-40

## ARTICLE 15
### MISCELLANEOUS PROVISIONS

**15.1**   Where reference is made in this Agreement to a provision of the General Conditions or another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents

**15.2**   Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's, Contractor's and Subcontractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

## ARTICLE 16
### ENUMERATION OF SUBCONTRACT DOCUMENTS

**16.1**   The Subcontract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**16.1.1**   This executed Standard Form of Agreement Between Contractor and Subcontractor, AIA Document A401, 1987 Edition;

**16.1.2**   The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement; Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda and other documents enumerated therein;

**16.1.3**   The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:

Modification                                                                                                      Date

**16.1.4**   Other Documents, if any, forming part of the Subcontract Documents are as follows:
*(List any additional documents which are intended to form part of the Subcontract Documents. Requests for proposal and the Subcontractor's bid or proposal should be listed here only if intended to be part of the Subcontract Documents.)*

This Agreement entered into as of the day and year first written above

CONTRACTOR                                                  SUBCONTRACTOR

_____                  _____
*(Signature)*                                                          *(Signature)*

_____                  _____
*(Printed name and title)*                                        *(Printed name and title)*

**AIA**   **CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

AIA DOCUMENT A401 • CONTRACTOR-SUBCONTRACTOR AGREEMENT • TWELFTH EDITION • AIA ® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006     **A401-1987   10**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A-41

APPENDIX B

CONTRACTORS INSURANCE REQUIRMENTS

1. Compensation and Employer's Liability Insurance

The Contractor shall take out and maintain during the life of the contract the statutory Workmen's Compensation and Employer's Liability Insurance for all his employees to be engaged in work on the project under the contract and, in case any such work is sublet, the Contractor should require the subcontractor similarly to provide Workmen's Compensation and Employer's Liability insurance for all the latter's employees to be engaged in such work.

2. Bodily Injury Liability and Property Damage Liability Insurance

The Contractor shall take out and maintain during the life of the contract Bodily Injury Liability and Property Damage Liability Insurance to protect him an any Subcontractor performing work to be covered by the contract from claims for the damages for personal injury, including accidental death, as well as from claims for property damage, which may arise from the operations under the contract, whether such operations be by himself or by a Subcontractor, or by anyone directly or indirectly employed by either of them, and the amount of such insurance should not be less than:

Bodily Injury Liability Insurance, in the amount not less than Three Hundred Thousand Dollars ($300,000) for injuries, including wrongful death to any one person, and subject to the same limit for each person in an amount not less than Five Hundred Thousand Dollars ($500,000) on account of one accident.

Property Damage Insurance, in the amount not less than Fifty Thousand Dollars ($50,000) for damages on account of any one accident, and in the amount not less than One Hundred Thousand Dollars ($100,000) for damages on account of all accidents.

3. Special Hazards Insurance

In the event of the possibility of special hazards existing in the work contemplated, such hazards shall be covered by a rider to the policy or policies required under the subparagraph 2 in amounts not less than those stipulated under subparagraph 2. If any special hazard the contractor shall, prior to performing any work involving the special hazard, immediately proceed with the procuring of this insurance.

A-42

Page two
Appendix B

### 4. Automobile Bodily Injury Liability Insurance

Automobile Bodily Injury Liability Insurance in an amount not less than One Hundred Thousand Dollars ($100,000) for the injuries, including the death, to any one person and subject to the same limits for each person, in an amount not less than Three Hundred Thousand Dollars ($300,000) on account of any one accident.

### 5. Proof of Carriage of Insurance

The Contractor shall furnish the Owner with certificates showing the type, amount, class of operations, effective dates, and date of expiration of policies. Such certificates shall contain substantially the following statement. "The insurance covered by this certification shall not be canceled or materially altered, except after thirty (30) days written notice has been received by the Owner"

A-43

# EXHIBIT "I"



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
------------------------x
FEDERAL INSURANCE        : CIVIL ACTION
COMPANY a/s/o            :
EZIBA.COM./AVACET,       : NO. 04-339
INC., EZIBA SECURITIES   :
CORP.,                   :
        Plaintiff(s),    :
          v.             :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s).    :
------------------------x
MILLERS CAPITAL          : CIVIL ACTION
INSURANCE COMPANY        :
a/s/o DEL-HOMES          : NO. 04-1322-JJF
CATALOG GROUP, LLC,      :
        Plaintiff(s),    :
          v.             :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
BECKER MORGAN GROUP,     :
INC., and O'DONNELL,     :
NACCARATO & MACINTOSH,   :
INC.,                    :
        Defendant(s)     :
and                      :
LIGHTHOUSE               :
CONSTRUCTION, INC.,      :
        Defendant and    :
        Third-Party      :
        Plaintiff,       :
          v.             :
EAST COAST ERECTORS,     :
INC.,                    :
        Third-Party      :
        Defendant.       :
------------------------x
```

Esquire Deposition Services

c5a2c36b-3372-45de-8c41-c7582a668b08

Δ-ΛΛ

Page 2

```
1              Oral deposition of MICHAEL M.
2   McKONE, held at the law offices of CHRISSINGER
3   & BAUMBERGER, 3 Mill Road, Suite 301,
4   Wilmington, DE 19806, on Wednesday, July 27,
5   2005, beginning at 1:50 p.m., on the above
6   date, before Debra J. Weaver, a Federally
7   Approved RPR, CRR, CSR of NJ (No. XI 01614) and
8   Delaware (No. 138-RPR, Expiration 1/31/08), and
9   a Notary Public of New Jersey, Pennsylvania and
10  Delaware.
11
12
13
14
15
16
17
18
19
20
21
22           ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
23                  15th Floor
           Philadelphia, Pennsylvania 19103
24               (215) 988-9191
```

MICHAEL M. McKONE

Page 12

1          A.        Yes.

2          Q.        Working out of a job trailer or

3     something?

4          A.        Yes.

5          Q.        At the conclusion of your employment

6     with Lighthouse, what was your position?

7          A.        Project manager.

8          Q.        How, if at all, did your duties as

9     project manager differ from your duties as job

10    superintendent?

11         A.        I ran several projects from the

12    office and did more paperwork, and I wasn't on site

13    much at all.

14         Q.        When was it that you became project

15    manager while at Lighthouse?

16         A.        After a year I was with Lighthouse.

17    A year, year and a half.

18         Q.        In 1999 there was a project involving

19    an addition to the Catalog Resources or Client Logic

20    space, if you will, at the Business Enterprise Park.

21    Are you familiar with that job?

22         A.        Yes.

23         Q.        What was your position with

24    Lighthouse at the time that job started?

25         A.        Project manager.

Esquire Deposition Services

c5a2c36b-3372-45de-8c41-c7582a668b08

A-46

MICHAEL M. McKONE

Page 13

1          Q.        And who was the job superintendent

2     for the Catalog Resources expansion in 1999?

3          A.        Chris Rankin.

4          Q.        In 1999, to whom did you report at

5     Lighthouse?

6          A.        Bob MacLeish.

7          Q.        And what was Mr. MacLeish's position?

8          A.        President.

9          Q.        Can you tell me how it was that you

10    first became involved in the Catalog Resources

11    expansion project?

12         A.        Bob just showed me, I guess,

13    preliminary sketches of the job, and that was the

14    first time I saw it.

15         Q.        And upon showing you those sketches,

16    was he -- did he inform you or was that in the

17    context of his asking you to become involved as a

18    project manager for that work?

19         A.        I just assumed that I would be

20    because it was -- Bob and I were the only ones in

21    the office at the time.

22         Q.        Do you mean --

23         A.        In the position to --

24         Q.        Were there any other project managers

25    employed by Lighthouse at that point?

Esquire Deposition Services

c5a2c36b-3372-45de-8c41-c7582a668b08

A-47

MICHAEL M. McKONE

Page 72

1      Q.      Do you recall any discussion at all

2  about East Coast executing a formal subcontract with

3  Lighthouse Construction?

4      A.      No.

5      Q.      As you sit here today, is it your

6  belief that East Coast did execute a formal contract

7  with Lighthouse?

8                 MR. HILL:  Object to the form of the

9  question.

10                THE WITNESS:  Yes.

11  BY MR. VEITH:

12     Q.      Take a look at Williams-132 and tell

13  me if you recognize that.

14     A.      Yes, I recognize it.

15     Q.      And what is that document?

16     A.      This is a contract from Lighthouse

17  Construction to East Coast Erectors for the Catalog

18  Resource building.

19     Q.      And is that the Form AIA 401 contract

20  that was referred to in your February 26th, 1999,

21  letter to Mr. Williams --

22     A.      Yes.

23     Q.      -- which has been previously marked

24  as Williams-121?

25     A.      Yes.

Esquire Deposition Services

MICHAEL M. McKONE

Page 100

1       A.      No, I do not.

2       Q.      So as far as you know, you testified

3   from documents that you recognized today, the only

4   documents relating to the contract between East

5   Coast Erectors and Lighthouse Construction, Inc.,

6   were the proposal letter that Mr. Williams wrote and

7   the acceptance letter that you wrote?

8               MR. BAUMBERGER:  Objection to form.

9               MR. VEITH:  Objection to form.

10              MR. HILL:  What's wrong with the

11  form?

12              MR. VEITH:  I think you've excluded

13  some things, but I don't know that --

14              MR. HILL:  Strike that.  I'll

15  rephrase the question.

16  BY MR. HILL:

17      Q.      As far as signed documents evidencing

18  the contract between East Coast Erectors and

19  Lighthouse Construction, Inc., the only documents

20  that are signed that you know of are the proposal

21  letter from Mr. Williams, including whatever he

22  referenced in it, including the scope of work if

23  it's referenced in there, and the letter that you

24  wrote back to him on February 26th; is that correct?

25      A.      Yeah.  Yes.

Esquire Deposition Services